PARTIDO POPULAR DEMOCRÁTICO, peticionario, *v.* HON. LUIS A. FERRÉ, GOBERNADOR DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado.

*Número:* O-69-98      *Resuelto:* 2 de febrero de 1970

*Rafael Hernández Colón, José Trías Monge, Rubén Rodríguez Antongiorgi, Juan Cancel Ríos, Francisco Aponte Pérez,* abogados del peticionario; *Santiago C. Soler Favale, Secretario de Justicia, J. F. Rodríguez Rivera, Procurador General Interino, Gilberto Gierbolini Ortiz, Secretario Auxiliar de Justicia, Nellie Ortiz Torres, Jefe, División de Litigios Generales, y Arturo Aponte Parés, abogado División de Litigios Generales, Departamento de Justicia,* abogados del demandado.

### SENTENCIA

Por los fundamentos expuestos en las opiniones emitidas en esta fecha por el Juez Presidente Señor Negrón Fernández, el Juez Asociado Señor Santana Becerra y el Juez Asociado Señor Blanco Lugo, en la que concurren los Jueces Asociados Señores Pérez Pimentel y Dávila, a la solicitud de *mandamus*, no ha lugar. El Juez Asociado Señor Rigau emitió una opinión disidente en la que concurren los Jueces Asociados Señores Ramírez Bages y Torres Rigual, según aparece de sus votos separados.

Los Jueces Asociados Señores Pérez Pimentel, Dávila, Ramírez Bages y Torres Rigual emitieron votos separados.

El Juez Asociado Señor Hernández Matos se inhibió.

Así lo pronunció y manda el Tribunal y certifica el Secretario.

(Fdo.)  Joaquín Berríos

*Secretario*

—O—

Opinión del Juez Presidente Señor Negrón Fernández

San Juan, Puerto Rico, a 2 de febrero de 1970

Las peculiares circunstancias que han estado presentes en la vida y condición política puertorriqueña durante casi tres cuartos de siglo, hacen de este caso uno perteneciente, tanto a la esfera del Derecho Constitucional en su sentido de gobierno interno, como uno perteneciente a la esfera del Derecho Político en su más amplia significación, en tanto tiene tangencia con la redefinición o modificación de las relaciones políticas básicas entre Estados Unidos y Puerto Rico, que son las que generan, por convención, la organización constitucional de nuestro gobierno y que, por su origen y naturaleza misma, regulan y limitan el ejercicio de las facultades totales de nuestro estado político actual.

Al emitir mi voto en contra de la expedición del auto solicitado lo hago por razones fundamentales que, en sus proyecciones, van más allá de la apariencia y contenido litigioso del presente recurso.

## I

En su solicitud de *mandamus* el demandante, Partido Popular Democrático, reclama el ejercicio del poder coactivo de este Tribunal para que el demandado, en su carácter de Gobernador del Estado Libre Asociado de Puerto Rico, "pro-

ceda al cumplimiento de los deberes que le impone la Ley de Plebiscito de 1967", (¹) los cuales, según el demandante, no había cumplido el demandado a pesar de haber sido requerido para ello. (²) Dichos deberes, en síntesis, los formula el demandante en la siguiente forma:

1) La Ley de Plebiscito le impone al Gobernador de Puerto Rico "el claro deber de cumplir fielmente la voluntad del pueblo expresada en la votación plebiscitaria" que tuvo lugar el 23 de julio de 1967, y en la cual resultó triunfante la fórmula Estado Libre Asociado, con un 60.41 por ciento del total de votos válidos emitidos, contra un 38.98 por ciento la Estadidad y un 0.60 por ciento la Independencia; resultado éste que el exgobernador de Puerto Rico, Hon. Roberto Sánchez Vilella, le certificó al expresidente de los Estados Unidos, Hon. Lyndon B. Johnson, "solicitando, además, la constitución conjunta de los grupos asesores recomendados en el informe de la Comisión de Status, y descritos en la Exposición de Motivos de la referida ley."

2) En descargo de su deber de cumplir fielmente el mandato plebiscitario, el Gobernador "tiene la obligación legal de completar los pasos requeridos por el Artículo 45 de la Ley de Plebiscito para la constitución conjunta de los grupos asesores recomendados por la Comisión de Status."

3) En descargo de su deber de cumplir fielmente el mandato plebiscitario el Gobernador "tiene además la obligación legal de seleccionar los miembros puertorriqueños de los grupos asesores de entre las personas propuestas por el Partido Popular Democrático," fundado este deber en la intención manifiesta de la Ley de Plebiscito de "que la responsabilidad básica de iniciar las recomendaciones para el desarrollo del

(¹) Ley Núm. 1 de 23 de diciembre de 1966, según enmendada, 16 L.P.R.A. Suplemento Acum., 1968, secs. 844 *et seq.*

(²) Comunicaciones del Partido Popular Democrático al Gobernador, de fechas 24 de enero y 24 de febrero de 1969 que se acompañaron como parte de la Solicitud.

status que resultase triunfante correspondiese a sus representantes y defensores en el proceso plebiscitario."

4) La Ley de Plebiscito le impone al Gobernador "el deber de proponerle al Presidente de los Estados Unidos la constitución conjunta de grupos asesores 'respecto de medidas de desarrollo del Estado Libre Asociado, según hayan de considerarse a base de la autorización otorgada por el pueblo en el plebiscito,' " siendo dicha autorización, "según constó en la propia papeleta de votación utilizada . . . para 'desarrollar el Estado Libre Asociado de acuerdo con sus principios fundamentales hasta el máximum de gobierno propio compatible con la común defensa, el común mercado, la común moneda y el indisoluble vínculo de la ciudadanía de los Estados Unidos.' "

El demandado contestó la Solicitud y aparte de admitir y negar alegaciones, que dejaron trabada la contienda conforme a su posición, haciendo otras alegaciones en contrario —entre ellas la de que "no se ha negado ni se niega a cumplir con las obligaciones que pueda imponerle la ley", acompañando copia de la contestación que, en carta de 15 de mayo de 1969 dirigida al Delegado Presidencial del Partido Popular Democrático, diera a los requerimientos de éste de fecha 24 de enero y 24 de febrero anteriores interpuso solicitud de desestimación fundada en varias defensas afirmativas relativas a la improcedencia del recurso.

En su referida carta de 15 de mayo, el Gobernador comunicó al Delegado Presidencial del Partido Popular Democrático: "Pueden ustedes tener la seguridad de que yo daré cumplimiento cabal a las disposiciones de la Ley de Plebiscito y que me guiaré en su cumplimiento por las expresiones mayoritarias del Pueblo de Puerto Rico.", a la vez que fijaba su posición respecto al ejercicio de sus responsabilidades bajo la Constitución y la Ley de Plebiscito, las cuales, afirmó, "no pueden ni deben ser compartidas con otras personas o entidades por el Ejecutivo, en ausencia de un precepto

claro de ley. Son inherentes a su cargo, por lo que debe rechazarse en su ejecución cualquier intento de intervención extraña."

## II

Procede hacer referencia a las disposiciones de la Ley de Plebiscito de 1967 pertinentes a la cuestión suscitada, así como a una de las conclusiones, y a las varias recomendaciones contenidas en el Informe de la Comisión de Status que atañen de cerca a este recurso, así como a otras disposiciones legislativas anteriores también allí mencionadas.

En la Exposición de Motivos de la Ley de Plebiscito de 1967 se hace un breve historial de las gestiones que culminaron finalmente en su aprobación, comenzando con la Resolución Conjunta aprobada el 3 de diciembre de 1962 por la Asamblea Legislativa de Puerto Rico; la Ley Pública 88–271 de 20 de febrero de 1964 para establecer la Comisión de los Estados Unidos y Puerto Rico sobre el Status de Puerto Rico, 48 U.S.C. Sec. 731, nota, 1 L.P.R.A., pág. 144; la aceptación por la Asamblea Legislativa de Puerto Rico de la invitación del Congreso para participar en los trabajos de dicha Comisión—Ley Núm. 9 de 13 de abril de 1964—y a algunas conclusiones y recomendaciones contenidas en el informe de la referida Comisión de fecha 5 de agosto de 1966.

En la propia Exposición de Motivos se hizo referencia a la siguiente conclusión de la Comisión:

"Sería muy útil para todos los interesados si ocurriese una expresión de la voluntad de los ciudadanos de Puerto Rico mediante una votación popular sobre la cuestión de si desean que continúe el status de Estado Libre Asociado con capacidad de crecimiento y desarrollo, o si desean optar por la Estadidad o la Independencia. La Comisión reconoce, sin embargo, que corresponde al Pueblo de Puerto Rico decidir si desea expresar su preferencia y cuándo y cómo interesa hacerlo."

También se hizo referencia en la Exposición de Motivos de la Ley de Plebiscito a la cuarta de las siguientes cuatro

recomendaciones contenidas en el informe de la propia Comisión:

"Las conclusiones arriba mencionadas a los hechos en que éstas se apoyan demuestran la necesidad de un método en el futuro inmediato que haga factible la consideración de las propuestas de mejoramiento o desarrollo del Estado Libre Asociado, o el cambio hacia la Estadidad o la Independencia.

La Comisión recomienda, por tanto, que se establezcan procedimientos mediante los cuales se puedan constituir, con carácter *ad hoc*, grupos conjuntos asesores a iniciativa del Presidente de los Estados Unidos y del Gobernador de Puerto Rico, actuando éstos conjuntamente.

Los grupos conjuntos asesores se formarían con personas de la más reconocida habilidad y el más alto prestigio y tomarían bajo consideración los problemas que afectan las relaciones entre la Isla y los Estados Unidos continentales y que les sean referidos por el Presidente de los Estados Unidos y el Gobernador de Puerto Rico. Cada grupo asesor informaría acerca de sus conclusiones y recomendaciones al Presidente y al Congreso de los Estados Unidos, y al Gobernador y a la Asamblea Legislativa de Puerto Rico. La integración de los grupos la determinaría la naturaleza de los problemas bajo su consideración.

Si el pueblo de Puerto Rico indicase en un plebiscito su preferencia por la Estadidad o la Independencia, uno o más grupos conjuntos asesores se constituirían a fin de estudiar las medidas indicadas de transición. Si el pueblo de Puerto Rico mantuviese su preferencia por un mayor crecimiento del Estado Libre Asociado, de conformidad con los lineamientos contenidos en la Resolución Número 1, con fecha de 3 de diciembre de 1962, de la Asamblea Legislativa del Estado Libre Asociado, o por virtud de otras medidas que lleven a un crecimiento del Estado Libre Asociado, se convocaría a uno o más grupos conjuntos asesores para examinar estas propuestas."

Los lineamientos contenidos en la Resolución Núm. 1 de 3 de diciembre de 1962 de la Asamblea Legislativa de Puerto Rico a que se hace mención en las anteriores Recomendaciones de la Comisión y en la Exposición de Motivos de la Ley de Plebiscito se expresaron así en dicha Resolución:

"POR CUANTO, los que favorecen el desarrollo máximo del Estado Libre Asociado en unión permanente con los Estados Unidos de América lo conciben dentro de los siguientes principios:

1. El reconocimiento y reafirmación de la soberanía del pueblo de Puerto Rico, para que no pueda quedar duda sobre su capacidad para pactar en términos de igualdad jurídica.

2. El aseguramiento de la permanencia e irrevocabilidad de la unión entre Estados Unidos y Puerto Rico sobre las bases de la común ciudadanía, la común defensa, la común moneda, el mercado libre, la común lealtad a los valores de la democracia, y aquellas otras condiciones que se consideren, en el pacto, de mutuo beneficio para Estados Unidos y Puerto Rico.

3. La definición específica de los poderes de los Estados Unidos con respecto a Puerto Rico, los que deberán ser exclusivamente los esenciales a la unión.

4. Todos los demás poderes se ejercitarán por los organismos constitucionales del pueblo de Puerto Rico.

5. La participación del pueblo de Puerto Rico en los poderes que ejercite el gobierno de Estados Unidos bajo el pacto en aquellos asuntos que afecten a Puerto Rico, en medida proporcionada al ámbito de dichos poderes. Esto podrá incluir, entre otras formas de instrumentar tal participación, el derecho a votar por el Presidente y Vicepresidente de Estados Unidos.

6. El establecimiento de una fórmula a base de la cual el pueblo de Puerto Rico contribuya a los gastos generales del gobierno de Estados Unidos en forma compatible con la estabilidad y el crecimiento económico de Puerto Rico."

El Art. 1 de la Ley de Plebiscito dispuso para la celebración de un plebiscito el 23 de julio de 1967 para que los electores capacitados para votar en el mismo seleccionaran entre (a) Estado Libre Asociado (b) Estadidad (c) Independencia; y en cuanto al significado del voto a favor del Estado Libre Asociado, al igual que se hizo en cuanto a las otras dos fórmulas al particular significado de cada una, dispuso lo siguiente:

"Un voto a favor del Estado Libre Asociado significará:

(1) La reafirmación del Estado Libre Asociado establecido por común acuerdo bajo los términos de la Ley 600 de 1950 y la Resolución Conjunta 447 de 1952 del Congreso de Estados Unidos como comunidad autónoma permanentemente asociada a Estados Unidos de América;

(2) La inviolabilidad de la común ciudadanía como base primordial e indispensable de la unión permanente entre Puerto Rico y Estados Unidos;

(3) La autorización para desarrollar el Estado Libre Asociado de acuerdo con sus principios fundamentales hasta el máximum de gobierno propio compatible con la común defensa, el común mercado, la común moneda y el indisoluble vínculo de la ciudadanía de Estados Unidos;

(4) que ningún cambio en las relaciones entre Estados Unidos y Puerto Rico habrá de tener efecto a menos que antes reciba la aceptación de la mayoría de los electores votantes en referéndum convocado al efecto."

El Art. 19 de dicha ley proveyó para la impresión y contenido de las papeletas de votación y dispuso incluir, en lo concerniente al Estado Libre Asociado, al igual que en lo concerniente a las otras dos fórmulas en su particular significado, los mismos conceptos expuestos en el Art. 1.

El Art. 45, que transcribimos textualmente, dispuso:

"El Superintendente General de Elecciones certificará al Gobernador el resultado de la consulta plebiscitaria. El Gobernador, a su vez, certificará el resultado al Presidente y al Congreso de Estados Unidos, al Comisionado Residente y a la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico.

De resultar triunfante una de las fórmulas según lo dispuesto en el Artículo 2 de esta ley, el Gobernador en su certificación al Presidente, solicitará la constitución conjunta de los grupos asesores recomendados en el informe de la Comisión de Status y descritos en la exposición de motivos de esta ley.

De acuerdo con ese informe, los grupos conjuntos asesores deberán considerar las medidas de transición necesarias hacia la estadidad o hacia la independencia en caso de que una de estas fórmulas resultara triunfante. En tal caso los miembros

del grupo asesor que deban ser nombrados por el Gobernador de Puerto Rico, *serán designados a propuesta del partido,* o del Comité Directivo que haya representado la fórmula triunfante en el proceso plebiscitario. Si la representación de la fórmula en el proceso plebiscitario hubiera sido dual, el partido y el Comité Directivo tendrán derecho a proponer un número igual de miembros.

En caso de que el Estado Libre Asociado fuera la fórmula triunfante, *el Gobernador propondrá al Presidente* la constitución conjunta de grupos asesores respecto de medidas de desarrollo del Estado Libre Asociado, según hayan de considerarse a base de la autorización otorgada por el pueblo en el plebiscito.

Un voto mayoritario a favor de cualquiera de las fórmulas de status constituirá un mandato del pueblo de Puerto Rico al Comisionado Residente, como su representante en la esfera federal, para actuar en el desempeño de sus funciones oficiales de acuerdo con la voluntad del pueblo expresada a virtud de dicho voto." (Enfasis nuestro.)

## III

La cuestión litigiosa central en el presente recurso—con vista de la contestación del demandado y su afirmación de que dará cumplimiento cabal a las disposiciones de la Ley de Plebiscito y de que se guiará en su cumplimiento por las expresiones mayoritarias del Pueblo de Puerto Rico, pero rechazando al mismo tiempo la iniciativa y el control absoluto reclamado por el demandante, como partido político que representó la fórmula Estado Libre Asociado, triunfante en el plebiscito, en la designación de los miembros puertorriqueños de los comités conjuntos asesores, *ad hoc,* recomendados en el informe de la Comisión de Status,[3] así como en la formulación de las medidas a considerarse por éstos para el desarrollo del Estado Libre Asociado, por

[3] Informe de la Comisión de los Estados Unidos y de Puerto Rico sobre el Status de Puerto Rico, 5 de agosto de 1966, publicación del Superintendente de Documentos de la Oficina de Impresión del Gobierno de los Estados Unidos, página 10.

considerar que ello sería una intervención extraña y no autorizada por la ley en el ejercicio de sus responsabilidades bajo la Constitución y el estatuto plebiscitario—se reduce a determinar si bajo los hechos y circunstancias que presenta este caso, procede según el Derecho aplicable que este Tribunal utilice su poder coactivo para obligar al demandado a actuar en la forma y manera que el demandante reclama, o si debe rechazar el pedido para que el demandado realice, en su más elevada discreción y conforme a sus atribuciones bajo la Constitución y la Ley de Plebiscito, como primer ejecutivo, su función de dar viabilidad al resultado de la consulta plebiscitaria, para el perfeccionamiento y crecimiento del Estado Libre Asociado.

## IV

Para fundamentar el demandante, Partido Popular Democrático, su pedido de que se ordene al Gobernador demandado a llevar a cabo su gestión instrumental del resultado plebiscitario designando los miembros puertorriqueños de los comités *ad hoc* de acuerdo con su propuesta y requerimiento y proponer como agenda de los mismos los temas también por él sometidos al demandado, arguye que, de así no hacerlo el demandado, por omitir el Art. 45 de la Ley de Plebiscito una expresión categórica al efecto de que de resultar triunfante la fórmula Estado Libre Asociado los miembros de dicho comité deben ser designados a propuesta del partido que representó dicha fórmula en la consulta plebiscitaria, no se daría igual tratamiento a los defensores del Estado Libre Asociado como a los defensores de la Estadidad o de la Independencia, de haber alguna de éstas triunfado, pues con relación a éstas el Art. 45 dispuso claramente que los miembros de los grupos asesores deberían ser designados por el Gobernador a propuesta del partido, o del comité directivo que hubiera representado dicha fórmula

en la consulta plebiscitaria. Seguidamente sostiene que corresponde a este Tribunal "llenar la laguna con una interpretación que se derive de los principios que dimanan del informe de la Comisión de Status, de la mecánica que para la celebración del plebiscito, para la implantación de sus resultados, estructuró el legislador." Sostiene en consecuencia que la intención legislativa fue que en caso de resultar triunfante el Estado Libre Asociado, los miembros de los grupos asesores se nombrarían por el Gobernador a propuesta del partido que representó dicha fórmula triunfante pues es el representante de dicha fórmula "el que queda autorizado por el pueblo para llevar a cabo el mandato plebiscitario."

El alcance de la participación del partido político en los procedimientos para implementar el plebiscito quedó definido en el informe conjunto rendido el 17 de diciembre de 1966 al Senado y a la Cámara de Representantes por las comisiones especiales que consideraban los proyectos 470 del Senado y 649 de la Cámara al recomendar su aprobación, con enmiendas, al expresar lo siguiente:

"De acuerdo con el proyecto, la participación de los partidos políticos en los procedimientos para implementar el plebiscito es solamente la de representar cada uno, si optase por ello, la fórmula política que ha venido sosteniendo o propugnando para Puerto Rico durante todo el debate político sobre status de que antes se ha hecho mención. No puede desconocerse que la cuestión del status ha sido motivo fundamental de la lucha entre los partidos políticos puertorriqueños.

Por otra parte ha de reconocerse que ninguna fórmula política es propiedad de ningún partido. Por consiguiente, de abstenerse algún partido político de hacerse cargo de la función de representar en los organismos electorales, a nivel estatal o a nivel local, y en los colegios de votación, la fórmula que han venido defendiendo, el proyecto provee los medios que se han considerado más adecuado para que cada fórmula pueda estar representada por reconocidos sostenedores suyos en todos esos

organismos electorales." (Diario de Sesiones, Vol. 20, año 1966, página 503.)

La desigualdad invocada es más aparente que real. Aunque al disponer que la designación de los miembros de los grupos asesores que deberían considerar las medidas de transición necesarias hacia la Estadidad o la Independencia, en caso de que una de éstas fórmulas resultara triunfante *a propuesta del partido, o del comité directivo*, que hubiera representado la fórmula triunfante en el proceso plebiscitario, la Asamblea Legislativa demostró una gran pulcritud para rodear las medidas de transición hacia la Independencia o la Estadidad, a ser consideradas por los grupos asesores conjuntos, de las mayores garantías para que la expresión de preferencia sobre alguna de estas dos fórmulas de status, pudiera ser instrumentada efectivamente conforme al propósito de la consulta plebiscitaria. Sin embargo, por la obvia razón de que ninguna de dichas dos fórmulas resultó triunfante no cabe considerar aquí si dicha disposición de ley podría constituir o no un válido ejercicio de autoridad legislativa al delegar en el partido o en el comité directivo que hubiera representado la fórmula de Estadidad o de Independencia, de haber resultado alguna de ellas triunfante, la virtual administración de los trámites instrumentales subsiguientes al plebiscito, no siendo, ni los partidos políticos ni los comités directivos representantes de dichas fórmulas de status, órganos constitucionales del gobierno establecido, por lo cual no podría conferirse a ellos la representación de esa gestión instrumental subsiguiente con postergación del primer ejecutivo en su representación oficial al convertirlo en mero agente de un partido político o de un comité directivo. Por lo tanto, no es punto de partida válido para invocar la desigualdad de tratamiento la disposición de ley que pudo haber resultado en un mecanismo extraconstitucional negatorio de las facultades representativas que corresponden al Gobernador como primer ejecutivo del gobierno

establecido. Convenir con el demandante en que como partido político que representó en la consulta plebiscitaria la fórmula Estado Libre Asociado es él el que quedó autorizado por el pueblo para llevar a cabo los ulteriores trámites conjuntamente con los representantes de los Estados Unidos en los comités *Ad Hoc*, con exclusión de las prerrogativas que por su representación constitucional como primer ejecutivo y por la facultad incondicionada conferídale expresamente por la Ley de Plebiscito le corresponden al Gobernador del Estado Libre Asociado de Puerto Rico, sería crear un vacío en el orden de nuestro gobierno constitucional para llenarlo con un partido político que sigue vinculado a los procesos electorales ordinarios. Si bien el propósito legislativo al autorizar la celebración del plebiscito conforme a las recomendaciones de la Comisión de Status, fue separar la consulta plebiscitaria de los comicios electorales ordinarios, con el evidente propósito de que la votación en el plebiscito no tuviera que estar sujeta necesariamente a consideraciones de índole político-partidistas, y que la preferencia pudiera expresarse aún fuera de las consideraciones que rodean las votaciones del proceso electoral ordinario, nada hay ni en la Ley de Plebiscito ni en el informe de la Comisión de Status que sugiera desvincular la instrumentación del resultado del plebiscito, si triunfaba la fórmula Estado Libre Asociado, del gobierno constitucionalmente constituido. Ello es así, a mi juicio, aun cuando en los comicios electorales de 1968 hubiera triunfado para constituir gobierno, el propio partido que representó en el plebiscito la fórmula Estado Libre Asociado.

V

En vista de la naturaleza altamente privilegiada del auto de *mandamus*; de que la ley no requiere expresamente que el Gobernador del Estado Libre Asociado de Puerto Rico designe los miembros de los comités asesores conjuntos,

*ad hoc*, a propuesta del partido que representó la fórmula triunfante en el plebiscito; que el historial legislativo, según se desprende del informe conjunto de las comisiones del Senado y de la Cámara de Representantes que consideraron el proyecto que se convirtió en la Ley de Plebiscito de 1967, limita la participación de los partidos políticos en los procedimientos para implementar *el plebiscito* a la de representar las fórmulas políticas que venían sosteniendo o propugnando como status para Puerto Rico, reconociéndose que ninguna de dichas fórmulas era propiedad de ningún partido político; de que, por la naturaleza continua del proceso post-plebiscitario y los principios generales que informan la evolución y desarrollo futuro del Estado Libre Asociado para la redefinición o modificación de las relaciones políticas básicas entre Estados Unidos y Puerto Rico, cualesquiera discrepancias en los criterios para la instrumentación de las medidas de crecimiento y desarrollo del Estado Libre Asociado a ser consideradas por dichos comités podrían trasladar al foro judicial el debate en torno al status político de Puerto Rico, estimo improcedente la expedición del auto solicitado.

—O—

Opinión del Juez Asociado Señor Santana Becerra sosteniendo su voto para que no se expida auto de *mandamus*.

San Juan, Puerto Rico, 2 de febrero de 1970

En 2 de mayo de 1969 el demandante Partido Popular Democrático acudió en Primera Instancia ante este Tribunal en súplica de que mediante auto de *mandamus*, ordenemos al Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Luis A. Ferré, "que proceda al cumplimiento de los deberes que le impone la Ley de Plebiscito de 1967." [1]

---

[1] "Ley de Plebiscito de 1967", Ley Núm. 1 de 23 de diciembre de 1966, según enmendada. 16 L.P.R.A. Supl. Acum., 1968, secs. 844 a 938.

A esta súplica le dan cuerpo y sustancia ciertas alegaciones de la demanda, a saber:

la alegación séptima, al efecto de que el 24 de enero de 1969 el demandante Partido Popular Democrático solicitó del Gobernador de Puerto Rico aquí demandado que nombrase a los miembros puertorriqueños que habrían de formar parte del primer grupo asesor para el desarrollo del Estado Libre Asociado, *"proponiéndole las personas que debían ser designadas y sometiéndole, además, una relación de los temas que a su entender debían ser estudiados."* Copia de dicha comunicación se acompañó como parte de la solicitud de *mandamus;*

la alegación octava, al efecto de que el 24 de febrero de 1969 el Partido Popular Democrático requirió por segunda vez al Gobernador de Puerto Rico "el cumplimiento de sus deberes bajo la Ley de Plebiscito, sin que hasta el presente el demandado haya contestado directamente estos requerimientos o tomado acción afirmativa alguna sobre los mismos." Se acompañó copia de dicha comunicación como parte de la solicitud;

la alegación novena, al efecto de que la Ley de Plebiscito impone al Gobernador de Puerto Rico "el claro deber de cumplir fielmente la voluntad del pueblo expresada en la votación plebiscitaria", y que dicha voluntad es que "se conserve el Estado Libre Asociado como el status de Puerto Rico y que se proceda a su máximo desarrollo de conformidad con los principios señalados en la Exposición de Motivos y en los artículos 1, 19 y 45 de dicha Ley." Se alega que la ley no le reconoce discreción al Gobernador "para detener el desarrollo del Estado Libre Asociado o para invalidar en ninguna otra forma el resultado de la consulta plebiscitaria";

la alegación décima, al efecto de que en el descargo de su deber de dar cumplimiento al mandato plebiscitario, el Gobernador tiene la obligación legal de completar los pasos requeridos *"por el artículo 45 de la Ley de Plebiscito* para

la constitución conjunta de los grupos asesores recomendados por la Comisión de Status";

la alegación undécima, al efecto de que en el descargo de su deber de cumplir fielmente el mandato plebiscitario, el Gobernador tiene "la obligación legal de seleccionar los miembros puertorriqueños de los grupos asesores *de entre las personas* propuestas por el Partido Popular Democrático", y que la intención manifiesta de la Ley de Plebiscito fue que "la responsabilidad básica de iniciar las recomendaciones para el desarrollo del status que resultase triunfante correspondiese a sus representantes y defensores en el proceso plebiscitario";

la alegación duodécima, al efecto de que respecto a los temas a considerarse por los grupos asesores, la Ley de Plebiscito impone al Gobernador el deber de proponerle al Presidente de los Estados Unidos la constitución conjunta de grupos asesores "respecto de medidas de desarrollo del Estado Libre Asociado, según hayan de considerarse a base de la autorización otorgada por el pueblo en el Plebiscito";

la alegación décimotercera, al efecto de que la autorización otorgada por el pueblo en el plebiscito fue para "desarrollar el Estado Libre Asociado de acuerdo con sus principios fundamentales hasta el máximum de gobierno propio compatible con la común defensa, el común mercado, la común moneda y el indisoluble vínculo de la ciudadanía de los Estados Unidos";

la alegación decimocuarta, en parte, al efecto de que la obligación del Gobernador bajo los Arts. 1, 19 y 45 de la Ley de Plebiscito, es la de proponer la constitución de grupos asesores para que éstos recomienden las enmiendas necesarias "para desarrollar el Estado Libre Asociado de acuerdo con sus principios fundamentales hasta el máximum de gobierno propio compatible con tales principios" o, en la alternativa, para la consideración por éstos *de los temas propuestos por el Partido Popular Democrático*;

la alegación decimoquinta, finalmente, al efecto de que aun de estimarse, "contrario al claro sentido de la Ley", que el Gobernador tiene discreción para "proponer los temas a estudiarse por los grupos asesores", tal discreción tendría rigurosamente que "ajustarse a las normas de ley derivables de la Ley de Plebiscito y del proceso en que ella se enmarca."

La comunicación de 24 de enero de 1969 dirigida al Gobernador y suscrita por el Hon. Severo E. Colberg como Delegado Presidencial del Partido Popular Democrático que forma parte de las alegaciones, contiene un requerimiento al Gobernador para que "sin mayor vacilación y demora" procediera a designar los miembros locales de los grupos asesores, y que "según el claro sentido de la ley", estos miembros debían ser "personas identificadas con la fórmula triunfante, *propuestas por el Partido Popular Democrático*" que fue el Partido que representó dicha fórmula en el proceso plebiscitario. A tal efecto, la carta de requerimiento propuso para constituir la representación local en el primer grupo asesor a los señores Luis Muñoz Marín, Luis Negrón López, Rubén Rodríguez Antongiorgi, Miguel Hernández Agosto, José Trías Monge, Frank Zorrilla, Rafael Durand Manzanal, Salvador Rodríguez Aponte, Francisco Aponte Pérez, Roberto Rexach Benítez, Gustavo Agrait, Arturo Morales Carrión y Eugenio Fernández Cerra. Esta comunicación igualmente señala al Gobernador las funciones que este primer grupo asesor debía realizar y enumera diez temas específicos para estudio y formulación de recomendaciones "concretas" sobre los mismos. (²)

---

(²) En forma breve: (1) Mejoramiento de la legislación sobre cabotaje; (2) Distribución de beneficios y responsabilidad contributiva de empresas que operan en Puerto Rico y en los Estados Unidos; (3) Participación de Puerto Rico en programas federales y en la "Guerra contra la Pobreza"; (4) Mayor contribución del Estado Libre Asociado en la prestación aquí de los servicios federales; (5) Equiparación de los niveles de salarios mínimos en Puerto Rico con los de los Estados Unidos; (6) Participación de Puerto Rico en tratados comerciales, culturales y

La comunicación de 24 de febrero de 1969 dirigida al Gobernador y firmada esta vez por el Hon. Juan Cancel Ríos como Delegado Presidencial del Partido Popular Democrático que forma parte de las alegaciones, propone, después de hacer referencia a la comunicación de 24 de enero, reunirse con el Gobernador "para discutir tan importante tema, de modo que los Comités Ad Hoc para el desarrollo del Estado Libre Asociado puedan constituirse e iniciar sus trabajos a la brevedad posible."

El Gobernador del Estado Libre Asociado contestó la demanda, y abogó además por su desestimación a base de siete defensas especiales. (³) Unió a su contestación copia de una comunicación fechada 15 de mayo de 1969 dirigida por él al Hon. Juan Cancel Ríos, Delegado Presidencial del Partido Popular Democrático, con referencia a la comunicación y requerimiento de 24 de enero de 1969. Expresa el Gobernador que está familiarizado con la Ley de Plebiscito, y además, que conoce cuales son sus deberes como primer ejecutivo de Puerto Rico, y que:

"Pueden ustedes tener la seguridad de que yo daré cumplimiento cabal a las disposiciones de la ley del plebiscito y que me guiaré en su cumplimiento por las expresiones mayoritarias del pueblo de Puerto Rico."

educativos; (7) Medidas que hagan más justa y equitativa para los puertorriqueños la Ley de Servicio Militar Obligatorio; (8) Protección para los productos agrícolas del país contra la competencia del exterior; (9) Clarificación y perfeccionamiento de los principios que rigen la aplicación de las leyes federales en Puerto Rico; (10) Agenda para futuros grupos asesores.

(³) Brevemente: (1) Falta de capacidad jurídica del demandante Partido Popular Democrático para instar el recurso; (2) Improcedencia del *mandamus* bajo la separación de poderes; (3) Cosa juzgada; (4) Naturaleza política de la controversia, no susceptible de ser judicialmente adjudicada; (5) Prematuro el recurso y porque el Gobernador no se ha negado ni se niega a cumplir cabalmente con la Ley de Plebiscito; (6) Incuria por parte del demandante; (7) Improcedencia del recurso por tratarse de una función discrecional del Gobernador.

Comenta el Gobernador en dicha comunicación—lo que constituye una declaración de principios sobre sus funciones constitucionales, básica y esencial en la consideración y fallo de la cuestión litigiosa ante el Tribunal—que:

". . . las responsabilidades que pueda tener el Gobernador y que emanan de la ley del plebiscito y de nuestra Constitución no pueden, ni deben ser compartidas con otras personas o entidades por el Ejecutivo *en ausencia de un precepto claro de ley.* Son inherentes a su cargo, por lo que debe rechazarse en su ejecución cualquier intento de intervención extraña".

—I—

Es preciso que desde el comienzo deje ubicado este pleito en lo que para mi debe ser su correcto lugar. Tomo la súplica de la demanda para que el Tribunal ordene al Gobernador el "cumplimiento de los deberes que le impone la Ley de Plebiscito de 1967" con la carne y sustancia que le dan las alegaciones, y entiendo que se pide al Tribunal una orden para que el Gobernador proceda a nombrar determinadas personas designadas o que designe el Partido Popular, y no otras, para constituir los grupos asesores recomendados por la Comisión de Status, bajo el supuesto de que el Partido Popular fue el organismo que defendió la fórmula Estado Libre Asociado en el Plebiscito; y bajo el mismo supuesto, una orden para que someta a la consideración y estudio del primer grupo asesor, para sus recomendaciones, aquellos temas sometidos por el Partido Popular demandante, y no otros. (4)

---

(4) La posición, de público conocimiento, asumida pendiente este pleito por distinguidos portavoces del Partido Popular en torno a la propuesta del Gobernador de someter a un grupo asesor el problema del voto presidencial, esfera ésta de acción no incluida entre los diez temas sometidos por el Partido Popular en la comunicación y requerimiento de 24 de enero de 1969, al no darle dichos líderes y distinguidos portavoces una franca acogida a esa proposición, y hasta el combatirla, me reafirma que

Situado este pleito en su lugar propio, no creo que el propósito ni el interés del demandante sea obtener una expresión del Tribunal para advertirle al Gobernador que tiene que cumplir con los deberes que las leyes le imponen. No creo que esto fuera un ejercicio correcto de la función judicial, particularmente estando en contrapeso la apropiada norma de conducta que debe mantenerse entre las jerarquías de los tres poderes constitucionales del Estado Libre Asociado, que a tenor de la Sec. 2 del Art. I de la Constitución que le rige están *igualmente* subordinados a la soberanía del pueblo de Puerto Rico. Sugestivamente, el Gobernador ha manifestado en documento que acompaña a su contestación que está familiarizado con la ley, y que conoce cuáles son sus deberes como Primer Ejecutivo de Puerto Rico.

El que se determine con precisión cuál es el dictamen judicial que en este pleito interesa el demandante, tiene otra fundamental importancia que toca a la facultad misma del Tribunal para emitir un fallo. Ello es así porque se actúa en jurisdicción original. Según la Sec. 3 del Art. V de la Constitución, el Tribunal Supremo es únicamente un Tribunal de Ultima Instancia, con la excepción que la propia Constitución establece. Conforme al mandato Constitucional, la ley que organiza el Poder Judicial, Ley de la Judicatura de 1952, estatuye igualmente que el Tribunal Supremo será tribunal de Ultima instancia, y crea como tribunales de Primera instancia el Superior y el de Distrito. Como excepción, la Constitución en la Sec. 5 del Art. V autoriza al Tribunal Supremo o a sus jueces a conocer en Primera instancia recursos de *habeas corpus*, y aquellos recursos y causas *que se determinen por ley*.

La jurisdicción y facultad del Tribunal para conocer en Primera instancia de este pleito, y fallarlo, surge del Art. 1

es correcta la conclusión a que he llegado en cuanto a qué es lo que realmente pide el demandante en este pleito y qué es lo que desea que el Tribunal ordene hacer al Gobernador.

de la Ley de 12 de marzo de 1903, que establece el auto de *mandamus*. Art. 649, Código Enjuiciamiento Civil, ed. 1933, 32 L.P.R.A. sec. 3421.

Por ejercerse una jurisdicción y facultad para entender de esta controversia en Primera Instancia sólo por vía de excepción constitucional, distinto a lo que pudiera ocurrir en los tribunales de Primera Instancia bajo el liberalismo procesal moderno—véanse Reglas 6.5 (b) y 10.2 (5) de Procedimiento Civil de 1958—son de riguroso y estricto seguimiento para el Tribunal las disposiciones procesales y sustantivas *sobre la materia* impuestas por el Legislador al autorizar este *auto*, conforme a un recurso especial y extraordinario adjetivado por la propia ley que lo crea como altamente privilegiado, y que, como discutiré luego, tiene una fisonomía clásica inconfundible en el Derecho secularmente establecida. En el ejercicio de su jurisdicción y facultad para entender en este pleito en Primera Instancia por vía de excepción constitucional, el Tribunal no puede extenderse en cuanto a *la materia* más allá del ámbito permisible por la ley que crea el recurso extraordinario, ley que en el caso ante nos constituye la fuente legal que permite ejercer la jurisdicción en Primera Instancia que se ejerce. (⁵)

---

(⁵) La cuestión jurisdiccional, por constituir la facultad para fallar judicialmente una *cuestión* litigiosa, esencia del *poder judicial,* es de estricto escudriñamiento. *Marbury* v. *Madison,* 1 Cranch 137. Declarado por el Tribunal Supremo un estado de hechos en que procedía que el Secretario de Estado expidiera la comisión de su cargo al demandante Marbury, y habiéndose instituido esa acción original ante el Tribunal Supremo en virtud de un estatuto del Congreso que lo autorizaba, Marshall, en su histórica decisión de 1803, se niega a ello, por el fundamento de que la jurisdicción original del Tribunal Supremo de los Estados Unidos estaba fijada en la Constitución—Art. III, Sec. 2, par. 2—y el Congreso no tenía facultad para ampliarla adicionándole un recurso de *mandamus*. Nuestra Constitución permite hacer excepcionalmente lo que no se permite en la Federal, pero el estatuto ha de ser de riguroso cumplimiento, particularmente, en sus disposiciones sustantivas.

En el primer caso de *mandamus* que se dilucida en la Colonia de Massachusetts en el año 1729, se escudriña la cuestión jurisdiccional en forma más dramática que en *Marbury,* y se suscita una candente dis-

Si de los hechos, de la ley, y de la norma de Derecho aplicables surge que procedería dictarse al Gobernador una orden judicial obligándolo a realizar los actos que el demandante nos pide que le ordenemos realizar como un deber de su cargo, y que para mi no son otros sino que nombre a las personas designadas por el Partido demandante para el primer grupo asesor, y que le encomiende la consideración de aquellos asuntos que somete dicho Partido, debía dictarse tal orden.

Si por el contrario, de los hechos, de la ley, y de la norma de Derecho aplicables no ha lugar a dictar tal orden judicial obligando al Gobernador a realizar esos actos, debe negarse tal orden.

Cualquier otra determinación o fallo del Tribunal en Primera Instancia que no sean los mencionados se hacen, a mi entender, sin jurisdicción y sin facultad constitucional para ello.

—II—

A la luz de las defensas especiales interpuestas por el Gobernador en su contestación, entre ellas que la materia envuelta en este litigio no es justiciable, esto es, que no es susceptible de ser juzgada y fallada judicialmente por ser una de naturaleza política; y que el recurso es improcedente bajo el principio de la separación de poderes, creo necesario también dejar ubicada esta controversia en su lugar

---

cusión pública entre el Ejecutivo, el Legislativo y lo Judicial. Una Comisión de Árbitros dispuso que la Casa Consistorial del pueblo de Malden debía ubicarse en determinado sitio. La Legislatura confirmó a la Comisión. Ante la desobediencia del sector sur del pueblo, los del norte acudieron a la Corte y ésta dictó auto de *mandamus* obligando al cumplimiento del fallo de la Comisión. Se pidió a la Legislatura, como organismo de apelación y compuesta por una Cámara de Representantes y un Consejo Ejecutivo, que dejara sin efecto ese *auto*, y ésta se dividió. El Consejo sostuvo la acción judicial; la Cámara de Representantes la revocó contra una fuerte oposición del Consejo, por el fundamento de que la corte (antecesora de la Suprema Corte de Justicia de Massachusetts) carecía de *jurisdicción original* para conceder el *mandamus*. En definitiva prevaleció la Cámara. The American Journal of Legal History, Vol. 1, 1957. *"Mandamus in the Colonies"*, págs. 328 y ss.

correcto en relación con las doctrinas sentadas en los casos normativos de *Baker* v. *Carr*, 369 U.S. 186, decisión de 1962, y *Powell* v. *McCormack*, 395 U.S. 486, resuelto en junio 16 de 1969. Ambas partes invocan y discuten dichos casos.

Entiendo que hay una sustancial diferencia de fondo entre esos casos y el pleito ante nos, y me parece propio señalarla antes de entrar en la consideración de los méritos del caso.

## *Baker* v. *Carr*

En el fondo mismo del caso de *Baker* v. *Carr* salta el delicado problema, que no parece hallar nunca final reposo en el sistema federativo de la Unión, de las relaciones entre la soberanía federal y la soberanía de los Estados en cuanto hasta dónde el Poder Judicial federal puede, y debe intervenir o abstenerse propiamente de intervenir, con las actuaciones gubernamentales u oficiales de los Estados en el ejercicio de su soberanía. Este problema no existe en el caso ante nos.

Residentes de cinco condados del Estado de Tennessee que alegaron ser electores cualificados demandaron en su propio derecho y en representación de otros electores en su misma posición, a funcionarios de dicho Estado en un Tribunal de Distrito federal, que se constituyó con tres jueces. Interpusieron su acción bajo las Secs. 1983 del Título 42 y 1343 (3) del Título 28, U.S.C., para reivindicar una alegada privación por el Estado de sus derechos constitucionales. (6)

---

(6) La Sec. 1983 del Título 42 dispone que estará sujeta a responderle a un ciudadano de los Estados Unidos o persona dentro de su jurisdicción, en un procedimiento en ley, en equidad, o en cualquier otro procedimiento adecuado de resarcimiento, cualquier otra persona que so color de ley, ordenanza, reglamento, uso o costumbre de un Estado o Territorio, prive a dicho ciudadano o persona de cualquier derecho, privilegio o inmunidad protegido por la Constitución y las leyes.

La Sec. 1343 (3) del Título 28 estatuye que las Cortes de Distrito tendrán jurisdicción original en cualquier acción civil autorizada por

Después de exponer las alegaciones y los hechos de fondo, 369 U.S. págs. 187 a 193, la Opinión del Juez Brennan por el Tribunal se refiere a la súplica de los demandantes así: (193)

"La demanda concluye que 'a estos demandantes y otros situados en igual posición se les niega la igual protección de las leyes que les otorga la Enmienda Decimocuarta de la Constitución de los Estados Unidos, por razón de la degradación o desvalorización ["debasement"] de sus votos'."

En el escolio (15) que sigue a la anterior expresión, el Tribunal puntualiza que es claro que el derecho constitucional ahí reclamado descansa exclusivamente en una alegada violación de la Enmienda Decimocuarta, privación de la Cláusula de la igual protección de dicha Enmienda, y aclara además que el Tribunal no considerará las alegaciones políticas al efecto de que la acción del Estado era contraria a la filosofía de gobierno en los Estados Unidos y a toda la jurisprudencia Anglo-Sajona.

La Corte de Distrito desestimó la acción a base de (1) falta de jurisdicción sobre la materia y (2) que la demanda no aducía una reclamación sobre la cual pudiera concederse un remedio. Este segundo motivo se consideró en la opinión como que la Corte de Distrito había resuelto que la demanda no presentaba una cuestión justiciable o sujeta a ser judicialmente fallada.

En la extensa discusión que sigue en cuanto a la jurisdicción sobre la materia, la capacidad o el derecho a pedir de aquellos demandantes (*standing*) y la naturaleza justiciable o no de la reclamación, quedó claramente establecido que *Baker* v. *Carr* resolvió un problema de derechos personales e individuales de ciudadanos de Tennessee, derechos que estaban protegidos contra la acción del Estado por la Constitu-

---

ley que instituya cualquier persona para remediar la privación, so color de ley, ordenanza, etc. de un Estado, de un derecho, privilegio o inmunidad protegido por la Constitución de los Estados Unidos.

ción Federal, en ese caso, por la Cláusula de la igual protección de la ley de la Enmienda Decimocuarta. La opinión una y otra vez descarta todo criterio de que el Tribunal tuviera ante sí un problema político, en tal caso no justiciable, o que estuviera allí envuelta la cláusula constitucional de garantía de una forma republicana de gobierno. (Art. IV, Sec. 4) . . . "Nuestra conclusión, véanse pp. 208–237, *infra*, de que este caso no presenta una 'cuestión política' no justiciable, resuelve la única duda posible de que éste sea un caso o controversia." (pág. 198) . . . "Los apelantes piden un remedio para proteger o vindicar un *interés propio* y de aquellos en similar posición." (pág. 207) . . . "El daño que reclaman los apelantes es que esta clasificación desfavorece a los votantes en los condados en que residen, poniéndolos en una posición injustificable de desigualdad constitucional cara a cara a electores en condados irracionalmente favorecidos." (pág. 207) . . . "El derecho de un ciudadano a un voto libre de arbitrario menoscabo por acción del Estado se ha reconocido como un derecho protegido por la Constitución." (pág. 208)

Bajo el criterio de lo justiciable: . . . "Por supuesto, el mero hecho de que el pleito busca la protección de un derecho político no quiere decir que presenta una cuestión política. Tal objeción 'es algo más que un mero juego de palabras.' " (pág. 209) . . . "El problema aquí es la compatibilidad de acción del Estado con la Constitución Federal. No tenemos un problema resuelto o a ser resuelto por una rama política del gobierno en posición de igualdad con esta Corte." (pág. 226)

El Juez Douglas, en su opinión concurrente, es igualmente explícito en cuanto a que ese pleito envuelve la protección de un interés personal e individual . . . "Dejo a un lado los problemas de 'la cuestión política' envuelta en la distribución de poder entre esta Corte, el Congreso y el Jefe del Ejecutivo. Tenemos aquí una fase del problema recurrente de

la relación de las cortes federales con las agencias estatales. Particularmente, el problema es el ámbito en que un estado puede darle al voto de una persona más fuerza que al voto de otra." (pág. 242) (⁷)

Es claro, pues, que *Carr* envuelve la reivindicación de derechos individuales que el Tribunal dijo que estaban protegidos por la Constitución Federal contra acción irrazonable del Estado, y que por lo tanto tenían derecho los demandantes a que no se les desestimara su pleito sin una adjudicación en los méritos.

### *Powell* v. *McCormack*

En este caso, distinto a *Baker* v. *Carr*, el litigio surge y se desenvuelve dentro de la propia Soberanía federal. Se produce más de cerca el problema de la cuestión política no justiciable. Contrario a lo que aclara *Baker* en cuanto a aquella acción—369 U.S. a la pág. 226—en este de *Powell* hay una cuestión resuelta por otra Rama política del gobierno "co-igual" o de la misma jerarquía de la Rama Judicial.

El Representante Powell fue elegido al Congreso en noviembre de 1966 por un distrito de Nueva York. En enero de 1967 no se le permitió prestar juramento y ocupar el cargo pendiente el informe de una Comisión especial nombrada para determinar si el Congresista podría ocupar o no su escaño. En febrero de 1967 la Comisión informó que Powell *llenaba los requisitos constitucionales para servir*, pero por razones que señaló, recomendó que se le tomara juramento, y luego se le censurara por la Cámara, y se le multara en $40,000 y se le despojara de los privilegios de antigüedad. La Cámara, por el contrario, acordó excluir a

---

(⁷) La exposición que hace el Juez Clark en su opinión concurrente, 369 U.S. págs. 253 a 259, da una cabal idea de la violación por Tennessee del derecho constitucional de los demandantes cuya protección se reclamó judicialmente.

Powell y dispuso que se notificara al Gobernador de Nueva York que existía una vacante.

Así surgió este pleito ante una Corte de Distrito federal, que desestimó la demanda por falta de jurisdicción sobre la materia. Powell demandó a cinco representantes por sí y como representativos del Cuerpo, incluyendo a su Presidente, conjuntamente con el Secretario, el Macero y el Portero de la Cámara, no legisladores. Al Secretario porque se negaba a prestarle los servicios de un representante, al Macero porque se negaba a pagarle su sueldo, y al Portero porque le negaba entrada al Salón de Sesiones.

Ante el planteamiento de que el litigio se había tornado insubsistente y había perdido su eficacia porque en enero de 1969, pendiente el pleito, un subsiguiente Congreso había dado asiento a Powell, el Tribunal se negó a archivar la acción.

Las razones expuestas para negarse a decretar que el pleito había perdido su efectividad y archivarlo, 395 U.S., págs. 495 a 500, enfatizan la diferencia fundamental que trató de señalar entre esos litigios y el caso de autos. La única expresión disidente, del Juez Steward, gira precisamente en torno a este aspecto. (pág. 574)

Invocada la defensa de que la Cláusula sobre Debate de la Constitución, Art. I, Sec. 6, constituía un total impedimento para la acción, [8] el Tribunal desestima el caso en cuanto a los Congresistas demandados. (págs. 506, 550) Dictaminó que los demandados no legisladores no estaban inmunes bajo dicha Cláusula contra litigios para responder de *actuaciones inconstitucionales*, aunque actuaran en ejecución de órdenes o mandatos de las Cámaras.

---

[8] "Los senadores y representantes . . . . Tampoco podrán ser reconvenidos fuera de la Cámara por sus manifestaciones en cualquier debate en ella." (Traducción de L.P.R.A.)—Const.

". . . and for any Speech or Debate in either House, they shall not be questioned in any other Place."

Discutiendo la falta de jurisdicción sobre la materia, fundamento de la Corte de Distrito para desestimar el caso, dice el Tribunal a la pág. 512:

"Según expusimos en *Baker* v. *Carr*, 369 US 186, 198 (1962), existe una significativa diferencia entre el determinar si una corte federal tiene 'jurisdicción sobre la materia' y el determinar si una causa sobre la cual una corte ejerce jurisdicción sobre la materia es 'justiciable'. La Corte de Distrito determinó que 'el decidir el caso en los méritos . . . constituiría una clara violación de la doctrina de la separación de poderes' y entonces desestimó la demanda 'por falta de jurisdicción sobre la materia'. [cita] Sin embargo, según correctamente lo reconoció la Corte de Apelaciones, la doctrina de la separación de poderes se considera más propiamente al determinar si un caso es 'justiciable'. Convenimos con la conclusión unánime de la Corte de Apelaciones de que la Corte de Distrito tenía jurisdicción sobre la materia de este caso. Sin embargo, *por las razones expuestas en le Parte VI, infra*, discrepamos de la conclusión de la Corte de Apelaciones de que el caso no es justiciable."

Considerando la naturaleza justiciable o no del caso, el Tribunal concluye que el litigio no envuelve una cuestión política que bajo la separación de poderes lo hiciera no justiciable, a tenor con la interpretación que le dio a la Sec. 5 del Art. I de la Constitución.[9] Concluye que la *función claramente encomendada* por la Constitución al Congreso—otra Rama política "co-igual" del Gobierno—para juzgar la capacidad de sus miembros quedaba limitada en un caso de *exclusión* (así determinó que era este caso) y no de *expulsión*, a juzgar aquellas calificaciones de capacidad expresa-

---

[9] "Cada Cámara será el único juez de las elecciones, resultado de las mismas y *capacidad* de sus miembros;" (Traducción de L.P.R.A.)— Const.

"Each House shall be Judge of the Elections, Returns and *Qualifications* of its own Members."

mente fijadas por la Constitución en la Sec. 2, Cl. 2 del Art. I, y no otras. (¹⁰)

Más claro lo expone el Juez Douglas en su opinión concurrente: "Pueden surgir disputas sobre si un miembro elegido tiene las 'calificaciones' de la Constitución, en cuyo caso la Cámara es el único juez. Pero la Cámara no es el único juez cuando se adicionan 'calificaciones' no especificadas en la Constitución."

—III—

Ahora deseo referirme a la fundamental y básica diferencia que existe entre los casos de *Baker* v. *Carr* y *Powell* v. *McCormack* y otros citados en ellos, de un lado, y la controversia ante el Tribunal, del otro. Tanto en *Baker* como en *Powell*, la causa de acción judicial se ejerce para remediar o reivindicar derechos del individuo, derechos personales del ciudadano, protegidos en ambos casos por la Constitución, aun cuando eran derechos constitucionalmente protegidos de naturaleza política. En el primero, remedio contra acción constitucionalmente irrazonable del Estado en cuanto al derecho al voto de un ciudadano; en el segundo, remedio contra acción inconstitucional de otra Rama política del Gobierno "co-igual", en cuanto al derecho de un ciudadano a ocupar un cargo que la Constitución le protege. ". . . El mero hecho que el pleito busca la protección de un derecho político, no quiere decir que el mismo presenta una cuestión política." *Baker* v. *Carr*, 369 U.S. a la pág. 209.

Lo fundamental en la decisión de *Powell* no es precisamente su resultado final. Se llegó al resultado de que la controversia era justiciable contra la defensa de cuestión política y por ende de separación de poderes, debido a la manera

---

(¹⁰) "No podrá ser representante ninguna persona que no haya cumplido veinticinco años de edad, que no haya sido durante siete años ciudadano de los Estados Unidos y que al tiempo de su elección no resida en el estado que ha de elegirlo." (Traducción L.P.R.A.)—Const.

en que el Tribunal interpretó y aplicó la Sec. 5 del Art. I, en un caso de *exclusión*. De haberla interpretado y aplicado en forma contraria, esto es, que en el ejercicio de la facultad constitucional concedida al Congreso por la Sec. 5 del Art. I éste no quedaba limitado a lo que expresamente se especifica en la Sec. 2, Cl. 2 del Art. I, el resultado final hubiera sido diametralmente opuesto, o sea, que se trataba de una función encomendada por la Constitución a otra Rama política "co-igual" del Gobierno y la controversia no era justiciable bajo la teoría del caso político y separación de poderes.

Lo fundamental de la decisión de *Powell* es el hecho de que por tratarse de la reclamación de un derecho *personal* e *individual* del ciudadano, alegadamente protegido por la Constitución, el Tribunal Supremo no podía abdicar su obligación *de interpretar* las disposiciones constitucionales envueltas en la controversia, y despachar el caso sin más, como se hizo en primera instancia, a base de que por ser acción de otra rama política del Gobierno dentro de su propio funcionamiento, la controversia no era justiciable bajo el caso político y la separación de poderes. El que en las circunstancias chocantes de ese caso el Tribunal Supremo no se abstuviera de interpretar la Constitución para la protección de *derechos individuales*, es lo fundamental de la decisión de *Powell* v. *McCormack*.

Observa el Juez Presidente Warren: [395 U.S., pág. 548]

"Pero, según demuestra nuestra interpretación del Art. I, #5, una determinación del derecho del peticionario Powell a sentarse requería no más que una interpretación de la Constitución. Tal determinación cae dentro del tradicional papel otorgado a las cortes de interpretar la ley, y no envuelve una 'falta de respeto debido a una rama coordinada del gobierno', no tampoco ello envuelve una 'determinación inicial de política claramente para la no discreción judicial.' *Baker* v. *Carr*, 369 US 186, a la pág. 217. Nuestro sistema de gobierno exige que las cortes federales a veces interpreten la Constitución en forma

distinta de la interpretación dada al documento por otra rama."

Un examen de las alegaciones, de los hechos envueltos, y de la ley y del Derecho aplicables me producen la convicción que, a diferencia, fundamental para mí, de *Baker* y de *Powell*, el pleito ante nos no envuelve derecho personal o individual alguno, de persona natural o de persona jurídica, protegido por la Constitución o por las leyes del Estado Libre Asociado—o por cualquier otro cuerpo legal que pudiera invocarse y ser aplicable—que tenga que ser amparado o reivindicado por los tribunales.

Distinto a *Baker* y a *Powell*, no está ante nos una acción judicial para defender y amparar *derechos políticos* individuales y personales del ciudadano, en cuyo caso este Tribunal, me refiero al Poder Judicial, no puede abdicar sus obligaciones constitucionales de dar amparo y protección; sino que por el contrario, está ante el Tribunal un pleito que versa sobre una *materia* totalmente política, cual es, el adelanto o mejoramiento del sistema político que rige a los habitantes de Puerto Rico, materia ésta que, bajo la apropiada norma constitucional en un sistema republicano de gobierno, y el Congreso determinó que el del Estado Libre Asociado lo es, (11) queda claramente encomendada a sus dos Ramas políticas, la Rama Legislativa y la Rama Ejecutiva, con mayor razón, ante el hecho de que el adelanto y mejoramiento político del Estado Libre Asociado no depende únicamente de la voluntad de los habitantes de Puerto Rico, sino que en el proceso entra en juego también la voluntad del Congreso y del Pueblo de los Estados Unidos.

Son únicamente las Ramas políticas del Gobierno, la Legislativa y la Ejecutiva, las que tienen la determinación inicial de la política a seguir en el proceso de mejoramiento del Estado Libre Asociado, inmune dicha determinación a la discreción judicial, y corresponde exclusivamente a dichas

---

(11) Ley Pública 447 de 3 de julio de 1952, 66 Stat. 327.

Ramas políticas, en ese proceso, la inteligencia y el entendimiento con el Congreso y el Pueblo de los Estados Unidos. Hago parte de las anteriores conclusiones el ANEXO I que adhiero a este voto.

Después de la consideración de las alegaciones, de los hechos, y de la ley y el Derecho aplicables, mi conclusión es que la *materia* de este pleito—en donde no hay derechos individuales del demandante ni de persona otra alguna a ser amparados por la vía judicial, y en que ni el demandante ni persona otra alguna tiene capacidad o un derecho o razón para pedir [12]—no es justiciable la misma como una cuestión *política*, y su corolario de separación de poderes.

El hecho de que se haya usado como vehículo el recurso de *mandamus* no desvirtúa un ápice la naturaleza enteramente política de la *materia* envuelta, ni la conclusión de que no es justiciable. Porque en las circunstancias de hecho y de derecho que rodean este pleito, se ejerce la función ejecutiva pura y política por excelencia—de la cual el Gobernador como Jefe de la Rama Ejecutiva es el depositario y único juez—sólo conforme a la conciencia, buen juicio y sana discreción del Ejecutivo, y enteramente libre del intervencionismo judicial según lo tiene sentado una secular norma de Derecho público. A esta función política la Constitución le da el nombre de "Poder Ejecutivo" y lo deposita en manos del Gobernador. Art. IV, Sec. 1. [13]

---

[12] El criterio legal de *"Standing"* discutido en *Carr* y en *Powell.*

[13] A principios de siglo la mayoría de las decisiones eran en favor de proscribir la expedición de un *mandamus* contra el Gobernador del estado, con abstracción de si trataba o no de un acto ministerial, y aunque se tratase de un acto ministerial, prohibición ésta que respondía a las razones políticas de separación de poderes en las Constituciones estatales. Merrill, *Law of Mandamus*, 1892, págs. 102 y ss. Merrill compara *People* v. *Governor*, 29 Mich. 320, resuelto por el Juez Cooley, con *Martin* v. *Ingham*, 38 Kans. 641, como representativos de los criterios en uno u otro sentido. Véase *Lutz* v. *Post Gobernador de Puerto Rico*, 14 D.P.R. 860 (1908), a las págs. 864 y ss. Una de las consideraciones que se expresan en *Lutz*, pág. 865, es que aquí tanto el poder judicial como el

—IV—

Al hacer las anteriores conclusiones he mencionado el examen de las alegaciones, de los hechos, y de la ley y normas de Derecho aplicables en este caso.

En 5 de agosto de 1966, la Comisión de los Estados

---

ejecutivo del Gobernador emanaban de la Ley Orgánica Foraker, esto es, que tanto los tribunales como el Gobernador actuaban como agentes del mismo poderdante, el Congreso de los Estados Unidos.

Para 1946 veinte estados resolvían que el Gobernador no estaba inmune al *mandamus* por la sola razón política constitucional. Unos dieciocho deban inmunidad absoluta. Unos y otros estados se mencionan en *"Mandamus To Review State Administrative Action"*, 45 Mich. L. Rev., V. 126.

Aparte de lo que dijéramos en 1944 en *Banco Popular* v. *Corte*, 63 D.P.R. 66 (1944), en cuanto a que aquí regía la doctrina política de separación constitucional de poderes, al entrar en vigor el 25 de julio de 1952 la Constitución del Estado Libre Asociado tal separación constitucional de poderes quedó consagrada en la Sec. 2 del Art. I al estatuirse que el Gobierno del Estado Libre Asociado tiene forma republicana "y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán *igualmente* subordinados a la soberanía del pueblo de Puerto Rico."

Sin embargo, no entro ahora en un reexamen de *Lutz* v. *Post* ni en una evaluación de las dos corrientes de autoridad a la luz de nuestra Constitución. Es innecesario porque la posición que asumo no es la de desestimar el caso de plano por *falta de jurisdicción*. He llegado a mis conclusiones contra la procedencia del *mandamus* después de examinar y evaluar los méritos.

Mi voto en disidencia al ordenarse al Gobernador que contestara la solicitud de *mandamus* no se debió a un criterio de falta de jurisdicción, sino al hecho de que a la luz de las alegaciones, tomándolas como ciertas y bien hechas y en la actitud más favorable a ellas; y estando envuelta sólo una cuestión de derecho, en ese momento creía estar en condiciones de dar un fallo *sobre dichas alegaciones.*

En el examen de las decisiones nuestras en casos de *mandamus* contra el Gobernador surge siempre un derecho o interés beneficioso particular de una persona que se pide ser amparado judicialmente. Ello responde a un requisito imprescindible, desde los orígenes de este recurso extraordinario, para que proceda el *auto*. En *Lutz*, rechazamos la idea de que el mero papel de informador público como dueño de un periódico diera al allí demandante ese derecho o interés particular básico.

El caso presente es único.

Unidos y de Puerto Rico sobre el Status de Puerto Rico ([14]) rindió su informe al Presidente y al Congreso de los Estados Unidos y al Gobernador y a la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico con la siguiente recomendación:

"Las conclusiones arriba mencionadas o los hechos en que éstas se apoyan demuestran la necesidad de un método en el futuro inmediato que haga factible la consideración de las propuestas de mejoramiento o desarrollo del Estado Libre Asociado, o el cambio hacia la Estadidad o la Independencia.

La Comisión recomienda, por tanto, que se establezcan procedimientos mediante los cuales se puedan constituir, con carácter *ad hoc,* grupos conjuntos asesores a iniciativa del Presidente de los Estados Unidos y del Gobernador de Puerto Rico, actuando éstos conjuntamente.

.Los grupos conjuntos asesores se formarían *con personas de la más reconocida habilidad y el más alto prestigio* y tomarían bajo consideración los problemas que afectan las relaciones entre la Isla y los Estados Unidos continentales y que les sean referidos por el Presidente de los Estados Unidos y el Gobernador de Puerto Rico. Cada grupo asesor informaría acerca de sus conclusiones y recomendaciones al Presidente y al Congreso de los Estados Unidos, y al Gobernador y a la Asamblea Legislativa de Puerto Rico. *La Integración de los grupos la determinaría la naturaleza de los problemas bajo su consideración.*

Si el pueblo de Puerto Rico indicase en un plebiscito su preferencia por la Estadidad o la Independencia, uno o más grupos conjuntos asesores se constituirían a fin de estudiar las medidas indicadas de *transición.* Si el pueblo de Puerto Rico *mantuviese* su preferencia por un mayor crecimiento del Estado Libre Asociado, de conformidad con los lineamientos contenidos en la Resolución Número 1, con fecha de 3 de diciembre de 1962, de la Asamblea Legislativa del Estado Libre Asociado, *o por virtud de otras medidas* que lleven a un crecimiento del Estado Libre Asociado, *se convocaría a uno o más grupos conjuntos asesores para examinar estas propuestas.* ([15])

([14]) En el ANEXO I que acompaño hago referencia a los antecedentes y creación de esta Comisión.

([15]) *The Status of Puerto Rico.* Report of the United States-Puerto Rico Commission for the Study of the Status of Puerto Rico. Puerto

372

En 23 de diciembre de 1966 se aprobó por la Asamblea Legislativa la Ley Núm. 1 "Para disponer la celebración de un Plebiscito sobre el Status Político de Puerto Rico", etcétera. En su Art. 1 se dispuso la celebración de un plebiscito el 23 de julio de 1967 para que el pueblo de Puerto Rico expresara su voluntad sobre su status político y seleccionara entre: (a) Estado Libre Asociado, (b) Estadidad, y (c) Independencia. Se estatuyó que un voto a favor del Estado Libre Asociado significaría:

"(1) La *reafirmación* del Estado Libre Asociado establecido por común acuerdo bajo los términos de la Ley 600 de 1950 y la Resolución Conjunta 447 de 1952 del Congreso de Estados Unidos como comunidad autónoma permanentemente asociada a Estados Unidos de América;

(2) La inviolabilidad de la común ciudadanía como base primordial e indispensable de la unión permanente entre Puerto Rico y Estados Unidos;

(3) La *autorización* para desarrollar el Estado Libre Asociado de acuerdo con sus principios fundamentales hasta el máximo de gobierno propio compatible con la común defensa, el común mercado, la común moneda y el indisoluble vínculo de la ciudadanía de Estados Unidos;

(4) Que ningún cambio en las relaciones entre Estados Unidos y Puerto Rico habrá de tener efecto a menos que antes reciba la aceptación de la mayoría de los electores votantes en referéndum convocado al efecto." (Énfasis nuestro.)

Que un voto a favor de la Estadidad significaría:

"La *autorización* para solicitar del Congreso de Estados Unidos de América la admisión de Puerto Rico en la unión americana como estado federado." (Énfasis nuestro.)

Que un voto a favor de la Independencia significaría:

"La *autorización* para recabar del Congreso la independencia de Puerto Rico de Estados Unidos de América." (Énfasis nuestro.)

Rico Booklets—No. 5—Oficina del Estado Libre Asociado de Puerto Rico en Washington, D.C. 1967. Traducido en *Status de Puerto Rico*. U.S. Government Printing Office, Washington D.C.

El Art. 19 de la Ley establece cómo debía ser la papeleta de votación, y se dispuso que a todo lo ancho de la parte inferior de la misma se insertarían unas expresiones idénticas a las del Art. I anteriormente transcritas en cuanto a que significaba el voto dado a cada una de las fórmulas. Se ordenó, sin embargo, que en la papeleta se insertara esta otra expresión no contenida en el Art. I:

"Un voto mayoritario a favor de cualquiera de las fórmulas de status constituye un *mandato* del pueblo de Puerto Rico al *Comisionado Residente,* como su representante en la esfera federal, para actuar en el desempeño de sus funciones oficiales de acuerdo con la voluntad del pueblo expresada a virtud de dicho voto." (Énfasis nuestro.)

En el Art. 45 se dispuso que el Superintendente General de Elecciones certificaría al Gobernador el resultado de la consulta plebiscitaria, que el Gobernador a su vez, certificaría el resultado al Presidente y al Congreso de los Estados Unidos, al Comisionado Residente y a la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico.

Se dispuso también que de resultar triunfante una de las fórmulas según lo dispuesto en el Art. 2 (aquella que obtuviera más del 50% de la suma total del número de votos válidos emitidos para las 3 fórmulas), el Gobernador, en su certificación al Presidente, *solicitaría* la constitución conjunta de los grupos asesores recomendados en el Informe de la Comisión de Status, y que de acuerdo con ese informe, los grupos conjuntos asesores deberían considerar las medidas de *transición* necesarias hacia la Estadidad o hacia la Independencia en caso de que una de estas fórmulas resultara triunfante. Dictamina el Legislador a renglón seguido:

"En tal caso [en el caso de triunfar la Estadidad o la Independencia] los miembros del grupo asesor que deban ser nombrados por el Gobernador de Puerto Rico, serán designados a *propuesta* del Partido o del Comité Directivo que haya representado la fórmula triunfante en el proceso plebiscitario. Si

la representación de la fórmula en el proceso plebiscitario hubiere sido dual, el Partido y el Comité Directivo tendrán derecho a proponer un número igual de miembros." (Énfasis nuestro.)

En el párrafo que le sigue, dispone el Art. 45 que:

"En caso de que el Estado Libre Asociado fuera la fórmula triunfante, el Gobernador *propondrá* al Presidente la constitución conjunta de grupos asesores respecto de medidas de desarrollo del Estado Libre Asociado, según hayan de considerarse *a base de la autorización otorgada por el pueblo en el plebiscito.*" (Énfasis nuestro.)

Están en orden algunas observaciones. La primera es que de los cuatro apartados del Art. 1 de la Ley referentes a lo que significaría un voto a favor del Estado Libre Asociado, y que se imprimen en la papeleta de votación, los apartados números (1), (2) y (4) son únicamente declarativos. En otras palabras que si el voto dado en esa papeleta se dio a favor del Estado Libre Asociado, tenía el efecto de ser (a) una *reafirmación* del Estado Libre Asociado, (b) una *expresión* de la inviolabilidad de la común ciudadanía como base de la unión permanente entre Puerto Rico y los Estados Unidos, y (c) una *expresión* de que ningún cambio en las relaciones entre Estados Unidos y Puerto Rico habría de tener efecto a menos que antes recibiera la aceptación de la mayoría de los electores puertorriqueños. Sólo el apartado (3) envuelve propiamente un acto del votante y no una declaración. El acto es la *autorización* que él da para desarrollar el Estado Libre Asociado en la forma expresada en dicho apartado (3).

¿A quién va dirigida la autorización? Aunque la Ley no lo dice, concibo que va dirigida a las Ramas políticas del gobierno, la Legislativa y la Ejecutiva. Por el contrario, al emitir su voto el elector otorgó el *mandato* del pueblo que aparece en la papeleta electoral y que cubre las tres fórmulas. Un mandato al *Comisionado Residente* para que, como su representante en la esfera federal, actúe en el desempeño

de sus funciones oficiales de acuerdo con la voluntad expresada por el pueblo en dicho voto.

Una segunda observación es la siguiente:

El Art. 45 de la Ley dispone que de tener mayoría cualquiera de las tres fórmulas, en la certificación al Presidente del resultado de la votación el Gobernador *solicitaría* de él la constitución conjunta de los grupos asesores recomendados en el Informe de la Comisión de Status. ([16])

Pero en la única ocasión en que el Art. 45 menciona el acto de nombrar o designar como resultado de la votación, concebible, inmediatamente o dentro de un período razonable de tiempo después, lo es en aquella ocasión en que hubiera triunfado la fórmula Estadidad o la fórmula Independencia.

---

([16]) La evidencia en el récord demuestra que el 17 de agosto de 1967 el Gobernador en el cargo Hon. Roberto Sánchez Vilella dio cumplimiento a la anterior disposición de la Ley al certificar al Presidente el resultado de la votación plebiscitaria:

"I therefore propose the establishment from time to time of *ad hoc* joint groups to recommend such measures as in their judgment shall promote the development of full self-government and the creation of a more perfect union between the United States and Puerto Rico, within the basic nature of Commonwealth status."

En la contestación del Presidente Johnson fechada al día siguiente, dice el Presidente que él está listo para nombrar los miembros de los Estados Unidos a ese o esos grupos en cualquier tiempo en que el Estado Libre Asociado de Puerto Rico pueda estar listo para nombrar los miembros del *Estado Libre*. "I stand ready to appoint the U. S. members of such group or groups whenever the Commonwealth of Puerto Rico may be ready to appoint the Commonwealth members."

Termina el Presidente diciendo que cree apropiado que la *agenda* de trabajo debía ser propuesta por el Gobernador del Estado Libre Asociado.

A la fecha en que se radicó este pleito, 2 de mayo de 1969, ni el Presidente Johnson ocupaba la Presidencia de los Estados Unidos ni el Gobernador Sánchez Vilella ocupaba la Gobernación del Estado Libre Asociado. Tampoco estaba en el poder allá gobernando el Partido político del Presidente Johnson, ni aquí el Partido político del Gobernador Sánchez Vilella.

Dada la naturaleza de la acción judicial que se ejercita de *mandamus*, y dada la naturaleza enteramente política de la *materia* envuelta en el pleito, el hecho anteriormente apuntado es para mí de considerable importancia.

Y en esta única ocasión, nombrar o designar el Gobernador *a propuesta* del Partido, o del Comité Directivo que hubiera presentado la fórmula triunfante. Esta disposición del Art. 45 fue *functus officio* tan pronto se terminó el escrutinio y no salió triunfante ni la Estadidad, ni la Independencia.

En lo que respecta al Estado Libre Asociado, sistema político triunfante, el Art. 45 dispuso que el Gobernador *propondría* al Presidente *la constitución conjunta de grupos asesores* respecto de medidas de desarrollo del Estado Libre Asociado, según hayan de considerarse a base de la *"autorización"* otorgada por el pueblo en el plebiscito.

Una tercera observación con referencia a la anterior disposición de la Ley. Está el hecho innegable, que toca el aspecto de la solicitud de *mandamus* relativo a la *agenda*, que la *autorización* que el votante dio al emitir su voto a favor del Estado Libre Asociado es la del apartado (3) del Art. 1, que en virtud del Art. 19 se inserta o reproduce en la papeleta de votar y es la que el elector lee. Este apartado (3) está redactado en términos *generales*, con la única orientación de que el desarrollo del Estado Libre Asociado debe ser conforme con "sus principios fundamentales" y ser compatible con la común defensa, un común mercado y moneda, y un indisoluble vínculo de la ciudadanía de los Estados Unidos.

Esa *autorización* así dada por el votante en la papeleta cuando votó a favor del Estado Libre Asociado no menciona materia, área, ni esfera específica de desarrollo, ni menciona *prioridades* entre esas materias, áreas o esferas.

En esas circunstancias de ley, que derrotarían *ab initio* cualquier petición de *mandamus* acogiéndola con el mayor favor, es lógico y razonable que jefes de gobierno, políticos, miembros de la Rama Legislativa y miembros de la Rama Ejecutiva, abogados, estudiosos del Derecho público y constitucional y los ciudadanos discrepen honestamente en cuanto a maneras, métodos, prioridades, esferas, en el proceso de

desarrollo del Estado Libre Asociado *"de acuerdo con sus principios fundamentales"*, según el votante leía en la papeleta electoral.

Es todavía más lógico y razonable, que entre los principales actores que toman parte en el proceso de desarrollo, exista honesta discrepancia de criterio tanto en lo que hubiere de sustantivo en el proceso como en cuanto al mecanismo, cuando se considera el hecho histórico-político, el cual expongo con algún detalle en el ANEXO I que acompaño, que ha existido y existe una abierta controversia de ideas y de criterios en cuanto a qué es o representa política y constitucionalmente el sistema político "Estado Libre Asociado", controversia de ideas y criterios que precisamente dio lugar a los hechos que culminaron en la creación de la Comisión de Status y poco después en la votación plebiscitaria.

Esta controversia, que incuestionablemente conduce a la aprobación de la Resolución Conjunta Núm. 2 de 19 de marzo de 1959 sobre "clarificaciones y modificaciones" a la Ley de Relaciones Federales con Puerto Rico, Resolución que originó luego el Proyecto Fernós-Murray que no se aprobó, repercutió también en el Congreso al discutirse el Proyecto Aspinall que creó la Comisión de Status.

Es aún más lógico y razonable que exista honesta e inevitable discrepancia de criterio o de entendimiento entre los principales actores en el proceso de desarrollo si, en cuanto a tal lógica y honesta discrepancia, se considera el hecho histórico, sería una candidez judicial el ignorarlo, que a la fecha de radicarse el *mandamus* el "Poder Ejecutivo" en Puerto Rico había sido otorgado por el pueblo a los representantes de un Partido distinto al Partido aquí demandante, que gestionó primero, y defendió luego, el Estado Libre Asociado en el plebiscito.

El hecho de que existan esas lógicas, razonables y honestas e inevitables discrepancias de criterio entre las Ramas

políticas del Gobierno, políticos y demás ciudadanos, no autoriza que el Tribunal, el Poder Judicial, tercie en la contienda cuando no hay envueltos derechos individuales o personales de un ciudadano o persona en particular a ser protegidos, y la *materia* del pleito es totalmente política. Como se observa en *Baker* v. *Carr*, a la pág. 208, lo que aquellos demandantes allí reclamaban no era *meramente* la alegación del derecho de los ciudadanos en general a que el Gobierno se administre de acuerdo con la ley, citando de *Fairchild* v. *Hughes*, 258 U.S. 126.

Finalmente, una cuarta observación es que el único *mandato* que aparece en la faz de la propia papeleta que en virtud del Art. 19 el elector tuvo ante sí al votar, y luego se ratifica en el Art. 45 después de la votación, es un mandato dirigido al *Comisionado Residente* para que actuara en su cargo representativo conforme a la fórmula triunfante.

—V—

Hasta aquí, la ley positiva aplicable. Ha sido preciso un examen detallado de la misma, porque en este recurso extraordinario de *mandamus*, "altamente privilegiado" y selectivo, de naturaleza brusca; coercitivo y apremiante, las cortes no pueden tomarse libertades so pretexto de al interpretar la ley, buscar una intención legislativa oculta.

La Ley de 12 de marzo de 1903—"Ley Para Establecer el Auto de Mandamus"—dispone en su Art. 1 que el auto es *"altamente privilegiado"*, y dispone en el Art. 2, que se dirigirá a cualquier tribunal inferior, etc., o persona "obligada al cumplimiento de un acto que la ley *particularmente ordene* como un deber resultante de un empleo, cargo o función pública; . . . ." En su Art. 3 dictamina que el auto podrá dictarse basado en los informes de la parte *"beneficiada e interesada."* ([17])

---

([17]) En su texto en inglés que prevalece, se dice "to compel the performance of any act which the law *'specially'* enjoins as a duty resulting

Esos conceptos de "altamente privilegiado", acto "que la ley particularmente [*specially*] ordene;" "parte beneficiada e interesada" (*beneficially interested*) no fueron puestos ahí por el Legislador al azar o por improvisación. Recogen y sintetizan una carga de doctrina acumulada durante tres siglos de decisiones, y están ahí esos conceptos con propósitos restrictivos y limitativos del poder judicial de ordenar, como salvaguardas necesarias por razón del origen de este auto y su naturaleza coercitiva.[18]

Nada hay en la Ley de Plebiscito de 1967 ni en ley otra alguna de aplicación, que imponga al Gobernador el claro e insoslayable deber, como ejecutoria de su cargo, el constituir grupos asesores con personas designadas por el Partido demandante, ni el deber insoslayable de someter a esas personas como tarea de trabajo, los temas o agenda que le sometió el Partido demandante, a serle impuesta la ejecución de dicho deber mediante orden de *mandamus*.

El Tribunal no puede, como es la tesis del demandante ante la inexistencia en la Ley del deber que se nos pide hagamos cumplir, escribir ese deber en el estatuto por vía de búsqueda de una intención legislativa, y luego de puesto ahí

---

from an office," . . . . En el Art. 3: "It may be issued on the information of the party '*beneficially*' interested." (*beneficially interested*)

[18] En su origen, el auto eran órdenes de "mando y ordeno" expedidas directamente por el Rey. No admitían contestación ni defensa. Más tarde, atemperándose su rigor, el auto fue expedido por la Corte del Rey—Kins Bench. Antes que Lord Mansfield ampliara su alcance, principalmente se usaba para ordenar la restitución a un cargo público y se le conocía más bien como auto de restitución.

Comenta Merrill, *op. cit.*, recogiendo los precedentes históricos, que en nada han cambiado hoy:

"El auto de *mandamus* con frecuencia se ha considerado como un auto de alta prerrogativa, (*) la mano derecha de la ley, y una de las flores de la Corona. No se pone en juego ligeramente. Sólo se usará para proteger *una persona* contra daño *substancial*, o para asegurar o proteger derechos *substanciales*. Por consiguiente, se ha establecido que no se expedirá a menos que hayan envueltos derechos materiales." (pág. 53.)

(*) Nuestra Ley de *Mandamus* usa el mismo término: "*high prerogative writ.*"

por el Tribunal, no por el Legislador, ordenar su cumplimiento mediante *mandamus* como un "especial" deber previamente estatuido por ley. Hacer esto destruiría tres siglos de decisiones judiciales, y un gran principio del buen orden de Derecho.

No obstante lo mucho que se ha escrito desde entonces sobre el particular, todavía son de pleno vigor como en 1866 cuando se pronunciaron, las palabras del Juez Presidente Chase en *State of Mississippi* v. *Johnson*, 71 U.S. 475, al efecto de que no cabe confundir el concepto "ministerial" con el concepto "ejecutivo", y que el deber que se puede obligar a cumplir es un deber simple y preciso e impuesto por la ley. (pág. 498.)

Aun cuando se le diera al Informe y recomendación de la Comisión de Status categoría de *Ley*, como supletorios de la Ley de Plebiscito, queda el hecho que dicha Comisión hace referencia a "personas de la más reconocida habilidad y el más alto prestigio"—reconocida habilidad y alto prestigio que incuestionablemente poseen las personas propuestas por el demandante—pero no necesariamente por razón de afiliación política.

En primer lugar, el texto del Art. 45 de la Ley es claro y diáfano y libre de ambigüedad. Art. 14, Cód. Civil, ed. 1930. "Cuando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada *bajo el pretexto* de cumplir su espíritu." Aplicando este precepto de ley, expresé en ocasión anterior que "cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es *la expresión por excelencia* de toda intención legislativa." *López* v. *Muñoz, Gobernador*, 81 D.P.R. 337, 346 (1959).

En segundo lugar, si en una ocasión no hay discrepancia entre el texto de la ley y la intención legislativa, y en que ambos van cogidos de las manos, lo es ésta ocasión. El Art. 45 de la Ley no es una pieza de legislación descuidada o negligente, ni fallida. No hay omisiones no provistas o impen-

sadas. Por el contrario, responde a una realidad política y jurídica verdad. ¿Por qué?

El Estado Libre Asociado no era una de tres "fórmulas" para el plebiscito. Era algo más. Era, como es, el sistema político rigiendo. Era el pueblo de Puerto Rico mismo, los habitantes de Puerto Rico, como cuerpo político soberano. En el proceso plebiscitario, el Estado Libre Asociado eran los miembros del Partido Popular demandante que lo defendían, pero también eran el Estado Libre Asociado los que votaban por la Estadidad y los que votaban por la Independencia que deseaban cambiar a otro sistema político.

La Legislatura que aprobó la Ley de Plebiscito era una cómodamente dominada por legisladores que defendían al Estado Libre Asociado y querían su permanencia; y el Gobernador en la incumbencia, que concluyó el proceso legislativo al firmar la Ley, también defendía el Estado Libre Asociado y quería su permanencia.

Es lógico, lo contrario hubiera sido ilógico y un contrasentido, que esa Asamblea Legislativa defensora del Estado Libre Asociado no asumiera paternidad alguna, y por el contrario, eludiera toda participación y responsabilidad en cuanto al proceso de *transición* a seguir en caso de un cambio, de triunfar una de las fórmulas que requerían un distinto sistema político. De ahí, el que dispusiera la Ley que las personas a ser nombradas para entender en las medidas de *transición* a otro régimen político fueran así nombradas a *propuesta* de aquellos que querían ese otro régimen, y no dejar la responsabilidad en manos del propio Estado Libre Asociado a través de su Ejecutivo. En tal caso, el Gobernador sólo servía de *agente* de ese sector de opinión al solo efecto del trámite de la constitución del grupo de *transición*.

Por el contrario, de triunfar como triunfó el Estado Libre Asociado, sistema político vigente—el pueblo mismo políticamente organizado—el triunfo constituiría sólo una declaración de reafirmación y mejora del sistema por el

votante, no un cambio. La propia Comisión de Status capta la situación y usa el término "indicase" en relación con la Estadidad o Independencia, y "mantuviese" al referirse al Estado Libre Asociado.

El Legislador no podía entonces disponer que los grupos asesores para el desarrollo se nombraran sólo a propuesta del Partido Popular o del organismo que hubiera defendido esa reafirmación en el plebiscito, ni que el desarrollo fuera únicamente en las áreas designadas por el Partido Popular o el organismo defensor del desarrollo, porque ello llevaría en sí un equivocado concepto *propietario* por un Partido o por un organismo, del régimen político de un pueblo.

En el proceso político de desarrollo del Estado Libre Asociado, el Estado Libre Asociado son los afiliados al Partido Popular demandante, pero son también el Estado Libre Asociado los que desean la Estadidad y abogan por ella, y también son aquellos que desean la Independencia y abogan por ella. ([19])

Por las mismas razones, es obvia la conclusión que el Partido Popular demandante no tiene un derecho o interés *"beneficiario"* particular o *"especial"*, según reza y exige la Ley de *Mandamus*, para ejercitar esta acción, distinto al interés general de cualquier ciudadano en que el gobierno funcione.

La *materia* de este pleito es el resultado de un fenómeno político corriente, susceptible de ocurrir en todo sistema de gobierno en que existe el proceso electoral periódico.

---

([19]) La insinuación del demandante de que el Art. 45 puede ser nulo por quebrantamiento de la cláusula constitucional de la igual protección de la ley, en tanto no dispuso que los grupos asesores se designaran a propuesta de dicho Partido por ser el defensor de esta "fórmula" en el plebiscito, resulta insubstancial a la luz de las razones que tuvo el Legislador para no disponerlo así y la lógica de la situación. Sobre el efecto de esta cláusula para que produzca nulidad el Tribunal Supremo de los Estados Unidos ha hecho demasiadas expresiones en los últimos años, para que no se conozca con precisión el ámbito de la prohibición constitucional.

El pueblo que votó en el plebiscito de julio de 1967 es el pueblo que votó en las elecciones de noviembre de 1968. El Estado Libre Asociado del plebiscito es el Estado Libre Asociado de las elecciones. Tanto en una como en la otra ocasión, y también el 2 de mayo de 1969 cuando se radica este pleito, la *función ejecutiva* del Estado Libre Asociado residía, como reside, en el Gobernador. No debería ser necesario explicar que me estoy refiriendo a la *Institución* de la gobernación, no al incumbente que en determinado momento histórico esté ocupando el cargo.

Así pues, esta controversia ideológica que gira en torno al desarrollo del Estado Libre Asociado traída al seno del Tribunal es una controversia ideológica del pueblo *versus* el pueblo mismo; del Estado Libre Asociado *versus* el Estado Libre Asociado mismo; a ser dilucidada en los foros políticos apropiados, el foro de la opinión pública, el foro electoral, el foro de las Ramas políticas del gobierno; a *ser* fallada por el pueblo mismo, que históricamente ha dado sus fallos.

Un hecho palpable que convence que estamos ante una materia evidentemente sujeta a meros criterios políticos y a la función "ejecutiva" propiamente política del Primer Ejecutivo, es el hecho de que a partir del 18 de agosto de 1967 cuando el Presidente Johnson anunció al Gobernador de Puerto Rico estar listo para nombrar los miembros americanos del grupo o grupos asesores en cualquier tiempo en que el Estado Libre Asociado estuviera listo para nombrar los suyos, transcurrió un período de 16 meses y medio en que el Gobernador y la Legislatura que aprobaron la Ley de Plebiscito y defensores ambos del desarrollo del Estado Libre Asociado no actuaron para iniciar el proceso de desarrollo, a pesar de que durante el mismo período ocupaba allá la Presidencia el Presidente Johnson.

No debo especular en cuanto a las razones del porqué el hecho histórico es así, pero sí puedo concluir que el Gobernador entendía que ello era una función "ejecutiva" suya de

orden político. El hecho podría tener mucha o relativa importancia en cualquier otro tipo de pleito. En una acción de *mandamus*, para mí tiene decisiva importancia. [20]

No está lejos de la realidad el Secretario de Justicia cuando insinúa que la intervención en ese debate de este Tribunal, del Poder Judicial, equivaldría a una administración del proceso de desarrollo político del Estado Libre Asociado. Para mí tendría el efecto de poner bajo Sindicatura judicial dicho proceso de desarrollo político. Este desarrollo no pertenece al Partido demandante como tal, ni pertenece al Partido demandante en particular las esferas de desarrollo.

¿Podría negarle entonces el Tribunal un auto de *mandamus* a cualquier ciudadano que le pidiera al Gobernador la designación de determinadas personas dignas de ser nombradas, o su propia designación para un grupo asesor, y el Gobernador se negara? ¿Podría el Tribunal negarle otro auto de *mandamus* a cualquier ciudadano que le solicitara incluir para estudio un tema no incluido entre los diez sometidos por el demandante, y el Gobernador se negara? ¿Podría entonces el Tribunal negarse a intervenir en cualquier otro aspecto relacionado con el proceso o mecanismo para el desarrollo del Estado Libre Asociado que la imaginación del pueblo y de la ciudadanía en general conciba, y el Gobernador rechazara? Eso sería la administración judicial del proceso de desarrollo de nuestro Sistema político. De

---

[20] En el documento que el Gobernador acompaña a su contestación dirigido al demandante, hace mención del hecho y manifiesta:

"Señalo, que aunque el plebiscito se celebró el 23 de julio de 1967 nunca se hizo requerimiento al entonces Gobernador del Partido Popular Democrático, Hon. Roberto Sánchez Vilella, para que designara representantes de Puerto Rico para las comisiones 'ad hoc' ni para que éste fijara temas ni personas en particular en la constitución de dichas comisiones, a pesar de que transcurrieron dieciocho meses, desde que se celebró el plebiscito hasta que el Sr. Sánchez Vilella cesó en su cargo de Gobernador.

"Fue claramente irrazonable, por lo tanto, que se me planteara dicho asunto por ese Partido, a los 21 días de mi toma de posesión y con posterioridad a la radicación de una demanda por un ciudadano particular, y en la cual el Partido Popular Democrático fue parte."

hecho, otro ciudadano particular ya tramitó acción contra el Gobernador sobre la misma *materia* en un Tribunal de jurisdicción concurrente con la que ahora ejercitamos. *Enrique Bird Piñero* v. *Hon. Luis A. Ferré, Gobernador, etc. y Partido Popular Democrático,* T.S.-S.J.-69-243. [21]

Creo que toda intervención sería un grave error judicial. Creo que de expedir yo un auto de *mandamus* bajo la ley aplicable a este caso y en sus circunstancias, estaría realizando un acto de fuerza por una Rama constitucional del gobierno contra otra Rama constitucional "co-igual" del gobierno. Nadie ganaría con desvalorar la Función ejecutiva, como no ganaría nadie con desvalorar la Función legislativa o la Función judicial. En todos los casos perdería el pueblo, en su orden constitucional y político.

Por todas las razones y fundamentos expresados en esta Opinión, he concluido que la *materia* de este pleito, enteramente política, es de la exclusiva incumbencia de las Ramas Ejecutiva y Legislativa del Estado Libre Asociado, y en su consecuencia, no justiciable. Por esta razón, he votado para que no se expida el auto de *mandamus*, ahora, o en momento futuro alguno.

—O—

### Anexo I al Voto del Juez Asociado
### Señor Santana Becerra

Datos históricos a grandes rasgos de la situación política de los habitantes de Puerto Rico

### Siglo XIX

Desde que a principios del Siglo XIX por Decreto de 22 de enero de 1809 de la Junta Suprema y Gubernativa de

[21] En vista de la conclusión a que he llegado en contra de expedir el auto, no creo necesario discutir la defensa de cosa juzgada por sentencia firme de un Tribunal en ejercicio de una jurisdicción de igual jerarquía a la que aquí se ejercita en Primera Instancia.

España se reconoce a Puerto Rico ser parte integrante de la Monarquía española y se concede a sus habitantes representación nacional ante la misma a nombre del Rey Fernando VII, hecho éste que motiva la elección, el 4 de mayo de 1809, de don Ramón Power como representante de los puertorriqueños ante la referida Junta Suprema Gubernativa y el histórico acto en la Catedral en que el Primer Obispo puertorriqueño se despoja de su anillo pastoral y se lo entrega al Representante en prenda recordativa de su resolución de sostener "los derechos de nuestros compatriotas"; y disuelta luego la referida Junta Suprema y sustituida por el Consejo de Regencia de 1810 éste, en Decreto oficial reafirma que Puerto Rico es parte integrante de la Nación española y corresponden a los puertorriqueños "los mismos derechos y prerrogativas que a la Metrópoli", lo cual motiva la segunda elección de Power como Diputado a Cortes; y reafirmada la anterior declaración del Consejo por decretos de las Cortes al instalarse y elevar a Power a su primera Vicepresidencia, proclamando "una sola nación y una sola familia" los dominios españoles en ambos hemisferios, y la igualdad de derechos de los naturales de Puerto Rico con los de la Península; y desde entonces, y hasta el día de hoy, los puertorriqueños no han cesado un momento en su lucha por obtener mayores libertades políticas como pueblo.

El anhelo de los puertorriqueños desde entonces y su lucha por mayor poder político ha sido, tomándole prestado un verso al malogrado poeta cantor del verde de nuestra campiña "un pecho que grita en verde, ¡pero que siempre grita!"

En las instrucciones que los Ayuntamientos dan al primer Diputado en el Parlamento español, se hace adhesión profunda a la Nación española, pero piden, en lo político, reformas inmediatas en nombre de "la ley de la humanidad." Entre muchas otras importantes, se piden reformas sociales para mejorar las condiciones "intelectuales" y una "uni-

versidad", porque la educación de la juventud "es la base primordial del Estado"; y piden la libertad de tráfico con las naciones extranjeras. Estas y otras instrucciones indican la orientación que ya al principio del Siglo XIX tenía el pensamiento de los puertorriqueños sobre problemas políticos y socio-económicos que todavía son del presente.

El 14 de julio de 1812 se promulga la vigencia en Puerto Rico de la Constitución del 19 de marzo de ese año, con el reconocimiento de la igualdad de derechos de los puertorriqueños como parte integrante de la Nación, española, y su derecho a estar representados en el Parlamento español por representantes de elección popular. Localmente esta Constitución crea la Diputación Provincial, organismo básico para el desarrollo y fomento interno del país, con su mayoría de miembros elegidos conjuntamente con el Diputado a Cortes.

El régimen liberal bajo la Constitución de 1812 queda reemplazado en 1814 al ser derogada la Constitución, y hasta el 1820, por el absolutismo de Fernando VII; se restablece la Constitución en 1820 hasta el 1823 y se eligen diputados y vuelven a estar los puertorriqueños investidos con todos los derechos de la ciudadanía española como parte de la nación.

A partir de 1823 se reemplaza la Constitución con el absolutismo nuevamente de Fernando VII y se dan, por Decreto de 28 de mayo de 1825, que sigue uno anterior despótico de 4 de septiembre de 1810, las combatidas e hirientes facultades omnímodas de los Gobernadores para gobernar al país, y conforme a las Leyes de Indias. No obstante, por el Estatuto Real de 1834, ya bajo el régimen de Isabel II, y por Decreto adicional, se reconoció a los puertorriqueños el derecho a dos representantes en el Estamento de Procuradores (Cámara Baja) de las Cortes españolas.

En 1823 ocurre un hecho considerado por el historiador Cruz Monclova como la aparición de la fórmula política au-

tonomista, que luego en la segunda mitad del Siglo adquiere gran arraigo y de hecho finalmente se convierte en el pensamiento predominante del sector reformista y liberal del país que sin rechazar del todo la idea autonomista, había mantenido una tendencia asimilista.

El Diputado de Puerto Rico entonces, don José María Quiñones, junto a dos Diputados cubanos, presentó un Proyecto para el Gobierno Económico y Político de las Provincias de Ultramar que se ha dicho representaba un tránsito del sistema asimilista bajo la Constitución de 1812 a uno autonomista; un proyecto que (cita el Profesor Cruz Monclova) establecía "el hecho diferencial" entre Cuba y Puerto Rico respecto de la Metrópoli, y fijaba las consecuencias de ese "hecho diferencial." Según Cruz Monclova, el Proyecto recogía en el orden intelectual la idea de Montesquieu de que "las leyes deben ser propias para el país donde han de regir y relativas a su género de vida colectiva", y la idea de la Constitución Napoleónica de que "las colonias serían gobernadas por leyes especiales adecuadas a sus particulares condiciones."

Las Cortes aprobaron el Proyecto de don José María Quiñones, si bien de inmediato no se promulgó debido a la reaparición del régimen absolutista de 1823.

En 1834 se eligieron los dos representantes puertorriqueños al Estamento de Procuradores de las Cortes, y en las instrucciones dadas por el Ayuntamiento volvían a reclamar, además de derechos políticos y sociales reformistas, la libertad de comercio, y la educación. En 23 de mayo de 1836 los Estamentos fueron disueltos.

En 12 de agosto de ese año se restablece la Constitución de 1812, lo cual traía el asimilismo de los puertorriqueños a la nación española con iguales derechos. Comenta Cruz Monclova que los liberales acogieron jubilosos el retorno de la Constitución de 1812, que significaba asimilismo, a pesar de la idea autonomista de 1823, creyendo que por el mismo

camino llegarían a aquella meta. Vuelve a elegirse representación a las Cortes, y éstas en abril de 1837 aprobaron un dictamen disponiendo que las provincias de Ultramar se regirían por leyes especiales, volviendo así al pensamiento no asimilista de 1823. Las Cortes dispusieron a la vez la exclusión de las mismas de los Diputados insulares.

El dictamen de las Cortes se perpetuó en la Constitución de 1837, Art. 2 de sus Artículos Adicionales: "Las provincias de Ultramar serán gobernadas por leyes especiales."; Art. 80 de la Constitución de 1845; Art. 86 de la Constitución de 1856. Esas leyes especiales, que nunca llegaban, fueron uno de los grandes motivos de lucha de los puertorriqueños por más poder político durante el resto del Siglo, y hasta que advino el estatuto autonómico de 1897, de poca vida.

Escribe don Lidio Cruz Monclova en su *Historia de Puerto Rico*, Siglo XIX, que "grande fue, en cambio, la conmoción que experimentó la opinión insular, cuando, el 21 de diciembre siguiente, aparecía en la Gaceta un Real Decreto, promulgado a instancias del Ministro de Ultramar don Antonio Cánovas del Castillo el 25 de noviembre [1865] convocando a Madrid representantes de Puerto Rico y de Cuba para informar al Gobierno de los problemas '*social*, económico y político' de las islas y proponer las 'Leyes Especiales propias para hacer su felicidad.' "

Disponía el Decreto que la Junta Informativa se compondría de cuarenta y cuatro personas, veintidós de las Colonias y veintidós designadas por el Ministro de Ultramar, y para determinar los hechos la Junta oiría verbalmente o por escrito, a los Gobernadores Superiores, Regentes e Intendentes en Cuba y Puerto Rico, y los que antes habían desempeñado esos cargos; a los Senadores naturales de esas provincias, a veintidós comisionados de las islas elegidos por los Ayuntamientos o corporaciones y a otras veintidós personas designadas por el Ministro de Ultramar que hubieran

residido cuatro años en las Antillas y que conocieran de los asuntos a considerarse; y a las Corporaciones de Ultramar o de la nación que la Junta creyera útil oir.

El 6 de noviembre de 1866 la Junta celebró su primera reunión. En abril de 1867 la Junta recibió el primero de 3 informes de los puertorriqueños, de Ruiz Belvis, sobre el problema social. Como primera recomendación:—la abolición incondicional de la esclavitud, que queda abolida seis años después. Se presentaron luego el informe económico, que abogaba entre muchas cosas por la libertad de comercio, y el político. Éste, aparte de reclamar para los puertorriqueños los mismos derechos individuales, que constitucionalmente disfrutaban los españoles nacionales, proponía un sistema de régimen orgánico para el gobierno de Cuba y Puerto Rico. Éste era un orden orgánico autonomista, y según observa doña Pilar Barbosa, las reformas políticas, económicas y sociales defendidas por los puertorriqueños en la Junta Informativa fueron la base fundamental del Partido político Liberal Reformista que se organiza en 1870 cuando aparecen en Puerto Rico partidos políticos como tal, Partido que aunque fue de tendencia asimilista al organizarse, en gran parte luego evoluciona en el Partido Autonomista de 1887.

No puede quedar desapercibido el hecho del gran parecido que hay en su razón de ser, propósitos y mecanismos, entre esta Junta Informativa de 1866 y este otro mecanismo de la Comisión de Status y grupos asesores o comités *ad hoc*, nombre más familiar, con la misión de 'informar' sobre los problemas políticos, sociales y económicos de los puertorriqueños con miras a una solución.

El Gobierno de la Revolución de 1868 anunció un gobierno asimilista para los puertorriqueños y en consecuencia, en 1869 se les otorgaba de nuevo el derecho a la representación en las Cortes españolas eliminado desde 1837. Esta vez, once diputados. Sin embargo, no se le extendió a los puerto-

rriqueños la Constitución de 1869, ni su Título I sobre los derechos individuales de los españoles, la cual dispuso en su Art. 108 que las Cortes reformarían el sistema presente de Gobierno de las provincias de Ultramar cuando hubieren tomado asiento los Diputados de Cuba o Puerto Rico, para ser "extensivos a las mismas, con las modificaciones que se creyeren necesarias, los derechos consignados en la Constitución."

En agosto de 1872 los puertorriqueños eligieron quince Diputados a las Cortes, y en mayo de 1873 elegían quince Diputados ante la Asamblea Nacional de la República. En 6 de agosto de 1873 se promulga una Ley extendiendo a Puerto Rico el Título I de la Constitución de 1869—Derechos individuales de los españoles—y más tarde se abolían las facultades omnímodas de los Gobernadores bajo el Decreto de mayo de 1825. Caída la República en 1874, se suspendió en Puerto Rico dicho Título I por proclama del Gobernador local.

La Constitución de 1876, restaurada la Monarquía de Alfonso XII, disponía otra vez en su Art. 89 que las provincias de Ultramar serían gobernadas por leyes especiales, y que el Gobierno quedaba autorizado para aplicar a dichas provincias, con las modificaciones que juzgare pertinentes y dando cuenta a las Cortes, las leyes promulgadas o a promulgarse para la Península. Dispuso el Art. 89 que Cuba y Puerto Rico estarían representados en las Cortes según lo determinara una ley especial.

Finalmente, el régimen político de la Carta Autonómica de 1897, parte de las "leyes especiales" prometidas desde 1837, y la culminación de una tenaz lucha de los puertorriqueños por mayor gobierno propio. Tal vez deba anotarse que la representación que ostentaban los puertorriqueños en las Cortes españolas no era una nominal, o restringida a los asuntos de interés sólo local. Sus Diputados ejercían la plena función gubernativa de todos los demás Diputados nacio-

nales, aun en asuntos tan de interés nacional como la selección de un Rey, cuando unos Diputados puertorriqueños votan a favor de Amadeo de Saboya, y don Román Baldorioty de Castro emite su voto en blanco con sus proféticas palabras: "Jamás por nada ni por nadie traicionaré mis principios. Esa monarquía ha de traer la guerra civil, y no quiero que la sangre que se va a verter sea sancionada con mi voto." (*)

## SIGLO XX

Con el cambio de soberanía motivado por la guerra de Estados Unidos y España, los derechos civiles y la condición política de los habitantes de Puerto Rico quedan a ser determinados por el Congreso de los Estados Unidos, bajo el Art. IX del Tratado de París. Los puertorriqueños perdieron en su totalidad la condición política que habían ganado bajo la Carta Autonómica de 1897, y con ella perdieron unos derechos básicos para su desarrollo económico por los cuales habían estado luchando ardientemente desde los comienzos del Siglo XIX y al fin se habían logrado. Ésos son los derechos estatuidos en los Arts. 37 y 38 de la Carta Autonómica, que disponían que la negociación de los tratados de comercio que afectara la Isla de Puerto Rico, ya se debieran a la iniciativa del Gobierno insular, bien a la del Gobierno central, se llevarían por el Gobierno central auxiliado en ambos casos por Delegados especiales debidamente autorizados por el Gobierno insular, cuya conformidad con lo convenido se haría constar al presentarlos a las Cortes del Reino, y si aprobados por éstas, regirían en el territorio insular; y el Art. 38 al efecto de que los tratados de co-

---

* Debo los datos de esta breve exposición histórica principalmente a Don Lidio Cruz Monclova en su *Historia de Puerto Rico*, Siglo XIX, 1958, y su obra *Baldorioty de Castro*, Instituto de Cultura Puertorriqueña, 1966; y a *Doña Pilar Barbosa*, obra de José Celso Barbosa—Vols. V y VI, *Historia del Autonomismo Puertorriqueño*, 1957. *Constituciones de España*.

mercio en cuya negociación no hubiera intervenido el Gobierno insular, se le comunicarían en cuanto fueren leyes del Reino, a fin de que en un período de 3 meses el Gobierno insular pudiera declarar si deseaba o no adherirse a sus estipulaciones. En caso de querer adherirse, el tratado se publicaría por el Gobernador como un Estatuto insular.

A 73 años plazo, este importante derecho político ya conquistado por los puertorriqueños para su desarrollo económico forma ahora parte de una *agenda* para estudio de un comité *ad hoc*, sin que aún pueda anticiparse su suerte.

Como régimen político, la Carta Autonómica de 1897 fue sustituida por la Carta Orgánica Foraker de 1900. Este estatuto declaró a los habitantes de Puerto Rico ciudadanos de Puerto Rico, con derecho, como tales ciudadanos de Puerto Rico, a la protección de los Estados Unidos, y los dejó políticamente organizados bajo el nombre de "El Pueblo de Puerto Rico". En su vigencia dispuso la Ley de 1900 que sus disposiciones se aplicarían a la Isla de Puerto Rico e islas adyacentes y a las aguas de las islas situadas al este del meridiano 74 de longitud oeste de Greenwich, cedidas a los Estados Unidos en virtud del Tratado de París.

Distinto a la Carta Orgánica de 1917 que la sustituyó, en ésta el Congreso no hizo expresión alguna de ubicación política de los puertorriqueños en el ámbito de su sistema federativo. Distinto a la Carta Orgánica de 1917, la Foraker no contenía una Carta de Derechos para la protección de los habitantes de Puerto Rico. La Constitución de los Estados Unidos, que contiene una Carta de Derechos, no regía por su propia fuerza en todas sus disposiciones en la isla cedida, ni tampoco había sido extendida a sus habitantes por acción del Congreso. Sin embargo, por interpretación judicial, los ciudadanos de Puerto Rico tenían la protección de ciertos derechos básicos dentro del sistema constitucional norteamericano. *Balzac* v. *Puerto Rico*, 258 U.S. 298, 312, y casos en él citados. Cuando menos debían tener la protección de la

cláusula del debido procedimiento de la Enmienda Quinta por razón de que siendo el Gobierno bajo la Ley Foraker un Gobierno local por delegación del Congreso, al Congreso le obligaba la Quinta Enmienda.

La Carta Orgánica de 1917, el próximo status orgánico de los puertorriqueños, les concede la ciudadanía de los Estados Unidos, y crea un Senado de elección, pero el Congreso ya los ubica en el engranaje federativo con la expresión de que la isla pertenece a los Estados Unidos. Esa expresión legislativa queda reafirmada judicialmente al dictaminarse cinco años más tarde por el Tribunal Supremo de los Estados Unidos, en *Balzac*, que Puerto Rico pertenecía a pero no formaba parte de los Estados Unidos. Ese concepto político, tanto de ley positiva como de interpretación judicial, revolotea aún al presente sin modificarse, no obstante los acontecimientos políticos que han sucedido posteriormente. La disposición positiva según interpretada se reproduce hoy como una disposición positiva de la actual Ley de Relaciones Federales, y hasta ahora el Tribunal Supremo de los Estados Unidos, final intérprete de esas relaciones, no se ha manifestado de manera distinta.

Al igual que durante los 90 años del Siglo XIX bajo la soberanía española, bajo la soberanía de los Estados Unidos los puertorriqueños no han cesado de desear y de luchar por mayores poderes políticos como Pueblo. Se explica esa lucha y ese anhelo porque como regímenes orgánicos, tanto la Ley Foraker como la Ley Jones fueron estatutos muy constreñidos en el reconocimiento de poderes políticos. A pesar de que la Ley Jones mejora la anterior Foraker, de fuerte centralización en lo administrativo, y produce alguna descentralización en ciertas funciones locales de gobierno, creando también un Senado de elección popular en sustitución del Consejo Ejecutivo de nombramiento Presidencial, es de notarse que transcurre un período de 30 años bajo la Ley Jones antes de que dentro del sistema de ese estatuto territorial los

puertorriqueños adquirieran el girón político de elegir a su Gobernador por voto popular, concesión del Congreso en el año 1947.

En la campaña eleccionaria de 1948, el Partido en el poder luchó, como parte de su programa político para esas elecciones, por el derecho de los puertorriqueños a adoptar su propia Constitución. Triunfante ese Partido por amplio margen, ese deseo y aspiración fueron acogidos por el Congreso y así comenzaron a desarrollarse los acontecimientos que dieron lugar a que el 25 de julio de 1952 el Gobernador de Puerto Rico proclamara la Constitución del Estado Libre Asociado de Puerto Rico. A los fines del Congreso, "The Commonwealth of Puerto Rico".

La base de la creación del Estado Libre Asociado fue la Ley 600 del Congreso aprobada en 3 de julio de 1950. Quizás sean convenientes unos comentarios en torno a este importante estatuto que no deja de estar libre en su seno de la esencia de cierto contrasentido intelectual y político, lo cual probablemente ha sido en gran parte la causa de la discusión y la discrepancia de ideas que surgieron después en cuanto a qué era exactamente la creación política Estado Libre Asociado.

Al aprobar la Ley 600 el Congreso hace *sua sponte* la afirmación de que, reconociendo ampliamente el principio del gobierno por consentimiento de los gobernados, aprueba esa Ley con carácter de un convenio, de manera que el pueblo de Puerto Rico pudiera "organizar un gobierno" basado en una constitución adoptada por él mismo. (Traducción L.P.R.A., Vol. 1, Documentos Históricos.)

Si la Ley 600 fuera aceptada por los electores capacitados de Puerto Rico en un referéndum, la Asamblea Legislativa quedaba autorizada para convocar una convención constitucional que redactara una constitución para la Isla de Puerto Rico. La Constitución debería crear un *gobierno* republicano en forma e incluir una Carta de Derechos. Si

los puertorriqueños aceptaban la Ley y adoptaban una constitución, el Presidente de los Estados Unidos quedaba autorizado para enviarla al Congreso de entender que la misma respondía a las disposiciones aplicables de la Ley 600 y a las disposiciones aplicables de la Constitución de los Estados Unidos. El Congreso debía aprobar la Constitución para que ésta entrara en vigor. Al regir dicha Constitución, el anterior estatuto orgánico, Ley Jones de 1917, continuaba en vigor con excepción de una serie de disposiciones mayormente de carácter administrativo, que quedaban derogadas, a ser citado entonces dicho estatuto como "Ley de Relaciones Federales con Puerto Rico."

Aceptada por una mayoría de los electores de Puerto Rico la Ley 600, siguió el proceso de la convención constitucional y se produce la Constitución del Estado Libre Asociado proclamada el 25 de julio de 1952. Según su Preámbulo crea, "dentro de nuestra unión con los Estados Unidos de América," el Estado Libre Asociado.

El "gobierno" del Estado Libre Asociado se ubica en sus Poderes Legislativo, Ejecutivo y Judicial, según quedan establecidos en la Constitución, igualmente subordinados los tres Poderes a la soberanía del Pueblo de Puerto Rico. Sec. 2, Art. I. Las relaciones de los habitantes de Puerto Rico con los Estados Unidos, sin embargo, se siguen rigiendo por aquellas disposiciones de la Carta Foraker de 1900 y de la Carta Jones de 1917 que en virtud de la Ley 600 quedaron en pie, citadas ahora como Relaciones Federales con Puerto Rico.

En cuanto a dichas Relaciones, la Constitución del Estado Libre Asociado no contiene expresión política fuera de su Preámbulo, con excepción de la Sec. 1 del Art. I que, al constituir el Estado Libre Asociado, con poder político que emana del pueblo y que se ejerce conforme a su voluntad, dispone que es "dentro de los términos del convenio acordado entre el pueblo de Puerto Rico y los Estados Unidos de

América"; y con excepción también de lo dispuesto en la Sec. 16 del Art. VI al efecto de que los funcionarios y empleados del Estado Libre Asociado prestarán juramento de fidelidad "a la Constitución de los Estados Unidos de América" y/a la Constitución y a las leyes del Estado Libre Asociado; y con excepción de la Sec. 3 del Art. VII al efecto de que ninguna enmienda a la Constitución podría alterar la forma republicana de gobierno o abolir la Carta de Derechos, exigencias éstas de la Ley 600, así como que cualquier enmienda debe ser compatible con la resolución del Congreso aprobatoria de la Constitución, con las disposiciones aplicables de la Constitución de los Estados Unidos, con la Ley 600 y con la Ley de Relaciones Federales; y finalmente, con excepción de la Sec. 10 del Art. IX, que requiere la ratificación por el Congreso de la Constitución, antes de comenzar a regir.

Aparte de tales excepciones, las expresiones políticas de los habitantes de Puerto Rico al adoptar su Constitución, aparecen en el Preámbulo de la misma, y son: la ciudadanía de los Estados Unidos y la aspiración a enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas; y la lealtad a los postulados de la Constitución Federal.

Por esos dos elementos de Relaciones Federales, además de las excepciones detalladas, votó el pueblo. Los demás elementos son expresiones del Congreso.

—O—O—

En 10 de julio de 1962 el Gobernador de Puerto Rico Don Luis Muñoz Marín se dirigió al Presidente Kennedy y le expresa, refiriéndose a la creación del Estado Libre Asociado:

"Estábamos conscientes entonces de que el convenio no era perfecto. Esta conciencia se ha ido acentuando hasta hacerse ahora aguda. La misma Asamblea Constituyente reconoció desde el comienzo que había lugar para crecimiento, y que este creci-

miento podía y debía ser, no hacia la independencia o la estadidad federada, sino dentro de la naturaleza y genio de la propia idea creadora del Estado Libre Asociado.

Creo que ha llegado el momento de que ese crecimiento se efectúe. Un retraso indebido en esto no puede dejar de hacer daño a Puerto Rico y a la importancia de Puerto Rico como un exponente y ejemplo de la actitud de los Estados Unidos en un mundo donde el colonialismo es obsoleto y el nacionalismo extremo es obsolescente."

Expresa entonces el Sr. Muñoz Marín al puntualizar ciertos criterios en cuanto al crecimiento del Estado Libre Asociado que propone:

"(1) El principio indispensable del Estado Libre Asociado es el gobierno propio para Puerto Rico en asociación permanente con los Estados Unidos sobre una base de lealtad común, ciudadanía común, mutua dedicación a la democracia y un compromiso mutuo con la libertad.

(2) Las bases morales y jurídicas del Estado Libre Asociado deben aclararse aún más para así eliminar cualquier posible base para la acusación hecha por los enemigos y los amigos descarriados de los Estados Unidos y de Puerto Rico, de que el Estado Libre Asociado no fue la libre selección de nuestro pueblo actuando en capacidad soberana, sino meramente un tipo diferente de arreglo colonial al cual el Pueblo de Puerto Rico consintió.

(3) El poder y la autoridad gubernamental del Estado Libre Asociado debe ser completa. Todas las reservas o excepciones que no sean parte indispensable de los arreglos para la asociación permanente con los Estados Unidos deben ser eliminadas. Deben establecerse métodos para que el Pueblo de Puerto Rico pueda participar dentro del concepto de Estado Libre Asociado, en las funciones federales que le afectan."

Después de las anteriores expresiones dice el Sr. Muñoz Marín al Presidente que parece claro que el pueblo de Puerto Rico debería ser consultado de nuevo "sobre sus relaciones 'de gobierno' con Estados Unidos" y que había llegado el momento en que el pueblo, a base de su propia experiencia, debería considerar "cómo ha de perfeccionar el concepto de Es-

tado Libre Asociado dentro de su asociación permanente con la Unión Federal." Que ésa era su convicción sobre lo que debía hacerse y que creía que era la de la vasta mayoría de los puertorriqueños.

En su contestación al Gobernador Muñoz Marín, el Presidente Kennedy manifestó estar consciente de que la relación de Estado Libre Asociado no se había perfeccionado y no había realizado aún su pleno potencial, y que veía con beneplácito su declaración de que el pueblo de Puerto Rico estuviera a punto de comenzar a considerar "esta relación con el propósito de llevarla a su desarrollo máximo." Dice el Presidente que estaba en total simpatía con esta aspiración, y que no veía razón alguna por la cual el concepto de Estado Libre Asociado, si tal era el deseo del pueblo de Puerto Rico, no pudiera "desarrollarse" completamente "como una institución permanente en su asociación con los Estados Unidos." Que estaba de acuerdo en que éste era un momento oportuno para reconocer la necesidad de crecimiento "y con que, tanto como una cuestión de equidad para todos los concernidos como para establecer un 'récord' inequívoco, se consulte al pueblo de Puerto Rico, tal y como se propone usted hacerlo, para que éste pueda expresar su preferencia, incluyendo la independencia, si tal fuese su deseo."

¿Qué ocurrió antes de la comunicación del Gobernador Muñoz Marín al Presidente Kennedy de 10 de julio de 1962, y por qué el Gobernador habla de la clarificación de las "bases morales y jurídicas" del Estado Libre Asociado? A poco que se proclamó el Estado Libre Asociado surgió entre los habitantes de Puerto Rico una honda divergencia de criterio en cuanto a qué era y qué no era el Estado Libre Asociado en lo referente a los poderes políticos del pueblo de Puerto Rico y las relaciones de los puertorriqueños con los Estados Unidos. En cuanto a las facultades administrativas del Estado Libre Asociado, no había discusión. Los detractores del Estado Libre Asociado sostenían que todo lo ocurrido con su crea-

ción no había sido sino una descentralización administrativa del anterior estatuto territorial, Ley Jones, y que los puertorriqueños políticamente continuaban bajo status de territorio. Los defensores del Estado Libre Asociado sostenían que se había realizado un acto de libre determinación por los habitantes de Puerto Rico en cuanto a su organización política como pueblo. El debate no fue sólo en la arena política ni en la opinión pública. Llegó también al foro judicial. A la luz de controversias jurídicas específicas, unos tribunales federales dignificaban al Estado Libre Asociado situándolo en situación política paralela o similar a la de un Estado de la Unión. Otros tribunales federales mantenían el criterio del mero territorio, aun después de su creación. (*) Una de las esferas de mayor controversia era, y sigue siéndolo, la vigencia de leyes del Congreso en el Estado Libre Asociado, particularmente las aprobadas después de la creación de éste, sin la intervención de los puertorriqueños, así como el alcance del "permiso" para ello en la Ley de Relaciones; y si el "pacto" de la Ley 600 podía ser o no modificado unilateralmente por el Congreso. Infortunadamente para todos no se produjo, ni aún se ha producido, una opinión del Tribunal Supremo de los Estados Unidos sobre las Relaciones Federales, intérprete final de lo que el Estado Libre Asociado es como sistema político que gira en la órbita del sistema federativo de los Estados Unidos.

---

(*) *Mora* v. *Torres* (Ortiz) 113 F.Supp. 309—confirmado en *Mora* v. *Mejías* (1st Cir.) 206 F.2d 377; *Mora* v. *Mejías* (Ruiz Nazario) 115 F.Supp. 610; *Peñagaricano* v. *Allen Corporation* (1st Cir.) 267 F.2d 550; *Americana of Puerto Rico, Inc.* v. *Kaplus* (1st Cir.) 368 F.2d 431; *United States* v. *Figueroa Ríos* (Ruiz Nazario) 140 F.Supp. 376; *United States* v. *Mejías* (Ruiz Nazario) 131 F.Supp. 957; *Lumus Company* v. *Commonwealth Oil Refining Co.*, 195 F.Supp. 47; *Mirabal Carrión, et al.* v. *U.S.* (1st Cir.) 225 F.2d 679. Ver 125 F.Supp. 819. *Cuebas Arbona* v. *U.S. of America* (1st Cir.) 225 F.2d 679. Ver 126 F.Supp. 366. *Mitchell* v. *Rubio*, 139 F.Supp. 379; *Consentino, etc.* v. *International Longshoremen's Ass'n. etc.*, 126 F.Supp. 420. Véanse: *Detrés* v. *Lions Building Corporation*, 136 F.Supp. 699, y su revocación en (7th Cir.) 234 F.2d 596.

Los conceptos y clarificaciones vertidos en el Congreso y en el Informe del Comité de Terrenos Públicos de la Cámara sobre el alcance de la Ley 600 durante el debate de su aprobación, tanto cuando se demandaba dentro de dicha Ley mayor poder político para los puertorriqueños, como lo hacía el Representante Javits, como cuando se preocupaban por los poderes que el Congreso podría perder con la misma, venían a complicar aun más la situación avivando el debate ideológico suscitado. *Congressional Record—House*, págs, 9584–9602, junio 30, 1950; *Congressional Record—Senate*, págs. 8321–8324, junio 8, 1950; Informe del Senado Núm. 1779, Junio 6, 1950; Informe de la Cámara Núm. 2275, junio 19, 1950.

Independientemente de los argumentos en uno u otro sentido, puede haber una situación real, en un enfoque sereno y objetivo del problema libre de calor o apasionamiento intelectual o político, producto de lo que expresábamos anteriormente sobre que la Ley 600 contiene la esencia de un contrasentido.

El Congreso hace expresión de reconocimiento del principio del gobierno por consentimiento de los gobernados, y aprueba la Ley 600 con el carácter de un convenio para que el Pueblo de Puerto Rico pueda "organizar un gobierno" basado en una constitución adoptada por él mismo. No hay duda que antes de perpetuarse la Ley 600 de manera que diera los frutos que se deseaban, los puertorriqueños en una votación libre y voluntaria, y por un amplio margen, aceptaron la referida Ley. En el aspecto más sustantivo, sin embargo, no podría decirse bajo un criterio sereno y desapasionado, que los puertorriqueños en ese entonces determinaron por sí mismos, con todo lo que pudieran tener en su espíritu en el ámbito de sus anhelos y aspiraciones, el contenido y alcance de las Relaciones Federales que querían tener con los Estados Unidos, como si ambos pueblos, el de los Estados Unidos y el de Puerto Rico, se hubieran sentado frente a frente en la mesa de regateo del *"do ut des"* latino. Se usa el término "deter-

minar" a contrapuesta del término "aceptar", ya que el concepto de "libre determinación" en relación con el sistema político de un pueblo es un concepto que en Derecho público tiene un significado propio, definido e inconfundible. El único poder de determinación de los puertorriqueños era sobre la "única alternativa" de aceptar la Ley 600 como se ofrecía, o no, y seguir por ese entonces sin Constitución, y bajo el régimen Jones; pero no una determinación cubriendo el aspecto sustantivo del pacto.

Las disposiciones de la Ley Foraker y de la Ley Jones que quedaron en pie para regir las Relaciones Federales de los habitantes de Puerto Rico con los Estados Unidos, aun cuando los habitantes de Puerto Rico aceptaron la Ley 600, fueron escritas y adoptadas sólo y únicamente por el Congreso de los Estados Unidos, muchas de ellas tan lejos como desde el 1900 cuando los puertorriqueños no tenían aún un representante ante dicho Congreso, y las otras, las de 1917, cuando tenían un representante con las limitaciones y restricciones en su función, conocidas.

El concepto de convenio o pacto de la Ley 600 con los puertorriqueños en el Derecho público y para las relaciones políticas de Puerto Rico y los Estados Unidos, tiene su paralelo en el derecho privado y las relaciones de individuos con individuos, en el atípico "contrato de adhesión", en que una de las partes contratantes pone los pactos, tanto sustantivos como adjetivos, sin intervensión de la otra, y entonces la otra los acepta como están puestos. No quiere decir ello que un contrato de adhesión, por tener esas características, carezca de obligatoriedad. Un contrato de adhesión en la vida civil es tan obligatorio para una parte como para la otra de no haber motivos inherentes de nulidad. Aceptada por los puertorriqueños la Ley 600, el pacto o convenio que lleva en sí es de absoluta obligatoriedad para los puertorriqueños y esas Relaciones Federales los obligan política, legal y moralmente. Sin

embargo, el hecho de esa obligatoriedad no describe, necesariamente, el concepto propio de la libre determinación política de un pueblo en toda su amplitud.

El problema podría surgir—lo único que surge en las relaciones privadas cuando existe un contrato de adhesión—al llegar el momento de interpretarlo. En la esfera privada, debe hacerse liberalmente a favor de la parte que no lo escribió y restrictivamente en contra de aquella que lo escribió. No es éste el momento de adelantar criterio en cuanto a si llegado el caso, el de interpretar la Ley 600 de surgir la controversia apropiada, la más probable o cercana la de la aplicación de las leyes del Congreso y el significado del "permiso" general, los tribunales seguirían o no en el Derecho público normas semejantes de interpretación a las del Derecho privado en tales casos.

Aparte de las pugnas ideológicas suscitadas en torno a la Ley 600, los hechos históricos demuestran que en los acontecimientos que culminaron en la proclamación de la Constitución de 1952, los puertorriqueños hicieron algo más que "organizar un gobierno", según reza la Ley 600, aunque no dejaron de organizar uno.

Crearon un Estado. Se concibe que los términos Gobierno y Estado no son sinónimos ni la misma cosa. Bajo el Preámbulo, parte política de la Constitución y la Sec. 1 del Art. I, crearon un Estado con el poder político emanado del pueblo, a ejercerse dentro del convenio de la Ley 600. Bajo la Sec. 2 del Art. I, los puertorriqueños procedieron entonces a "organizar un gobierno."

El Congreso de los Estados Unidos aprobó la Constitución sin que expresara criterio en contrario o reserva alguna sobre lo realizado por los habitantes de Puerto Rico. Una conclusión lógica de lo anterior sería que la creación de un Estado diferente debería hacerse por los canales constitucionales reconocidos en el Derecho público cuando el cambio no

es por la fuerza de las armas, y sí mediante la expresión de los habitantes. La propia Constitución del Estado Libre Asociado crea el mecanismo.—Sec. 2 del Art. VII.

Con motivo del debate que genera el concepto y alcance político de Estado Libre Asociado, la Asamblea Legislativa aprobó en 19 de marzo de 1959 la Resolución Conjunta Núm. 2 "Para proponer al Congreso de los Estados Unidos de América clarificaciones y modificaciones a la Ley de Relaciones Federales con Puerto Rico." En el último "Por Cuanto" se expresa la conveniencia de proponer al Congreso ciertos cambios en el Estatuto de Relaciones Federales que "clarifiquen la naturaleza del Estado Libre Asociado", y modifiquen la Relación de Estado Libre Asociado con la Unión Federal, mencionando expresamente la Asamblea Legislativa: (1) la descripción adecuadamente en la Ley de Relaciones Federales del Estado Libre Asociado para que no pueda clasificarse como "posesión" o "territorio"; (2) clarificación sobre la aplicación de las leyes federales; (3) la eliminación de todo lo que en dicho Estatuto resulte confuso, anacrónico e inaplicable. Además, la Asamblea Legislativa solicitó del Comisionado Residente la gestión de cinco modificaciones a las Relaciones.

La Resolución Conjunta Núm. 2 motivó la presentación en el Congreso por el Comisionado Residente, en marzo 23 de 1959, del Proyecto Núm. H-5926. Una medida igual se presentó en el Senado por el Senador Murray—S-2023. El Proyecto Fernós-Murray contenía básicas y sustanciales enmiendas al "pacto" entre los puertorriqueños y los Estados Unidos. Hizo surgir pronunciadas discrepancias de criterio en el Congreso sobre las clarificaciones y modificaciones propuestas a las Relaciones Federales, políticas y económicas, que hubieran dado mayor poder político a Puerto Rico, y finalmente no se aprobó. Por las razones que fueran, el Congreso no respon-

dió en ese entonces al clamor del país por más derecho a gobierno propio. (1)

Después de lo relativo a la suerte del Proyecto Fernós-Murray y de la Resolución Conjunta Núm. 2 de 19 de marzo de 1959 para clarificar y modificar el Estado Libre Asociado, ocurre el cambio de comunicaciones entre el Gobernador Muñoz Marín y el Presidente Kennedy de julio de 1962.

Considerados ambos documentos, es claro que el Gobernador Muñoz Marín concebía en su comunicación sólo el desarrollo y crecimiento del Estado Libre Asociado dentro de una unión permanente con los Estados Unidos. Abogaba por mayores poderes políticos dentro de ese Sistema, y dentro de ese Sistema y de la unión permanente abogaba por cambios en las relaciones federales. Es en ese sentido y para esos fines que el Gobernador Muñoz Marín creía en la necesidad de otra consulta al pueblo. En el pensamiento del Sr. Muñoz Marín en esa comunicación no había la idea de una consulta al pueblo para cambiar el Sistema político de Estado Libre Asociado a otro sistema. Sin embargo, el Presidente Kennedy al final de su contestación, intercala el concepto de una consulta que podía desembocar en un cambio del Estado Libre Asociado hacia la independencia si tal fuese el deseo del pueblo.

En diciembre siguiente se aprueba la Resolución Conjunta Núm. 1, 1962, esta vez para proponer al Congreso el procedimiento para establecer "el ulterior status político final" del pueblo de Puerto Rico. En su parte dispositiva acuerda proponer al Congreso "la pronta" decisión en forma democrática

---

(1) Una amplia y detallada información del Proyecto Fernós-Murray, de sus disposiciones y sobre la discusión del mismo se obtiene en la publicación del Comité de lo Interior y Asuntos Insulares de la Cámara de Representantes titulada: "Puerto Rico. A Survey of Historical, Economic, and Political Affairs." Committee Print No. 15. Noviembre, 1959. United States Government Printing Office, Washington, 1959. Consúltese: "The Puerto Rican Federal Relations Act and the Articles of Permanent Association of Puerto Rico with the United States—A comparative Analysis Accompanied by Related Documents", publicación de la Oficina del Estado Libre Asociado en Washington, D.C. 1959.

del status político de Puerto Rico; que, expresada por el Congreso la forma en que estuviera dispuesto "acordar el Estado Libre Asociado en armonía con los principios contenidos en el cuarto Por Cuanto de esta Resolución", se sometan a la decisión del pueblo las "tres fórmulas de status"—Estado Libre Asociado, Estadidad, Independencia—a base de tal expresión del Congreso, de acuerdo con las leyes de Puerto Rico, "de modo que la solución triunfante quede implantada o se implante conforme a la voluntad del pueblo de Puerto Rico."

Como una observación ya de orden histórico, porque de hecho la fórmula Independencia no triunfó en el plebiscito de 1967, surge el hecho de hasta qué punto, rigiendo una Constitución en que el pueblo directamente se había manifestado por la ciudadanía de los Estados Unidos de América y su aspiración a enriquecer su acervo democrático en el disfrute individual y colectivo de los derechos y prerrogativas de esa ciudadanía, y se había manifestado por la lealtad a los postulados de la Constitución de los Estados Unidos, como factores determinantes de su vida, podía la Resolución Núm. 1 de 1962, siguiendo tal vez lo sugerido por el Presidente Kennedy, someter la fórmula Independencia que envolvía un abandono de esos factores, sin que antes se hubiera consultado al pueblo a través de una enmienda a la Constitución. En otras palabras: ¿era compatible esa parte de la Resolución Conjunta Núm. 1 con la Constitución vigente?

—O—O—O—

*Comisión de Status.*

Conforme a la expresión legislativa de la Resolución Conjunta Núm. 1 de diciembre de 1962, en 30 de abril de 1963 el Representante Sr. Aspinall presentó el Proyecto de la Cámara 5945, "Para establecer un Procedimiento para la Pronta De-

cisión, de una Manera Democrática, del Status Político de Puerto Rico."

Según se presentó originalmente, decía el Proyecto Aspinall que reconociendo debidamente el derecho inherente y la capacidad jurídica del pueblo de Puerto Rico para gobernarse a sí mismo y establecer aquellas relaciones con el Gobierno de los Estados Unidos según libremente se acuerden, el Congreso toma nota de la Resolución Conjunta Núm. 1 de la Asamblea Legislativa de Puerto Rico aprobada en 3 de diciembre de 1962, la cual propone al Congreso la pronta solución, de manera democrática del status político de Puerto Rico, y por la presente crea la Comisión de Pacto de los Estados Unidos y Puerto Rico—"United States-Puerto Rico Compact Commission."

La Comisión se compondría de 12 miembros, cuatro nombrados por el Presidente, cuatro por el Gobernador, más dos Senadores y dos Representantes del Congreso.

La encomienda dada a esta Comisión de Pacto fue así:

"The Commission shall draft a proposed compact of permanent union between the Government of the United States and the people of Puerto Rico in the light of the principles expressed by the Legislative Assembly of Puerto Rico in said joint resolution numbered 1, namely: (a) 'the recognition and reassertion of the sovereignty of the people of Puerto Rico'; (b) 'the permanence and irrevocability of the union between the United States and Puerto Rico on the basis of common citizenship, common defense, common currency, free market, common loyalty to the values of democracy, and of such other conditions as may be considered, in the compact, of mutual benefit to the United States and Puerto Rico'; (c) the specific definition of the powers of the United States with respect to Puerto Rico and the reservation of all other powers to the people of Puerto Rico; and (d) participation by the people of Puerto in the powers exercised, under the compact, by the Government of the United States, in matters affecting Puerto Rico, in a measure proportional to the scope of such powers and the adoption of a formula under which the people of Puerto Rico will contribute, in a manner compatible with the

stability and economic growth of Puerto Rico, to the general expenses of the United States Government."

La Comisión rendiría su Informe al Presidente, al Congreso, y al Gobernador y a la Asamblea Legislativa de Puerto Rico.

El Comité de lo Interior y Asuntos Insulares de la Cámara a la cual fue referido el Proyecto Aspinall, de hecho produjo una versión sustitutiva. El Proyecto original encomendaba a la Comisión el "redactar" un proyecto de pacto o convenio cubriendo las Relaciones Federales de la Resolución Conjunta Núm. 1. Véase el debate—*Congressional Record—House*. Octubre 23, 1963, págs. 20, 119 a 20, 130; Senado, 23, 785. La versión sustituta, que se convierte en la Ley Pública 88–271 de 20 de febrero de 1964, crea una Comisión de los Estados Unidos y de Puerto Rico sobre el Status de Puerto Rico, y le encomienda a esta Comisión el "estudiar" todos los factores, incluyendo, sin limitarse a, las leyes, tratados, constituciones, y convenios vigentes, aplicables, que tengan que ver con las presentes y futuras relaciones entre los Estados Unidos y Puerto Rico. (Traducción de L.P.R.A.) La Comisión debería rendir un informe al Presidente y al Congreso, y al Gobernador y la Asamblea Legislativa. Parece como si el tiempo hubiera retrocedido cien años a la Junta Informativa de 1866. La semejanza llega, inclusive, a lo "informativo." Distinto a la versión original del Proyecto Aspinall, en que la Comisión podía redactar las bases de un "pacto" y demás relaciones federales, a ésta la limita a hacer un estudio e informar.

La Comisión, de 7 miembros nombrados por el Presidente y el Congreso, a la cual se unieron 6 miembros a invitación del Congreso, aceptada por la Asamblea Legislativa, nombrados por el Gobernador, sometió sus recomendaciones después de muchas sesiones de trabajo y la acumulación de un extensísimo material informativo. Como es de conocimiento, la

Comisión se expresó sobre la 'necesidad de un método en el futuro inmediato que haga factible la consideración de las propuestas de mejoramiento o desarrollo del Estado Libre Asociado, o el cambio hacia la Estadidad o la Independencia", método éste que más adelante sugiere es un "plebiscito", y recomendó el establecer "procedimientos mediante los cuales se pueden constituir, con carácter ad hoc, grupos asesores a iniciativa del Presidente de los Estados Unidos y del Gobernador de Puerto Rico, actuando éstos conjuntamente." En caso de una preferencia plebiscitaria por la Estadidad o la Independencia, se constituirían grupos para estudiar las medidas de "transición." Si una preferencia por el Estado Libre Asociado, de conformidad con los lineamientos de la Resolución Conjunta Núm. 1 de diciembre de 1962, los grupos examinarían estas propuestas.

La recomendación de la Comisión de Status se aceptó por la Asamblea Legislativa de Puerto Rico y produce la Ley de Plebiscito de 1967 y la posterior consulta plebiscitaria. Implícitamente, se aceptó por el Presidente de los Estados Unidos en su comunicación al Gobernador de Puerto Rico Hon. Roberto Sánchez Vilella de 18 de agosto de 1967. El Congreso de los Estados Unidos aún no se ha manifestado sobre dicha recomendación. En esta etapa se encuentran hoy todavía los habitantes de Puerto Rico en su lucha de ciento sesenta años por mayores poderes políticos como pueblo.

Es impresionante cómo se comparan los pensamientos, enfoques, concepciones y actitudes de los distintos sectores de opinión de los puertorriqueños en cuanto a su problema político en el Siglo pasado, particularmente en la segunda mitad del Siglo, como lo demuestran en excelente exposición y análisis las obras de Don Lidio Cruz Monclova y de Doña Pilar Barbosa, con los pensamientos, enfoques, concepciones y actitudes de los distintos sectores de opinión de los puertorriqueños en este momento, en que el debate político se manifiesta tan candente como en el pasado Siglo. Difícilmente

podrían entenderse a cabalidad los pensamientos, concepciones y actitudes de hoy de los distintos sectores de la opinión puertorriqueña, si no se conoce a perfección nuestra lucha política del pasado histórico.

El presente mecanismo para obtener esos mayores poderes políticos es útil, y valioso, y ha sido aceptado. Se concibe que no es el único vehículo, dentro de los procesos constitucionales de ley y de orden y sin caer en la antijuricidad, que la imaginación creadora de los puertorriqueños pueda usar en su lucha, que ya pasa del umbral del siglo y medio, para resolver su condición política.

El debate sobre el problema político de Puerto Rico ha tenido siempre en el Siglo pasado y en el presente, su natural foro de la opinión pública y las urnas. En ese foro debe continuar.

—O—

Opinión emitida por el Juez Asociado Señor Blanco Lugo
San Juan, Puerto Rico, a 2 de febrero de 1970

I

*Las Alegaciones y la Contienda Judicial*

Nueve meses después de la celebración del plebiscito dispuesto por la Ley Núm. 1 de 23 de diciembre de 1966, 16 L.P.R.A. secs. 844–938, en 2 de mayo de 1969, el Partido Popular Democrático, que, conforme al Art. 4 (b), 16 L.P.R.A. sec. 847, había representado la fórmula de status triunfante Estado Libre Asociado, incoó ante este Tribunal una solicitud de *mandamus* contra el Hon. Luis A. Ferré, quien desde el 2 de enero de 1969 ocupa el cargo de Gobernador de Puerto Rico, para que se ordenara a éste proceder "al cumplimiento de los deberes que le impone la Ley de Plebiscito de 1967". Para darle contenido a esta vaga súplica y precisar las pretensiones de la parte peticionaria, requiérese un examen de las alegaciones de la solicitud.

Después de hacer referencia a la celebración del plebiscito y a su resultado, se expuso que el anterior Gobernador, Hon. Roberto Sánchez Vilella, había certificado al entonces Presidente de los Estados Unidos, Hon. Lyndon B. Johnson, el resultado de la consulta plebiscitaria, y solicitado la constitución conjunta de los grupos asesores recomendados en el informe de la Comisión de Status y descritos en la Exposición de Motivos de la Ley de Plebiscito de 1967, *supra*;(¹) que en 24 de enero de 1969 el Partido Popular Democrático había solicitado del Gobernador que designase los miembros puertorriqueños que habrían de formar parte *del primer grupo asesor* para el desarrollo del Estado Libre Asociado, y le *había propuesto* los nombres de las personas que debían ser designadas, *así como la relación de los temas* que a su entender debían ser estudiados; que idéntico requerimiento se reiteró en 24 de febrero de 1969, sin que se hubieren contestado o atendido; que el Gobernador tiene la obligación de cumplimentar la voluntad del pueblo expresada en la consulta plebiscitaria tomando los pasos requeridos por el Art. 45 de la Ley mediante la selección de los miembros puertorriqueños de entre las personas propuestas por el Partido Popular Democrático y la proposición al Presidente de Estados Unidos de "la constitución de grupos asesores para la recomendación por éstos de las medidas que estimen necesarias para desarrollar el Estado Libre Asociado de acuerdo con sus principios fundamentales hasta el máximum de gobierno propio compatible con tales principios o, en la alternativa, para la consideración por éstos de los temas propuestos por el Partido Popular Democrático."

Dedúcese, por tanto, que la solicitud apunta a la existencia de los siguientes deberes de parte del Gobernador de Puerto Rico:

(i) la constitución de grupos asesores para el desarrollo

(¹)La comunicación tiene fecha de 17 de agosto de 1967 y la contestación del Presidente de los Estados Unidos *es del siguiente día.*

del Estado Libre Asociado mediante la designación de los miembros puertorriqueños que integrarán los mismos;

(ii) la designación de los miembros de entre las personas sugeridas por el Partido Popular Democrático;

(iii) la designación de grupos asesores para la consideración de las medidas que los propios comités estimen necesarias para el desarrollo del Estado Libre Asociado o en su defecto, de los temas propuestos por el Partido Popular Democrático.[2] A *contrario sensu,* se niega la facultad del demandado para intervenir en la selección de los temas a considerarse por los grupos asesores.[3]

---

[2] En la comunicación del Partido Popular Democrático de 24 de enero de 1969 dirigida al Gobernador Ferré se propone la consideración de los siguientes temas para la formulación de recomendaciones:

"a) El mejoramiento de la legislación sobre cabotaje, de modo que puedan abaratarse los fletes marítimos entre Estados Unidos y Puerto Rico;

"b) La fijación y distribución de beneficios (profit allocation) de empresas que operan en Puerto Rico y en los Estados Unidos y su responsabilidad contributiva en los Estados Unidos y en Puerto Rico;

"c) La ampliación de la participación de Puerto Rico en programas de ayudas federales ('grants-in-aids') y en la Guerra contra la Pobreza;

"d) La estructuración de una fórmula que provea una mayor contribución del Estado Libre Asociado de Puerto Rico en la prestación de los servicios federales aquí;

"e) El establecimiento de una fórmula mediante la cual los niveles de salario mínimo en Puerto Rico se equiparen a los de Estados Unidos en el término más breve;

"f) La participación de Puerto Rico en tratados de naturaleza comercial, cultural y educativos;

"g) La aplicación de la Ley Federal de Servicio Militar Obligatorio para determinar aquellas medidas que la hagan más justa y equitativa para los puertorriqueños;

"h) La determinación de medidas de protección contra la competencia del exterior para los productos agrícolas del país;

"i) La clarificación y el perfeccionamiento de los principios que rigen la aplicación de las leyes federales en Puerto Rico;

"j) Proponer una agenda sobre otros temas que sirva de guía para la constitución de futuros grupos asesores."

[3] En su alegato, a las págs. 30 y 31, la parte peticionaria concreta sus pretensiones así:

" . . . lo que se interesa es una orden que instruya al demandado a:

"1. Designar a la brevedad posible los miembros de los grupos aseso-

En 15 de mayo de 1969, apenas un día antes de que este Tribunal proveyera en cuanto a la solicitud de *mandamus*, el Gobernador Ferré contestó las comunicaciones del Partido Popular Democrático. En su parte pertinente dice:

" . . . yo daré cumplimiento cabal a las disposiciones de la ley del plebiscito y que me guiaré en su cumplimiento por las expresiones mayoritarias del pueblo de Puerto Rico. Las responsabilidades que pueda tener el Gobernador y que emanan de la ley de plebiscito y de nuestra Constitución no pueden, ni deben ser compartidas con otras personas o entidades por el Ejecutivo en ausencia de un precepto claro de ley. Son inherentes a su cargo, por lo que debe rechazarse en su ejecución cualquier intento de intervención extraña."

Requerimos, conforme a lo dispuesto en la Regla 55 de las de Procedimiento Civil, la presentación por el demandado de su contestación a las alegaciones de la petición.([4]) Así lo hizo. En su contestación, en esencia, el Gobernador reafirmó la posición que expresa en su comunicación de 15 de mayo, y específicamente afirma que "no se ha negado ni se niega a cumplir con las obligaciones que pueda imponerle la

---

res propuestos o que proponga el Partido Popular Democrático; y

"2. (a) Proponer al Presidente de los Estados Unidos como agenda del primer grupo asesor la ofrecida por el Partido Popular Democrático, cual es, hacer las recomendaciones que estime dicho grupo de orden más fundamental y perentorio para cumplir con el mandato plebiscitario de desarrollar el Estado Libre Asociado hasta el máximo de gobierno propio compatible con la común defensa, el común mercado, la común moneda y el indisoluble vínculo de la ciudadanía de los Estados Unidos—lo que conlleva la formulación de recomendaciones sobre la totalidad de los principios especificados en la Resolución Conjunta de diciembre de 1962—y estudiar a tal fin los otros temas enumerados en la Comunicación del demandante al demandado del 24 de enero de 1969; o en la alternativa.

(b) Proponer al Presidente la constitución de un grupo asesor que estudie la totalidad del desarrollo del Estado Libre Asociado hasta el máximum de gobierno propio compatible con la común defensa, la común moneda, el común mercado y el indisoluble vínculo de la ciudadanía de los Estados Unidos de América."

([4]) A este respecto en la resolución correspondiente hice constar que "requeriría a la parte peticionaria para que informe si subsiste a esta fecha la situación de hechos alegada en la petición."

ley"; (⁴·¹) y que "el Gobernador tiene discreción para proponer los temas a estudiarse por los grupos asesores, y que al así hacerlo debe darle cumplimiento a las disposiciones de la Ley del Plebiscito y guiarse en su cumplimiento por las expresiones mayoritarias del Pueblo de Puerto Rico"; negándose "por constituir conclusiones, interpretaciones y opiniones . . . sin base en ley" que venga obligado a designar para integrar los grupos asesores a personas propuestas por el Partido Popular Democrático. Adujo, además, siete defensas especiales.

Así quedó trabada la contienda.

## II

### *Las Obligaciones del Demandado*

Diluida propiamente la controversia, se contrae a determinar cuáles son las funciones que la Ley de Plebiscito le asigna al Gobernador y el alcance de la intervención del Partido Popular Democrático, como representante de la fórmula triunfante Estado Libre Asociado, en la instrumentación del mandato plebiscitario. Más estrechamente, se trata de la composición de los grupos asesores y su agenda de trabajo. Ello, en sustancia envuelve, la interpretación del Art. 45 de dicha ley, 16 L.P.R.A. sec. 888, a la luz del proceso histórico que culminó en la celebración de la consulta plebiscitaria y del conjunto de disposiciones de las distintas leyes que en una u otra forma se relacionan con el asunto.

El Art. 45, *supra*, copiado a la letra, dice:

---

(⁴·¹) Estando aún pendiente de resolución este recurso el demandado anunció en un discurso pronunciado en ocasión de la conmemoración del Día de la Independencia de Estados Unidos que había recomendado al Presidente que se le uniera para proceder a la designación de un grupo asesor para estudiar la viabilidad de la participación de Puerto Rico en la selección del Primer Ejecutivo de dicha nación.

Hace apenas unos días, en 27 de enero de 1970, se anunció oficialmente por la oficina de prensa de La Fortaleza la "aprobación" por el Presidente de las personas sometidas por el Gobernador para formar parte de dicho grupo asesor.

"El Superintendente General de Elecciones certificará al Gobernador el resultado de la consulta plebiscitaria. El Gobernador, a su vez, certificará el resultado al Presidente y al Congreso de Estados Unidos, al Comisionado Residente y a la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico.

De resultar triunfante una de las fórmulas según lo dispuesto en el Artículo 2 de esta ley, el Gobernador en su certificación al Presidente, solicitará la constitución conjunta de los grupos asesores recomendados en el informe de la Comisión de Status y descritos en la exposición de motivos de esta ley.

De acuerdo con ese informe, los grupos conjuntos asesores deberán considerar las medidas de transición necesarias hacia la estadidad o hacia la independencia en caso de que una de estas fórmulas resultara triunfante. En tal caso los miembros del grupo asesor que deban ser nombrados por el Gobernador de Puerto Rico, serán designados a propuesta del partido, o del Comité Directivo que haya representado la fórmula triunfante en el proceso plebiscitario. Si la representación de la fórmula en el proceso plebiscitario hubiera sido dual, el partido y el Comité Directivo tendrán derecho a proponer un número igual de miembros.

En caso de que el Estado Libre Asociado fuera la fórmula triunfante, el Gobernador propondrá al Presidente la constitución conjunta de grupos asesores respecto de medidas de desarrollo del Estado Libre Asociado, según hayan de considerarse a base de la autorización otorgada por el pueblo en el plebiscito.

Un voto mayoritario a favor de cualquiera de las fórmulas de status constituirá un mandato del pueblo de Puerto Rico al Comisionado Residente, como su representante en la esfera federal, para actuar en el desempeño de sus funciones oficiales de acuerdo con la voluntad del pueblo expresada a virtud de dicho voto."

—A—

*La Integración de los Grupos Asesores*

Una interpretación estrictamente literal de las disposiciones transcritas conduciría inflexiblemente al reconocimiento de una discreción ilimitada al Gobernador en la implementación del mandato plebiscitario. Es la solución más simplista y la que no requiere elaboración. Pero su adopción

requeriría, como veremos, en cierta medida frustrar el resultado de la consulta, o cuando menos, desnaturalizarlo. En la obligación que tenemos de decir lo que es la ley no podemos actuar tímidamente, en desconocimiento de las consecuencias que ello conllevaría. Desaprobamos, pues, tal interpretación.

No se cuestiona la facultad del Gobernador de Puerto Rico para designar los comités asesores. Hasta aquí, sencillez. El problema se torna espinoso cuando nos enfrentamos al trato que la ley acuerda para la integración de los mismos. Por un lado, en el supuesto de que la fórmula triunfante hubiese sido la Estadidad o la Independencia, reconoce una intervención directa a los partidos políticos o comités directivos que hubieren representado tal fórmula— "En tal caso los miembros del grupo asesor que deban ser nombrados por el Gobernador de Puerto Rico, serán designados a propuesta del partido, o del Comité Directivo que haya representado la fórmula triunfante en el proceso plebiscitario"—; por otro lado, cuando se trata de la fórmula Estado Libre Asociado, ninguna mención se hace a la intervención de partidos o comités— ". . . el Gobernador propondrá al Presidente la constitución conjunta de grupos asesores respecto de medidas de desarrollo del Estado Libre Asociado . . . ."

No es fácil aceptar que se trata de una mera omisión legislativa que pudiera justificarnos a suplirla. No se trata de una mera pieza legislativa ordinaria y común en el trámite de la Asamblea Legislativa. La trascendencia de la materia a legislarse era obvia. Fue objeto de detenida consideración en una sesión extraordinaria de los órganos legislativos y de negociación activa entre los proponentes de las distintas fórmulas de solución al status político. La exclusión de la participación del partido representativo de la fórmula Estado Libre Asociado en la selección de los grupos asesores fue deliberada, en el sentido de que por la situación de poder

político entonces imperante, se estimó innecesaria. A esta imprevisión no podemos proporcionar el remedio que ahora se solicita.

Para la fecha en que se consideraba la necesidad de esta legislación recomendada por la Comisión de Status Político para la expresión de la preferencia del pueblo, el Partido Popular Democrático, defensor de la solución Estado Libre Asociado, había elegido al incumbente en la gobernación y controlaba decisivamente las cámaras legislativas. No era de esperarse que el entonces gobernador desatendiera las recomendaciones de su partido en una materia tan vital dentro del desarrollo político; lo contrario era cierto, podía anticiparse que designaría a propulsores de la fórmula Estado Libre Asociado para la integración de los grupos asesores, a sugestión de dicha colectividad. Pero ésa no era la situación de los defensores de las otras fórmulas cuya participación en el plebiscito se deseaba vehemente e intensamente para que el resultado de la consulta estuviese revestido de la mayor legitimidad posible, tanto internamente como en el exterior. Para garantizar esa participación, bien por partidos reconocidos o a través del mecanismo de los comités directivos que en sustitución de aquellos se diseñó, y que su esfuerzo no sería frustratorio en caso de que la voluntad del pueblo se manifestare a favor de la Estadidad o la Independencia, era imperativo que fueran representantes por ellos propuestos quienes consideraran las medidas de transición necesarias conducentes a cualquiera de las fórmulas mencionadas. De ahí la necesidad de provisiones expresas en ese sentido.

Es innegable también que los partidos políticos organizados que defendían la Estadidad y la Independencia habían hecho pronunciamientos sobre la inaceptabilidad de la consulta plebiscitaria. Existía un interés marcado en que concurrieran a la votación, ya que su retraimiento podía deslucir el resultado y afectar su confiabilidad. La interven-

ción en la instrumentación de las respectivas fórmulas puede haber constituido un incentivo para lograr esa participación.

Por otro lado la celebración de la consulta plebiscitaria en 23 de julio de 1967 concedía amplio término para que su resultado pudiese implementarse antes de las próximas elecciones cuadrianuales de noviembre de 1968. Precisamente uno de los objetivos de todo este proceso era desvincular la manifestación de la voluntad ciudadana de todo otro issue electoral. En la Exposición de Motivos de la Ley claramente se expresa que "Estos grupos asesores podrían comenzar *de inmediato* a considerar propuestas para el desarrollo del Estado Libre Asociado . . . ." Se descansó en la afinidad con la fórmula Estado Libre Asociado del gobernador electo hasta el 2 de enero de 1969.

Extraño resulta que se pretenda amparar la súplica de la parte peticionaria en una aplicación de la garantía constitucional sobre la igual protección de las leyes, especialmente considerando que fueron legisladores afiliados a dicho partido quienes proveyeron el trato en la selección de los grupos asesores de que ahora abjuran. Ni su génesis histórica ni su desarrollo posterior justifican la pretendida aplicación en este caso. Gray, *Developments in the Law—Equal Protection*, 82 Harv. L. Rev. 1065 (1969). Originalmente se dirigió a lograr la igualdad política y civil de un grupo numeroso de la población americana, Frank y Munro, *The Original Understanding of "Equal Protection of the Laws"*, 50 Colum. L. Rev., pág. 131 (1950); contemporáneamente ha servido para lograr cambios en la estructura social del país y para facilitar una revolución económica mediante (i) la limitación de las clasificaciones legislativas permisibles; (ii) la eliminación de legislación discriminatoria, y (iii) la imposición de limitaciones sustantivas al ejercicio del poder de razón de estado (*police power*). Tussman y TenBroek, *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341 (1949); Antieau, *Equal Protection Outside the Clause*, 40

Calif. L. Rev. 362 (1952). Nada encontramos en el Art. 45 que imponga una carga onerosa o penalidad discriminatoria en relación con la integración de los grupos asesores para el mejoramiento del Estado Libre. De ser necesario, como hemos expresado anteriormente, existen razones contemporáneas con la aprobación de la ley que explican la diferencia que en cuanto a la selección de los representantes estatuye dicho artículo. Es todo cuanto se requiere.(5) A menos que se pretenda que todo esto es un ejercicio de simetría abstracta. Rigurosamente no puede hablarse en la situación que consideramos de la vulneración de dicha garantía constitucional, que presupone en la *práctica* la existencia real y efectiva de cuando menos dos reglas distintas que se están aplicando para normar a personas o entidades que están colocadas en la misma posición.

Concluimos, por tanto, que el Gobernador no está obligado *por ley* a seleccionar los miembros puertorriqueños de los grupos asesores de entre las personas sugeridas por el Partido Popular Democrático. No obstante, ello no significa que tenga una discreción absoluta en la designación, ya que a nuestro juicio, del examen y estudio en conjunto de todas las disposiciones de la ley se desprende que habiendo triunfado la fórmula Estado Libre Asociado, los miembros puerto-

---

(5) Las reglas para la determinación de si se ha negado la igual protección de las leyes fueron expuestas por el Juez Van Devanter en *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U.S. 61 (1911), en la siguiente forma:

(1) La igual protección de las leyes de la Enmienda Decimocuarta no priva a los estados del poder de clasificar en el ejercicio de su poder de razón de estado, sino que admite una amplia discreción en ese sentido; y solamente interviene cuando lo estatuido no tiene una base razonable, y es por tanto, arbitrario.

(2) Una clasificación que tiene una base razonable no quebranta la garantía meramente porque no responda a una precisión matemática o porque en la práctica resulte en alguna inigualdad.

(3) Cuando se impugna la clasificación, si puede concebirse una situación de hechos que la justifique, se presumirá la existencia de tal situación a la fecha de la adopción de la legislación.

(4) Corresponde a quien impugna la clasificación el peso de demostrar que no descansa en una base razonable y que esencialmente es arbitraria.

rriqueños tienen que ser sostenedores de tal fórmula. (⁵·¹) De no ser así se vulneraría el resultado de la consulta, porque se podría encomendar la instrumentación de la fórmula triunfante a personas que no creen sinceramente en su virtualidad y eficacia y tal resultado lastimaría una conciencia justa. La estructura toda de la Ley de Plebiscito señala a que en todo momento todo lo concerniente a cada una de las fórmulas sea encomendado a quienes en ella crean y la defiendan para evitar una posible adulteración de los conceptos y sus finalidades. Así, en el Art. 4(a), 16 L.P.R.A. 847, al tratar del nombramiento de miembros adicionales para la Junta Estatal de Elecciones, ante la posibilidad de que el partido político defensor de determinada fórmula no hiciere la petición correspondiente al Gobernador, se provee que "los citados miembros adicionales sean nombrados por el Gobernador y *serán personas con un reconocido historial de defensa de la fórmula de status correspondiente.*" Y en el inciso (c)(2) del mismo artículo, al pautar para la organización y reconocimiento de las agrupaciones o entidades que por la abstención de los partidos políticos asumieran la representación de determinada fórmula, se proveyó que ". . . dicha agrupación, organización o entidad existía y tenía *un público y reconocido historial de defensa de la fórmula de status* de que se trate; o que, no habiendo existido a esa fecha como tal, estuviere a la fecha de la aprobación de esta ley, integrada en parte, *por personas que estuvieren afiliadas a una agrupación, organización o entidad que al 5 de agosto de 1966*, existía y tenía un *público y reconocido historial de defensa de la fórmula de status* que propugne la actual agrupación, organización o entidad, o

---

(⁵·¹) Conviene aclarar que la diferencia entre la interpretación sugerida por el Juez Asociado Señor Rigau—la obligación de designar los miembros de los grupos asesores a sugestión del Partido Popular Democrático, lo que presupone que se trata de creyentes de buena fe en la fórmula Estado Libre Asociado—y la nuestra, se limita en esencia al método de selección.

que no habiendo existido a la fecha de vigencia de esta ley, una parte sustancial de sus integrantes tenía, al 5 de agosto de 1966, por *su afiliación a cualquier partido*, un *público y reconocido historial de defensa de la fórmula de status* que se propone representar." Y al señalar en el inciso (4) el requisito mínimo de las firmas necesarias se requiere un número equivalente a no menos del uno por ciento de los electores "que votaron en las pasadas elecciones generales por el partido político *que propulsaba la fórmula de status favorecida por la agrupación, organización o entidad que interese participar.*"

Esta preocupación legislativa de que las distintas fórmulas estén representadas por personas reconocidamente partidarias de cada una ha sido constante. Así, en la Ley Núm. 9 de 13 de abril de 1964 (Leyes, pág. 42), referente a la designación de los miembros puertorriqueños en la Comisión de los Estados Unidos y de Puerto Rico sobre el status de Puerto Rico creada por la Ley Pública Núm. 88–271 de 20 de febrero de 1964, 78 Stat. 17, 48 U.S.C. § 731 nota, se dispone que si alguno de los partidos políticos no propusiere los nombres de los miembros para formar parte de la comisión, o para llenar cualquier vacante que surgiere, "el Gobernador designará como miembro o miembros de la Comisión a personas públicamente conocidas como partidarios de la fórmula política postulada por el partido que dejó de certificar nombres al Gobernador."

En este aspecto de la cuestión concluimos, en resumen, que conforme a la ley, (a) el Gobernador está obligado a designar los miembros de los grupos asesores para la consideración de medidas para el desarrollo del Estado Libre Asociado, y, (b) que tiene que designar como miembros puertorriqueños a personas con "un público y reconocido historial de defensa" de dicha fórmula.

—B—

*Las Medidas para la Consideración de los Grupos Asesores*

En el plebiscito celebrado el 23 de julio de 1967 el pueblo expresó su preferencia sobre status para el país: El Estado Libre Asociado con capacidad de crecimiento y desarrollo. [6] La estructuración del desarrollo del Estado Libre Asociado es la misión que corresponde a los grupos asesores para instrumentar el resultado de la consulta plebiscitaria. A este respecto, el Partido Popular Democrático reclama la facultad de determinar las medidas o los temas que serán objeto de consideración por dichos grupos asesores.

El párr. 4 del Art. 45, *supra*, se limita a disponer que:

"En caso de que el Estado Libre Asociado fuera la fórmula triunfante, el Gobernador propondrá al Presidente la constitución conjunta de grupos asesores respecto de medidas de desarrollo del Estado Libre Asociado, según hayan de considerarse *a base de la autorización otorgada por el pueblo en el plebiscito.*"

¿En qué consiste la autorización otorgada por el pueblo para el desarrollo del Estado Libre Asociado? La propia Ley de Plebiscito, en su Art. 1, 16 L.P.R.A. sec. 844, proporciona la guía necesaria para delimitar los *confines generales* de la gestión para el crecimiento del Estado Libre Asociado, [7], al decir que

"Un voto a favor del Estado Libre Asociado significará:

(1) La reafirmación del Estado Libre Asociado establecido por común acuerdo bajo los términos de la Ley 600 de 1950 y la Resolución Conjunta 447 de 1952 del Congreso de Estados Unidos como comunidad autónoma permanentemente asociada a Estados Unidos de América;

---

[6] De un total de 707,293 votos emitidos, el Estado Libre Asociado obtuvo el 60.41%, la Estadidad, 38.98% y la Independencia, 0.60%.

[7] En las papeletas impresas utilizadas para la celebración del plebiscito, conforme al Art. 19, 16 L.P.R.A. sec. 862, se insertó idéntico texto en la parte inferior de las mismas.

(2) La inviolabilidad de la común ciudadanía como base primordial e indispensable de la unión permanente entre Puerto Rico y Estados Unidos;

(3) La autorización para desarrollar el Estado Libre Asociado de acuerdo con sus principios fundamentales hasta el máximum de gobierno propio compatible con la común defensa, el común mercado, la común moneda y el indisoluble vínculo de la ciudadanía de Estados Unidos;

(4) Que ningún cambio en las relaciones entre Estados Unidos y Puerto Rico habrá de tener efecto a menos que antes reciba la aceptación de la mayoría de los electores votantes en referéndum convocado al efecto."

Y en la Exposición de Motivos, al adoptar por referencia ciertas expresiones de la Comisión de Status, se perifilaron aun más las medidas apropiadas para la consideración de los grupos asesores, señalándose el mayor crecimiento del Estado Libre Asociado "de conformidad con los lineamientos contenidos en la Resolución Núm. 1 con fecha 3 de diciembre de 1962, de la Asamblea Legislativa",[8] a saber:

"1. El reconocimiento y reafirmación de la soberanía del pueblo de Puerto Rico, para que no pueda quedar duda sobre su capacidad para pactar en términos de igualdad jurídica.

2. El aseguramiento de la permanencia e irrevocabilidad de la unión entre Estados Unidos y Puerto Rico sobre las bases de la común ciudadanía, la común defensa, la común moneda, el mercado libre, la común lealtad a los valores de la democracia, y aquellas otras condiciones que se consideren, en el pacto, de mutuo beneficio para Estados Unidos y Puerto Rico.

3. La definición específica de los poderes de los Estados Unidos con respecto a Puerto Rico, los que deberán ser exclusivamente los esenciales a la unión.

---

[8] En el informe conjunto de las Comisiones Especiales del Senado y de la Cámara de Representantes sobre Consulta Plebiscitaria, *Diario de Sesiones*, 1962, vol. 16, págs. 105, 106, se dice:

"Se dispone, además, que expresada por el Congreso la forma en que esté dispuesto a acordar el Estado Libre Asociado en armonía con los principios . . . [que] aparecen también consignados en el cuarto Por Tanto de la Resolución . . . ."

4. Todos los demás poderes se ejercitarán por los organismos constitucionales del pueblo de Puerto Rico.

5. La participación del pueblo de Puerto Rico en los poderes que ejercite el gobierno de Estados Unidos bajo el pacto en aquellos asuntos que afecten a Puerto Rico, en medida proporcionada al ámbito de dichos poderes. Esto podrá incluir, entre otras formas de instrumentar tal participación, el derecho a votar por el Presidente y Vicepresidente de Estados Unidos.

6. El establecimiento de una fórmula a base de la cual el pueblo de Puerto Rico contribuya a los gastos generales del gobierno de Estados Unidos en forma compatible con la estabilidad y el crecimiento económico de Puerto Rico."

Finalmente añade, "o por virtud de otras medidas que lleven a un crecimiento del Estado Libre Asociado."

Además, toda la evolución del Estado Libre Asociado desde su implantación en 1952, hasta la aprobación de la transcrita Resolución de 3 de diciembre de 1962, apuntan inequívocamente a la naturaleza y configuración de las medidas que para el desarrollo de esa fórmula pueden considerarse. [9]

---

[9] En el aspecto relativo a la aplicación localmente de las leyes federales con el consentimiento expreso de la Asamblea Legislativa de Puerto Rico, véanse, la R.C. Núm. 97 de 22 de junio de 1956 (R.C., 1956, pág. 245), sobre el impuesto de elaboración del azúcar refinada; la R.C. Núm. 1 de 25 de julio de 1956 (R.C., 1956, pág. 335), sobre la Ley Federal de Drogas y Narcóticos y el Art. 63 de la Ley de Narcóticos de Puerto Rico, Núm. 48 de 18 de junio de 1959, 24 L.P.R.A. sec. 976m; la Ley Núm. 3 de 6 de mayo de 1959 (Leyes, pág. 15), sobre espíritus destilados. Véase además, Leibowitz, *The Applicability of Federal Law to the Commonwealth of Puerto Rico*, 37 Rev. Jur. U.P.R. 615 (1968).

La Asamblea Constituyente misma reconoció expresamente mediante su Resolución Núm. 23 *Diario de Sesiones de la Convención Constituyente*, pág. 2410, que "El pueblo de Puerto Rico retiene el derecho de proponer y aceptar modificaciones en los términos de sus relaciones con los Estados Unidos de América, de modo que éstas en todo tiempo sean la expresión de acuerdo libremente concertado entre el pueblo de Puerto Rico y los Estados Unidos de América." A tenor con estas expresiones, la Asamblea Legislativa adoptó la R.C. Núm. 2 de 19 de marzo de 1959, instruyendo al Comisionado Residente de Puerto Rico que propusiera al Congreso las siguientes clarificaciones:

Nada en la ley require expresamente que la agenda de los grupos asesores sea sometida por el partido que representó la fórmula de status triunfante. En un riguroso proceso hermenéutico tal vez ello podría justificarse en ausencia de unas guías claras y precisas sobre el significado y contenido del "desarrollo del Estado Libre Asociado." Pero como hemos

---

(1) Que se describa adecuadamente al Estado Libre Asociado en el Estatuto de Relaciones Federales de modo que no pudiera clasificarse como "posesión" o "territorio";

(2) Establecer claramente que las leyes federales que son aplicables en Puerto Rico se aplicarán en la misma forma en que pueden ser aplicables a los estados, en armonía con el principio fundamental del pleno gobierno propio interno del pueblo de Puerto Rico;

(3) Eliminar del Estatuto de Relaciones Federales todo lenguaje que resultare confuso, inadecuado, anacrónico e inaplicable; y asimismo que propusiera las siguientes modificaciones:

"(1) Establecer el principio de que los arbitrios que se cobren en Puerto Rico sobre artículos producidos para consumo y exportación a los Estados Unidos sean impuestos por el Estado Libre Asociado; disponiéndose que si dichos arbitrios fueran más bajos que los impuestos bajo las leyes federales de rentas internas sobre artículos similares, el Tesoro Federal cobrará la diferencia en el puerto de entrada, preservando así la equidad competitiva entre dichos productos.

"(2) Establecer un mecanismo mediante el cual, a su solicitud, el Estado Libre Asociado pueda ser incluido o excluido de los tratados comerciales de los Estados Unidos.

"(3) Establecer un mecanismo adecuado para que el Estado Libre Asociado pueda asumir gradualmente, según lo permitan sus recursos, aquellas responsabilidades federales compatibles con el principio de la asociación permanente.

"(4) Disponer que las decisiones de la Corte Suprema de Puerto Rico puedan ser revisadas por la Corte Suprema de los Estados Unidos en la misma forma que lo son las decisiones de las cortes supremas de los estados.

"(5) Eliminar del Estatuto de Relaciones Federales la disposición relativa al margen prestatario conforme fue propuesto al Congreso de los Estados Unidos de América por la Resolución Conjunta Núm. 1 aprobada por el Gobernador del Estado Libre Asociado de Puerto Rico el 23 de junio de 1958."

En cumplimiento de este mandato legislativo se introdujo en 1959 legislación en el Octagesimosexto Congreso, Proyectos 2023 del Senado y 5926 de la Cámara de Representantes, disponiendo que las leyes federales serían aplicables en Puerto Rico (a) en la misma forma en que se podría aplicar si Puerto Rico fuera un estado, (b) en tanto fuesen compatibles con el convenio, y, (c) mencionen expresamente el Estado Libre Asociado.

dejado demostrado ese concepto tiene—por actuación de la Asamblea Legislativa misma y de los defensores de la fórmula —un significado, contenido y alcances fácilmente discernibles. En el ejercicio de las obligaciones que la ley le impone al Gobernador para estructurar el desarrollo del Estado Libre Asociado está limitado por este significado, contenido y alcances. (¹⁰) Desoírlos sería desatender el mandato de la consulta

Posteriormente se varió un tanto el requisito de compatibilidad con el convenio y se excluyó del ámbito de la autoridad legislativa federal todo lo relativo a leyes de rentas internas y de tarifas. También se distinguió entre la legislación aprobada conforme a los poderes federales en relación con los estados y la legislación adoptada bajo "otros poderes", a saber, la cláusula territorial, en cuyo caso se requería el consentimiento expreso de Puerto Rico para su vigencia. Esta legislación que se conoce como el Proyecto Fernós-Murray, núm. 9234 de la Cámara de Representantes, no fue informada por las comisiones correspondientes a pesar de que se celebraron audiencias tanto en Puerto Rico como en Estados Unidos. Véase, Hernández Colón, *The Commonwealth of Puerto Rico: Territory or State*, 19 Rev. C. Abo. de P.R., 207, 255 y ss. (1959).

De todas las medidas propuestas las únicas que lograron aprobación congresional fueron las relativas a: (a) la revisión directa por el Tribunal Supremo federal de las sentencias dictadas por el Tribunal Supremo de Puerto Rico, L.P. 87–189 (1961), 28 U.S.C. § 1258, y (b) la eliminación de las limitaciones impuestas sobre el margen prestatario de Puerto Rico por la Ley de Relaciones Federales, L.P. 87–121 (1961), véase, Ley Núm. 1 de 29 de septiembre de 1961 (Leyes, pág. 423).

En otro aspecto relacionado, véase la L.P. 808, 70 Stat. 658, que enmienda el Código Judicial de Estados Unidos, para disponer expresamente que a los fines de diversidad de ciudadanía para propósitos jurisdiccionales de las cortes federales, la palabra "estados" incluía "los territorios, el Distrito de Columbia y el Estado Libre Asociado de Puerto Rico." Beresford, *Commonwealth Status and the Federal District Court of Puerto Rico*, 19 Rev. C. Abo. de P.R. 19 (1958); Casellas, *The Admiralty Jurisdiction in the Commonwealth of Puerto Rico*, 22 Rev. C. Abo. de P.R. 165 (1961). Es interesante notar que está en desuso la práctica de designar miembros del Tribunal Supremo de Puerto Rico para sustituir temporalmente a los Jueces de la Corte de Distrito de Estados Unidos para Puerto Rico, según autorizado por la Sec. 41 de la Ley de Relaciones Federales. *Moreno-Ríos* v. *United States*, 256 F.2d 68 (1st Cir. 1958).

Para el trasfondo histórico anterior a 1952, véase, la amplia exposición contenida en la opinión del Juez Asociado Señor Rigau.

(¹⁰) Como indicamos en el escolio 4.1 se anunció la "aprobación" por el Presidente de Estados Unidos de las personas designadas por el Gobernador para formar parte del primer grupo asesor, sobre el derecho a

plebiscitaria, que presupone una instrumentación efectiva de su resultado. Es conveniente añadir que esta instrumentación del resultado del plebiscito requiere un desarrollo pleno y completo, y no fraccional y a tientas, de la fórmula triunfante. Conocidas son las áreas en que la implementación puede hacerse efectiva *inmediatamente*. Parafraseando a *Brown* v. *Board of Education*, 347 U.S. 483 (1954), es de esperarse que la acción ejecutiva se materialice dentro del término razonable que las circunstancias demandan (*with all deliberate speed*).

### —III—

### *La Disposición del Recurso*

Las conclusiones que anteceden nos relevan de discutir las defensas especiales interpuestas por el demandado. La consulta plebiscitaria tuvo lugar a mediados de 1967. Ya es de lugar, dos años y medio después, que comience a instrumentarse en forma efectiva y objetiva su resultado. Por ello parece más razonable que de una vez se advierta nuestra interpretación sobre las obligaciones que corresponden al Gobernador y a la intervensión del partido político que representó la fórmula triunfante en la implementación de dicho resultado. Es la interpretación de las leyes el único y limitado plano que la Constitución nos depara en este proceso del desarrollo político de nuestro país. Mientras más pronto hayamos cumplido esa función, mejor serviremos a toda la comunidad.

Consideradas las conclusiones que anteceden bien parecería que emitiéramos una orden dirigida al demandado para que cumpliera con las obligaciones que le fija la Ley de Plebiscito, según las hemos interpretado en esta opinión. Mas considerada su contestación en la que manifiesta conformidad con el nombramiento de los grupos asesores y sus actuaciones

votar por el Presidente y Vicepresidente de Estados Unidos, que es una de las formas de desarrollo del Estado Libre Asociado, según la R.C. Núm. 1 de 3 de diciembre de 1962.

oficiales durante la pendencia de este recurso, y que no hemos admitido la súplica principal de la parte peticionaria—que los integrantes de los grupos asesores se designen a su propuesta, ya a su propuesta también se seleccionen los temas a considerarse—no procede la expedición de un auto de *mandamus*.

—O—

Voto separado del Juez Asociado, Señor Pérez Pimentel

San Juan, Puerto Rico, a 2 de febrero de 1970

Estoy conforme con la opinión emitida por el Juez Asociado Señor Blanco Lugo. Respecto a mi concurrencia con la disposición del recurso he tomado en consideración (1) el corto período de tiempo que medió desde que el Hon. Gobernador demandado asumió su cargo y la fecha del requerimiento héchole por el demandante para que cumpliera las obligaciones que impone la Ley de Plebiscito, (2) la necesidad de una interpretación judicial de dicha Ley de Plebiscito, especialmente la de su Art. 45, en lo que respecta a la forma de designarse los miembros puertorriqueños de los comités asesores conjuntos y la ideología política de esos miembros, y (3) la manifestada disposición del Hon. Gobernador demandado de dar cumplimiento cabal a las disposiciones de la Ley de Plebiscito.

Habiendo la mayoría de este Tribunal interpretado la susodicha Ley de Plebiscito en el sentido de que la designación de los miembros puertorriqueños de los comités asesores debe por lo menos recaer en personas de un historial públicamente reconocido como defensores del Estado Libre Asociado de Puerto Rico, el demandado está ahora en mejores condiciones de proceder con la mayor prontitud a designar dichos miembros asesores conforme al criterio mayoritario de este Tribunal.

—O—

Voto separado del Juez Asociado, Señor Dávila

San Juan, Puerto Rico, a 2 de febrero de 1970

Concurro con la opinión del Juez Asociado Señor Blanco Lugo y con su conclusión de declarar el *mandamus* sin lugar, considerada la posición del demandado al efecto de que dará "cumplimiento cabal a las disposiciones de la ley de plebiscito", y por que entiendo que la sentencia dictada lo es sin perjuicio de que la parte peticionaria pueda recurrir a este Tribunal si el demandado no cumpliere dentro de un término razonable con las obligaciones que le impone el Art. 45 de la Ley de Plebiscito, según se interpretan en la ponencia del Juez Asociado, Señor Blanco Lugo, en el sentido de que (a) los miembros de los comités *ad hoc* a ser designados por el Gobernador deben ser personas "de la más reconocida habilidad y el más alto prestigio" y con "un público y reconocido historial de defensa" del Estado Libre Asociado, y que (b) la instrumentación del resultado del plebiscito requiere un desarrollo pleno y completo y no fraccional y a tientas, de la fórmula Estado Libre Asociado, conforme al contenido y alcance de este concepto, según se delimita en la opinión.

—O—

Opinión del Juez Asociado Señor Rigau con la cual concurren los Jueces Asociados Señores Ramírez Bages y Torres Rigual.

San Juan, Puerto Rico, a 2 de febrero de 1970

Por estar este caso íntimamente relacionado con un paso importante en el desarrollo constitucional de Puerto Rico, desarrollo que por su propia naturaleza inevitablemente es un proceso largo, no de años sino de décadas, es conveniente hacer un poco de historia para poner este caso en su correcta perspectiva.

Más que conveniente, es necesario hacerlo. Se reconoce universalmente que conocer el origen y la evolución histórica de una institución jurídica es esencial para su mejor entendimiento y muy útil para la correcta aplicación del derecho a los casos concretos. Mucho más cierto es eso cuando se trata del derecho constitucional, el cual es en gran parte la historia de un país. Por eso, sin duda, es que el Juez Holmes expresó que podía considerarse el derecho como un gran documento antropológico. [1] "Un producto histórico" lo llamó Castan. [2]

Debiera ser evidente esta relación tan íntima entre el producto—el derecho—y la historia del país que lo produce. Opera en todos los sistemas jurídicos. [3] El estudio racional del derecho, escribió Holmes, es en gran medida el estudio de la historia. [4] En la primera página de su clásico libro *The Common Law* aparece aquel su famoso aforismo: "La vida del derecho no ha sido la lógica; sino la experiencia." esto es, la historia. Y casi a renglón seguido añade "El derecho encarna la historia del país a través de los siglos." Esto es particularmente cierto del derecho constitucional. Veamos, pues, el trasfondo histórico y las raíces de la situación con la cual en el presente nos confrontamos.

Para la fecha en que tuvo lugar la invasión de Puerto Rico por las tropas americanas, acaecida en 1898, Puerto Rico, luego de cuatro siglos de dominación española, acababa de obtener la Carta Autonómica de 1897 que la daba virtualmente gobierno propio.

---

[1] *Collected Legal Papers* (1920), pág. 298.

[2] *Teoría de la Aplicación e Investigación del Derecho* (1947), pág. 105.

[3] Friedmann, W., *Legal Theory*, 4ta. ed. (1960), Capítulo 3; 5ta. ed. (1967), Capítulo 5.

[4] *The Path of the Law*, 10 Harv. L. Rev. 457; *Collected Legal Papers* (1920), pág. 186; *The Life of the Law*, ed. por Honnold (1964), pág. 3.

Esta primera gran conquista política de Puerto Rico que significa la Carta Autonómica fue, desde luego, un logro del autonomismo puertorriqueño. Por iniciativa de Luis Muñoz Rivera el Partido Autonomista Puertorriqueño, que se había fundado en Ponce en 1887, concertó en 1896, después de largas conversaciones y polémicas con líderes políticos de España, un pacto con el Partido Liberal Español que a la sazón dirigía Práxedes Mateo Sagasta, mediante el cual ambos partidos se comprometieron a apoyarse mutuamente, con la promesa de que Sagasta impulsaría ante la Corona Española la autonomía para Puerto Rico. Al año siguiente Sagasta asumía la posición de Primer Ministro de España e hizo buena su promesa a los puertorriqueños al lograr que la Regente María Cristina otorgase a Puerto Rico la Carta Autonómica.

Estableció la Carta Autonómica, en gran medida, un gobierno de tipo parlamentario. Para su época, fue aquel un documento progresivo. Las órdenes del Gobernador General no podían entrar en vigor a menos que fuesen refrendadas por nuestro Gabinete. El Parlamento Insular tenía facultades para crear aranceles y fijar derechos de importación y exportación. En cuanto al comercio internacional, se establecía que los tratados de comercio en cuya negociación no hubiese intervenido el gobierno insular se le comunicarían a fin de que pudiese en un período de tres meses declarar si deseaba o no adherirse a sus estipulaciones. Se concedía también al gobierno insular iniciativa para la negociación de tratados de comercio, aunque se llevarían a cabo por el gobierno central, pero auxiliado éste por delegados especiales autorizados por el gobierno insular. Además, se hacían irrevocables, en ausencia de consentimiento expreso del Parlamento Insular, éstas y otras muchas libertades conquistadas al promulgarse la Carta Autonómica.

Ya anteriormente, bajo la Constitución española de 1812, se había concedido a la isla representación con plenos derechos en el Parlamento español (las Cortes). Fue el primer

diputado puertorriqueño Ramón Power Giral. A la fecha de la ocupación americana, la representación nuestra en el Parlamento español consistía de 16 diputados y 5 senadores.[5]

No es necesario pormenorizar las viscisitudes políticas de Puerto Rico bajo el gobierno español, las cuales eran en parte reflejo de las de la propia España, pero es necesario recordar que en el siglo XIX Puerto Rico cobra conciencia de Pueblo y conciencia política, tiene lugar la insurrección conocida como el Grito de Lares en 23 de septiembre de 1868, surge un movimiento liberal dedicado a propulsar el desarrollo social, político y económico del país,[6] se fundan los primeros partidos políticos, y durante los últimos 25 años de aquel siglo se inicia un fuerte movimiento autonómico que ha perdurado en el pensamiento político puertorriqueño por ya casi un siglo.[7]

Además de otros logros de ese movimiento liberal puertorriqueño del siglo XIX—como la abolición pacífica de la esclavitud en 1873—culmina la gestión política de dicho movimiento la ya mencionada consecución de la Carta Autonómica. Queda así, en 1897, la nave puertorriqueña en manos propias y rumbo a su natural destino histórico cuando se desata la tormenta de la guerra hisponoamericana y el país es ocupado por las tropas americanas.[8] Como se sabe, como

[5] Pagán, Bolívar, *Historia de los Partidos Políticos Puertorriqueños* (1959), Vol. I, pág. 19.

[6] Recuérdese, entre muchos otros, los nombres ilustres de Ramón Power Giral, Román Baldorioty de Castro, Ramón Emeterio Betances, Segundo Ruiz Belvis, Eugenio María de Hostos, Julián E. Blanco Sosa, Ramón Marín, José Julián Acosta, Julio L. Vizcarrondo, Manuel Elzaburu, José Pablo Morales, José Gauthier Benítez, Luis Muñoz Rivera, José de Diego y José Celso Barbosa.

[7] Blanco, Tomás, *Prontuario Histórico de Puerto Rico*, 2da. ed. (1943), págs. 53–145; Cruz-Monclova y Colorado, *Noticia y Pulso del Movimiento Político Puertorriqueño* (1955) págs. 11–64; Pedreira, *Insularismo* (ed. 1957), págs. 89–95; Morales-Carrión, *Ojeada al Proceso Histórico de Puerto Rico* (1950), págs. 8–17; Cruz-Monclova, *Historia del Año 1887* (1966).

[8] Los hechos se sucedieron rápidamente. En 9 de febrero de 1898 se inauguraba la vida autonómica de la isla. En la noche del 15 del mismo

resultado de dicha guerra Puerto Rico pasa a la dominación de los Estados Unidos. Así, la guerra y sus resultados tronchan la esperanzadora planta de gobierno propio que en Puerto Rico acababa de nacer.

Luego de dos años de gobierno militar, en 1900, el Congreso de los Estados Unidos aprobó la Ley Foraker mediante la cual estableció un gobierno civil de tipo colonial para Puerto Rico.(⁹) El Gobernador, los jefes de los departamentos ejecutivos, la Cámara Alta de la Asamblea Legislativa (denominada entonces Consejo Ejecutivo) y los jueces del Tribunal Supremo eran nombrados por el Presidente de los Estados Unidos. No contenía una Carta de Derechos. Los puertorriqueños elegían, bajo dicha ley, la Cámara Baja (denominada Cámara de Delegados), los funcionarios municipales y un Comisionado a los Estados Unidos con voz pero sin voto en la Cámara de Representantes del Congreso de los Estados Unidos.

Es de conocimiento general que la Ley Foraker, aunque contenía disposiciones económicas favorables para el país, defraudó las esperanzas de los puertorriqueños de continuar, si acaso incrementado, su gobierno propio. Dicha ley fue muy impopular en prácticamente todos los sectores de opinión de Puerto Rico y prontamente comenzaron las peticiones de que fuese enmendada.(¹⁰)

mes, el buque de guerra norteamericano "Maine" explotaba en la bahía de la Habana. El 4 de marzo subía McKinley a la Presidencia de los Estados Unidos. El 25 de abril el Congreso de ese país declaraba la guerra a España. El 12 de mayo, al amanecer, la flota americana bombardeaba a San Juan. El 25 de julio desembarcaban en Guánica las primeras fuerzas de ocupación.

(⁹) 31 Stat. 77 (1900).

(¹⁰) Pagán, Bolívar, *Historia de los Partidos Políticos Puertorriqueños*, Vol. I (1959), págs. 66–68, 81; Cruz-Monclova y Colorado, obra citada, pág. 71; Morales-Carrión, obra citada, págs. 21–22. Véase por ejemplo, la carta de Luis Muñoz Rivera al Presidente McKinley publicada en el *Puerto Rico Herald*, en 13 de julio de 1901, en la cual expresaba: "La Ley Foraker, señor Presidente, buena en lo económico, no debió nunca salir del Capitolio de Washington; es una ley indigna de los Estados Unidos que la impo-

Una nueva Ley Orgánica, la Ley Jones de 1917 del Congreso de los Estados Unidos([11]) hizo reformas importantes. Mediante la misma se concedió la ciudadanía de los Estados Unidos a los puertorriqueños; ambas cámaras legislativas ahora serían electivas; y se decretó una buena Carta de Derechos que contenía lo mejor del pensamiento anglosajón en esa área de las libertades individuales.

Al principio la Ley Jones fue acogida en Puerto Rico con aplauso como un gran paso de avance hacia el gobierno propio. Pero a pesar de las importantes reformas que contenía, la carga colonial de esa nueva Ley Orgánica pronto la hizo también inaceptable para los puertorriqueños. El Gobernador, el Procurador General, el Comisionado de Educación, el Auditor y los Jueces del Tribunal Supremo seguían siendo de nombramiento presidencial.([12])

Esos y otros detalles de importancia (posible veto, aunque nunca ejercido, de la legislación puertorriqueña por el Congreso, etc.) unidos al vicio fundamental de que una Carta Orgánica decretada unilateralmente por el Congreso no empece lo bueno que fuera, no resolvía el problema moral latente en aquella relación, hicieron, como dijimos, que la Ley Jones no satisficiese las aspiraciones políticas ni la conciencia moral de los puertorriqueños.([13]) El sistema podría ser benévolo pero no validaba el principio básico de gobierno mediante el consentimiento de los gobernados que es esencial en la democracia y entre los hombres libres.

---

nen y de Puerto Rico que la soporta. No existe en ella ni la más leve sombra de un pensamiento democrático." Esta carta aparece completa en la citada obra de Bolívar Pagán, Tomo I, pág. 81.

([11]) 39 Stat. 951 (1917).

([12]) Treinta años más tarde se enmendó la Ley Jones para permitir a los puertorriqueños elegir su Gobernador. 61 Stat. 770 (1947).

([13]) Pagán, Bolívar, obra citada, Tomo I, págs. 179–181; Muñoz-Amato, Pedro, *Major Trends in the Constitutional History of Puerto Rico*, 12 Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico, 242, 284 (1949); Cruz-Monclova y Colorado, obra citada, pág. 75.

Tampoco satisfacía a algunos miembros del Congreso. Véanse las siguientes expresiones.

Congresista Huddleston: "Todo el procedimiento es anti-democrático. . . . Nosotros no sabemos nada sobre Puerto Rico. . . . Los Estados resentirían que el Congreso tratase de dictarles las cualificaciones para ser elector. El asunto debe dejarse al buen juicio de los puertorriqueños." [14]

Senador Fall: "Francamente digo que creo que muy pocos miembros del Senado tienen una idea de lo que están haciendo." [15]

Como era de esperarse, los esfuerzos por la sustitución de la Ley Jones continuaron. En 10 de febrero de 1943 la Asamblea Legislativa de Puerto Rico aprobó por unanimidad la Resolución Conjunta Núm. 1.

"Para plantear ante el Presidente y el Congreso de los Estados Unidos de América, el derecho del pueblo de Puerto Rico a que termine el sistema colonial de gobierno y a decidir democráticamente el status político permanente de Puerto Rico a la mayor brevedad posible, si fuere factible inmediatamente."

Se expresó en dicha resolución que el asunto del status debía ser decidido "por el voto libre del pueblo de Puerto Rico mismo." Se pedía que dicho voto fuese "en unas elecciones especiales." En efecto, se pedía un plebiscito sobre el status. *Leyes*, 1943, pág. 1085. [16] Para esa fecha estaban los Es-

---

[14] *Congressional Record*, Vol. 53, pág. 8468, 22 Marzo 1916, Congreso 64, Primera Sesión.

[15] *Congressional Record*, Vol. 54, pág. 3470, 17 Febrero 1917, Congreso 64, Segunda Sesión.

[16] En estos días de activismo estudiantil resulta interesante la siguiente nota. En dicha fecha el estudiantado universitario, colegios de Río Piedras, reunido en Asamblea General de Estudiantes aprobó una resolución solicitando el plebiscito. Comunicó a la Asamblea Legislativa dicha resolución el entonces estudiante universitario y Presidente del Consejo de Estudiantes de la Universidad de Puerto Rico, Santiago Polanco Abréu; quien fuera luego Presidente de la Cámara de Representantes de Puerto Rico y Comisionado Residente en Washington. *Actas de la Cámara de Representantes*, 1943, pág. 27.

tados Unidos enfrascados en la Guerra Mundial II y el asunto no prosperó.

En 20 de febrero de 1945 la Asamblea Legislativa aprobó, también por unanimidad, la Resolución Conjunta Núm. 1 de ese año. Concurrieron para su aprobación todos los partidos políticos entonces existentes en la isla, a saber, el Partido Popular Democrático, la Unión Republicana, el Partido Liberal y el Partido Socialista. Mediante dicha resolución se solicitó del Congreso de los Estados Unidos que sometiese "el problema del status político definitivo a la votación del pueblo de Puerto Rico." Puerto Rico expresaría su voluntad en un "plebiscito o referéndum completamente aparte de las elecciones generales." Para recabar del Congreso la ley plebiscitaria la Asamblea Legislativa creó ese año una Comisión Legislativa Sobre Status Político de Puerto Rico.

La Comisión Legislativa, presidida por el entonces líder de la mayoría parlamentaria y Presidente del Senado, Luis Muñoz Marín, se trasladó a Washington. Para la transcripción de la discusión que tuvo lugar en el Comité del Senado véase el periódico *El Mundo* de San Juan, de 15 de mayo de 1945. Al día siguiente dicho periódico publicó un editorial titulado: "El Turno del Congreso" en el cual expresó en parte:

"Puerto Rico tiene motivos para sentirse satisfecho con el planteamiento de su problema fundamental ante el Comité de Territorios y Posesiones del Senado de los Estados Unidos. Es una satisfacción que pertenece a todo el pueblo, como tal, sin limitaciones sectarias y sin apasionamientos importunos

Ese planteamiento tuvo una noble concresión en el testimonio prestado ante aquel organismo por el Presidente del Senado de Puerto Rico. . . ."

Aparentemente en los años de 1946 al 1948 los dirigentes del partido mayoritario concretaron la solución que constituiría la posición de dicho partido en las elecciones de 1948— el gobierno propio compatible con la asociación con los Estados

Unidos—posición que al recibir el respaldo electoral en Puerto
Rico y la aprobación del Congreso de los Estados Unidos, se
convertiría, luego de ser aprobada en las elecciones especiales
de 4 de junio de 1951 y 3 de marzo de 1952, en el Estado Libre
Asociado de Puerto Rico. [17]

Por ser más recientes que los antes mencionados, los desa-
rrollos constitucionales de 1950 al 1952, hay de los mismos,
presumiblemente, un recuerdo más claro que de los anteriores.
Pero esta descripción resumida del proceso constitucional de
Puerto Rico quedaría inexplicablemente incompleta si no se
mencionasen aquí dichos desarrollos. Por eso, debemos men-
cionarlos.

Por iniciativa puertorriqueña se presentó en el Congreso
de los Estados Unidos en marzo de 1950 el proyecto que
luego se convirtió en la Ley 600. [18] Allí expresó el Congreso
que "reconociendo ampliamente el principio del gobierno por
consentimiento de los gobernados, se aprueba esta Ley, con
el carácter de un convenio, de manera que el Pueblo de
Puerto Rico pueda organizar un gobierno basado en una
Constitución adoptada por él mismo." Por sus propios tér-
minos, para que esa ley operase tendría que ser aceptada por

---

[17] Sobre el desarrollo del pensamiento que se concretó en la fórmula
del Estado Libre Asociado pueden verse los siguientes pronunciamientos:·
Dos artículos sobre el Status Político, por Luis Muñoz Marín, publicados
en *El Mundo* de 28 y 29 de junio de 1946 y su discurso del 4 de julio
de 1948; las declaraciones del Dr. Antonio Fernós Isern publicadas en
*El Mundo* de 4 de julio de 1946, y su discurso de 26 de febrero de 1947,
dicho en Rollins College, en Winter Park, Florida. Todos esos trabajos
se encuentran en Fernos-Isern, Antonio, *Puerto Rico Libre y Federado*
(1951).

Sobre el proceso político-constitucional desde la Ley Jones (1917)
hasta el comienzo del proceso mediante el cual se organiza el Estado Libre
Asociado (1950), hemos dado solamente algunos datos sobresalientes. Para
una relación más completa de esos desarrollos véase Cruz-Monclova y
Colorado, *Noticia y Pulso del Movimiento Político Puertorriqueño* (1955),
págs. 91–109; y Fernos-Isern, Antonio, obra antes citada.

[18] Aprobada en 3 julio 1950, 64 Stat. 319; *Leyes de Puerto Rico
Anotadas*, Tomo I (ed. 1965), pág. 144. V. Fernos-Isern, obra citada,
pág. 13.

los electores de Puerto Rico por medio de un referéndum celebrado en toda la isla.

Conforme a lo anterior, dicha Ley 600 del Congreso se sometió para su aprobación o rechazo a los electores de Puerto Rico, en un referéndum celebrado en 4 de junio de 1951. La votación a favor de la aceptación de la ley fue de 76.5% de los votos y la misma quedó aceptada. Concurrieron a esa votación los partidos políticos existentes entonces, a saber: el Partido Popular Democrático, el Partido Estadista, el Partido Socialista y el Partido Independentista.

En 27 de agosto de 1951 se celebró la votación para elegir los miembros de la Convención Constituyente que habría de redactar la Constitución de Puerto Rico. La misma quedó compuesta de 92 delegados. La Convención trabajó desde el 17 de septiembre de 1951 hasta el 6 de febrero de 1952, en cuya fecha la misma aprobó la Constitución con 88 votos a favor, 3 en contra y un delegado ausente. [19]

En 3 de marzo de 1952 se sometió al electorado del país, para su aprobación o rechazo, la Constitución que había sido redactada por la Convención Constituyente. La Constitución fue aprobada por el 81% de los votos emitidos. [20]

En 3 de julio de 1952 se aprueba la Ley Pública 447 del Congreso mediante la cual, conforme a lo establecido en la antes mencionada Ley 600—que había sido aprobada por el Congreso y por el electorado puertorriqueño—el Congreso por su parte aprueba la Constitución de Puerto Rico. [21] Mediante dicha ley el Congreso propuso tres enmiendas a la Constitución, las cuales fueron expresamente aceptadas por

---

[19] Sobre la Constitución véase Gutiérrez Franqui and Wells, "The Commonwealth Constitution," *The Annals of the American Academy of Political and Social Science*, Vol. 285, enero 1953, pág. 33.

[20] Para una exposición más detallada de los hechos antes relatados, véase *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico* (1952), págs. 14–30.

[21] Ley Pública 447, 66 Stat. 327; L.P.R.A., Tomo I (ed. 1965), pág. 153.

el electorado de Puerto Rico en las elecciones de noviembre de 1952.

Dichas enmiendas consistieron en lo siguiente: (1) La Constitución originalmente disponía (Art. II, sec. 5), en lo pertinente, que "Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario." También disponía que la escuela primaria pública sería obligatoria. El Congreso propuso un lenguaje que especificaba que la asistencia obligatoria a las escuelas primarias públicas no se interpretaría como aplicable a aquellos que reciban instrucción primaria en escuelas privadas.

(2) La Constitución originalmente disponía (Art. VII, sec. 3) que ninguna enmienda a la misma podría alterar la forma republicana de gobierno o abolir su Carta de Derechos. El Congreso propuso que se adicionase a esa sección una segunda oración, para establecer que cualquier enmienda a la Constitución deberá ser compatible con la Ley 447 antes mencionada, con las disposiciones aplicables de la Constitución de los Estados Unidos, con la Ley de Relaciones Federales y con la Ley 600.

(3) Que se eliminase la Sec. 20 del Art. II. Esta Sec. 20 de la Carta de Derechos de la Constitución no confería derechos jurídicamente ejecutables sino que reconocía ciertos objetivos de justicia social tales como el derecho a obtener trabajo, el derecho a un nivel de vida adecuado, el de recibir protección social en el desempleo, la vejez o la incapacidad.

La citada Ley 447 del Congreso de 1952, expresa que la Ley 600, aprobada en 3 de julio de 1950, "fue adoptada por el Congreso como un convenio con el Pueblo de Puerto Rico para tener efecto una vez aprobada por el Pueblo de Puerto Rico."

Habiendo sido aprobada la Constitución por el electorado de Puerto Rico y por el Congreso de los Estados Unidos, se proclamó oficialmente por el Gobernador de Puerto Rico

la vigencia del Estado Libre Asociado de Puerto Rico el 25 de julio de 1952. [22]

La evolución que hasta aquí hemos reseñado de un pueblo que progresa de su status de posesión o botín de guerra (año 1898) hasta la asociación por convenio (años 1950–1952) recuerda la famosa expresión del eminente jurista inglés Sir Henry Maine en el sentido de que "puede decirse que la evolución de las sociedades progresistas ha sido una de status hacia contrato." [23]

En 27 de noviembre de 1953 la Asamblea General de las Naciones Unidas aprueba una resolución reconociendo que Puerto Rico había dejado de ser un "non-self-governing territory" y que los Estados Unidos ya no debía informar a las Naciones Unidas sobre Puerto Rico bajo el Art. 73 (e) de la Carta de las Naciones Unidas. [24]

Los hechos que conducen a la celebración del plebiscito en 1967 tienen su comienzo inmediato en cierta correspondencia cruzada en el año 1962 entre el Gobernador de Puerto Rico, Señor Luis Muñoz Marín, y el Presidente de los Estados Unidos, Señor John F. Kennedy. Decimos comienzo inmediato porque la idea de que se resolviese el problema

---

[22] Wells, Henry, *The Modernization of Puerto Rico* (1969), págs. 220–241; Friedrich, Carl, *Puerto Rico: Middle Road to Freedom* (1959); Wells, "Constitutional Development in Puerto Rico" en *Developments Towards Self-Government in the Caribbean* (Simposio), La Haya (1955), pág. 73; Magruder, Calvert, *The Commonwealth Status of Puerto Rico*, 15 U. Pitt. L. Rev. 1 (1953); Muñoz-Amato, Pedro, *Congressional Conservatism and Puerto Rican Democracy in the Commonwealth Relationship*, 21 Rev. Jur. U.P.R. 321 (1952).

[23] *Ancient Law* (1861), ed. Beacon Press, Boston (1963), pág. 165.

[24] Resolución 151 de la Asamblea General de las Naciones Unidas de 27 de noviembre de 1953. Para la correspondencia entre el Gobernador de Puerto Rico y el Presidente de los Estados Unidos y para el Mensaje del Gobierno de los Estados Unidos a las Naciones Unidas, véase 28 Dep't of State Bull. 584 (1953).

Dicho Art. 73 (e) le impone la obligación a los gobiernos Miembros de las Naciones Unidas que tienen bajo su tutela pueblos que no hayan alcanzado su gobierno propio que rindan informes al Secretario General de las Naciones Unidas.

del status político de Puerto Rico mediante un plebiscito tiene antecedentes más antiguos.

Ya en el año 1898, a raíz del cambio de soberanía, Eugenio María de Hostos propuso un plebiscito. En 1914 un grupo de líderes del Partido Unión de Puerto Rico se acercó al liderazgo del Partido Republicano invitándolos a concurrir a un plebiscito para decidir entre la estadidad y la independencia. La idea no prosperó pues el Partido Republicano no aceptó.[25] A través de los años los partidos políticos que han defendido la idea de la autonomía, o sus líderes, han propuesto la celebración de un plebiscito. Así ocurrió en el 1914, en el 1919, en el 1923, en el 1939 y hasta que llegamos al año 1943 en que, como ya dijimos, la Asamblea Legislativa aprobó, con la adhesión de todos los partidos políticos allí representados, una resolución concurrente proponiendo al Congreso la celebración de un plebiscito.

A partir del año 1956 se reanudó el debate en torno al plebiscito. A pesar del proceso constitucional de los años 1950 al 1952, que antes hemos relatado, algunos líderes de la oposición al gobierno insistían en que debía celebrarse un plebiscito sobre el status político en una votación celebrada únicamente con ese propósito específico. A esos fines la Asamblea Legislativa aprobó la Ley Núm. 95 de 21 de junio de 1960[26] autorizando la celebración de un plebiscito cuando un partido o agrupación política presentara a la Junta Estatal de Elecciones peticiones equivalentes al diez por ciento del electorado que hubiese votado en las elecciones inmediatamente precedentes. Durante los seis años que estuvo vigente

---

[25] Véase De Diego, José, *El Plebiscito* (1916). Hay una edición de 1966 de la Editorial Cordillera. También aparece en *Obras Completas* de José de Diego, Tomo II, ed. del Instituto de Cultura Puertorriqueña (1966), pág. 475.

[26] 16 L.P.R.A. sec. 701 y ss. Esa ley fue derogada por la Ley Núm. 1 de 23 diciembre 1966 que dispuso la celebración del plebiscito de 1967, 16 L.P.R.A. sec. 844 y ss.

esa ley, ningún partido o agrupación invocó sus disposiciones para solicitar la celebración de un plebiscito.

A los diez años de fundado el Estado Libre Asociado, en 10 de julio de 1962, el Gobernador Luis Muñoz Marín le escribe al Presidente Kennedy, y después de referirse a la fundación del Estado Libre Asociado le dice en su carta:

"Estábamos conscientes entonces de que el convenio no era perfecto. Esta consciencia se ha ido acentuando hasta hacerse ahora aguda. La misma Asamblea Constituyente reconoció desde el comienzo que había lugar para crecimiento, y que este crecimiento podía y debía ser, no hacia la independencia o la estadidad federada, sino dentro de la naturaleza y genio de la propia idea creadora del Estado Libre Asociado.

Creo que ha llegado el momento de que ese crecimiento se efectúe. Un retraso indebido en esto no puede dejar de hacer daño a Puerto Rico y a la importancia de Puerto Rico como un exponente y ejemplo de la actitud de los Estados Unidos en un mundo donde el colonialismo es obsoleto y el nacionalismo extremo es obsolescente."

En su carta al Presidente el Gobernador expresó los principios que a su juicio debían guiar el crecimiento propuesto:

"(1) El principio indispensable del Estado Libre Asociado es el gobierno propio para Puerto Rico en asociación permanente con los Estados Unidos sobre una base de lealtad común, ciudadanía común, mutua dedicación a la democracia y un compromiso mutuo con la libertad.

(2) Las bases morales y jurídicas del Estado Libre Asociado deben aclararse aún más, para así eliminar cualquier posible base para la acusación hecha por los enemigos y los amigos descarriados de los Estados Unidos y de Puerto Rico, de que el Estado Libre Asociado no fue la libre selección de nuestro pueblo actuando en su capacidad soberana, sino meramente un tipo diferente de arreglo colonial al cual el pueblo de Puerto Rico consintió.

(3) El poder y la autoridad gubernamental del Estado Libre Asociado debe ser completo. Todas las reservas o excepciones

que no sean parte indispensable de los arreglos para la asociación permanente con los Estados Unidos deben ser eliminadas. Deben establecerse métodos para que el pueblo de Puerto Rico pueda participar dentro del concepto de Estado Libre Asociado, en las funciones federales que le afectan."

Añadió el Gobernador en su carta al Presidente:

"Así pues, parece claro que el pueblo de Puerto Rico debe ser consultado de nuevo sobre sus relaciones de gobierno con Estados Unidos. Ha llegado el momento en que el pueblo, a base de su propia experiencia, deba considerar cómo ha de perfeccionar el concepto de Estado Libre Asociado dentro de su asociación permanente con la Unión Federal. Es ésta mi convicción sobre lo que se debe hacer, y creo que es la de la vasta mayoría de los puertorriqueños."

El Presidente Kennedy contestó al Gobernador en 24 de julio de 1962:

"Estoy consciente, sin embargo, como usted señala, de que la relación de Estado Libre Asociado no se ha perfeccionado y que no ha realizado aún su pleno potencial y veo con beneplácito su declaración de que el pueblo de Puerto Rico está a punto de comenzar a considerar esta relación con el propósito de llevarla a su desarrollo máximo. Estoy en total simpatía con esta aspiración. No veo ninguna razón por la cual el concepto de Estado Libre Asociado, si tal es el deseo del pueblo de Puerto Rico, no pueda desarrollarse completamente como una institución permanente en su asociación con los Estados Unidos. Estoy de acuerdo con que este es un momento oportuno para reconocer la necesidad de crecimiento, y con que, tanto como una cuestión de equidad para todos los concernidos como para establecer un 'record' inequívoco, se consulte al pueblo de Puerto Rico, como se propone usted hacerlo, para que éste pueda expresar cualquier otra preferencia, incluyendo la independencia, si tal fuese su deseo."[26-a]

El resultado inmediato de ese intercambio de cartas entre el Gobernador de Puerto Rico y el Presidente de los Estados Unidos fue la aprobación por la Asamblea Legislativa de

_____

[26-a] *El Mundo*, 25 julio 1962, ed. final, pág. 16.

Puerto Rico de la Resolución Conjunta Núm. 1 de 3 de diciembre de 1962, L.P.R.A., Tomo I (ed. 1965), pág. 162, mediante la cual se propuso formalmente al Congreso de los Estados Unidos la celebración de un plebiscito en Puerto Rico. En el plebiscito se votaría por una de las tres fórmulas: (1) el Estado Libre Asociado, basado en la común ciudadanía con los Estados Unidos y desarrollado hasta el máximo que fuese compatible con la asociación, (2) la estadidad federada y (3) la independencia.

Como resultado de la mencionada Resolución Conjunta de 1962 de la Asamblea Legislativa de Puerto Rico, el Congreso aprobó la Ley Pública 88–271 de 20 de febrero de 1964, [27] mediante la cual creó una comisión conjunta, conocida como la Comisión del Status, a ser integrada por siete representantes de los Estados Unidos y seis de Puerto Rico, para estudiar a fondo los factores relacionados con las presentes y futuras relaciones entre ambos países.

En la Sec. 2 (c) de dicha Ley 88–271 el Congreso expresó lo siguiente:

"El Congreso invita por la presente al Estado Libre Asociado de Puerto Rico a proveer para la participación del Estado Libre Asociado y su pueblo en la labor de la Comisión, decretando una ley que disponga para el nombramiento de seis miembros adicionales de la Comisión."

Mediante la Ley Núm. 9 de 13 de abril de 1964, L.P.R.A., Tomo I (ed. 1965), pág. 166, la Asamblea Legislativa de Puerto Rico aceptó la invitación del Congreso para participar en la Comisión del Status y dispuso para el nombramiento de los seis miembros puertorriqueños de dicha Comisión.

La Comisión celebró vistas públicas en San Juan, trabajó durante dos años y rindió su informe en agosto de 1966. En su informe la Comisión llegó a ciertas conclusiones e hizo recomendaciones al Presidente y al Congreso de los Estados Unidos y al Gobernador y a la Asamblea Legislativa de

---

[27] 78 Stat. 17; L.P.R.A., Tomo I (ed. 1965), pág. 164.

Puerto Rico. En sus conclusiones la Comisión expresó que "Tanto Puerto Rico como los Estados Unidos comparten una común dedicación a la libertad individual, a los derechos humanos fundamentales y a las tradiciones del gobierno democrático y representativo." También expresó en su informe que:

"La principal conclusión de la Comisión es que las tres formas del Status político—el Estado Libre Asociado, la Estadidad y la Independencia—son válidas y confieren al Pueblo de Puerto Rico igual dignidad con igualdad de status y de ciudadanía nacional."

También concluyó la Comisión que cualquier preferencia entre dichas formas de status correspondía hacerla a Puerto Rico; que tal expresión debía preceder a cualquier cambio en el status; y que el primer paso hacia cualquier cambio de status político lo debía dar Puerto Rico. Concluyó además que:

"Sería muy útil para todos los interesados si ocurriese una expresión de la voluntad de los ciudadanos de Puerto Rico mediante una votación popular sobre la cuestión de si desean que continúe el Status del Estado Libre Asociado con capacidad de crecimiento y desarrollo, o si desean optar por la Estadidad o la Independencia."

Recomendó la Comisión del Status que de celebrarse un plebiscito y con el fin de estructurar la forma de status favorecida en el mismo, se convocase a uno o más grupos conjuntos asesores. [28]

A la luz de las conclusiones y recomendaciones de la Comisión del Status la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 1 de 23 de diciembre de 1966, 16 L.P.R.A. sec. 844 y ss., mediante la cual se dispuso para la celebración de un plebiscito. Luego del consiguiente debate público mediante mítines, la prensa, radio y televisión, se celebró el

---

[28] *Informe de la Comisión de los Estados Unidos y de Puerto Rico Sobre el Status de Puerto Rico* (1966) págs. 6–10.

plebiscito el 23 de julio de 1967. Votaron 707,293 electores y el resultado fue el siguiente. A favor del Estado Libre Asociado votó el 60.41%; a favor de la estadidad 38.98% y a favor de la independencia .60%. [29]

Es de conocimiento general que el Partido Popular Democrático propulso y defendió en el plebiscito el status de Estado Libre Asociado desarrollado hasta el máximo compatible con la asociación con los Estados Unidos, y que el demandado era el líder principal de los que favorecían la estadidad.

Según requerido por la Ley del Plebiscito, en 17 de agosto de 1967, el Gobernador de Puerto Rico, Roberto Sánchez Vilella, certificó al Presidente de los Estados Unidos, Lyndon B. Johnson, los resultados del plebiscito. El Presidente contestó al día siguiente mediante carta expresando su satisfacción por el hecho de que la voluntad popular de los puertorriqueños en relación con el status político había sido determinada democráticamente mediante el plebiscito y añadió que estaba listo para nombrar los miembros estadounidenses de los grupos asesores tan pronto el Estado Libre Asociado nombrase a sus representantes en dichos grupos.

El término por el cual fue electo el Gobernador Sánchez Vilella expiraba el 2 de enero de 1969 y en noviembre de 1968 se celebraron elecciones generales en la isla para elegir al Gobernador, al Comisionado Residente en Washington y a los miembros de la Asamblea Legislativa. El resultado de las elecciones fue el siguiente: Partido Nuevo Progresista 390,922 votos; Partido Popular Democrático 367,901 votos; Partido del Pueblo 87,832 votos; Partido Independentista Puertorriqueño 24,729 votos; Partido Estadista Republicano 4,057 votos. [29-a]

---

[29] Junta Estatal de Elecciones, *Informe Oficial sobre la Votación del Plebiscito de 1967*, pág. VII.

[29-a] Junta Estatal de Elecciones, *Estadística Electoral sobre las Elecciones Generales de 1968*, pág. 3.

Como resultado de dichas elecciones advino Gobernador el demandado, Honorable Luis A. Ferré, el candidato del Partido Nuevo Progresista. Tomó posesión de su cargo el 2 de enero de 1969. El Partido del nuevo Gobernador eligió al Comisionado Residente, Honorable Jorge L. Córdova Díaz y obtuvo el control de la Cámara de Representantes. El Partido Popular retuvo el control del Senado.

En 2 de mayo de 1969 el Partido Popular Democrático (P.P.D.) presentó en este Tribunal una solicitud de *mandamus* en la cual solicita que ordenemos al Gobernador a que proceda al cumplimiento de los deberes que le impone la Ley de Plebiscito.

En su solicitud alega el peticionario, en esencia, que la Ley de Plebiscito le impone al Gobernador el deber de nombrar, a propuesta del Partido Popular Democrático, los miembros puertorriqueños de los grupos asesores y que aquél se ha negado a hacerlo a pesar de habérselo solicitado formalmente el peticionario en dos ocasiones. Se basa el peticionario en el texto de dicha Ley y en que el Partido Popular Democrático fue el partido que defendió en el plebiscito la fórmula del Estado Libre Asociado, la cual resultó triunfante en dicha votación.

Luego de solicitar y obtener de este Tribunal una prórroga, el demandado presentó su contestación en 9 de junio de 1969. En la misma admitió algunas de las alegaciones hechas por el peticionario, negó otras y tomó la posición de que no procedía el *mandamus* solicitado ni en los méritos de la cuestión ni debido a una serie de defensas afirmativas que levantó. Vamos a discutir dichas defensas, unas más brevemente que otras debido a su respectiva importancia, y luego discutiremos el caso en sus méritos.

### La Capacidad Jurídica

La primera defensa afirmativa del demandado consiste en sostener que el demandante no tiene capacidad jurídica para

instar este recurso. La misma no tiene mérito. Una mera lectura del Art. 45 de la Ley de Plebiscito demuestra que la responsabilidad asumida por los partidos políticos y organismos representativos de las tres formas de status que se pusieron a votación en el Plebiscito, no termina con la celebración del mismo. Véanse, por ejemplo, los siguientes fragmentos de dicho Art. 45:

"De resultar triunfante una de las fórmulas según lo dispuesto en el Artículo 2 de esta ley, el Gobernador en su certificación al Presidente, solicitará la constitución conjunta de los grupos asesores recomendados en el informe de la Comisión de Status y descritos en la exposición de motivos de esta ley. . . .

En tal caso, los miembros del grupo asesor que deban ser nombrados por el Gobernador de Puerto Rico, serán designados a propuesta del partido, o del Comité Directivo que haya representado la fórmula triunfante en el proceso plebiscitario."

Si el partido político que propuso y defendió en el Plebiscito la fórmula que resultó triunfante en el mismo no tuviese capacidad jurídica para solicitar de los tribunales que se cumpliese con la Ley de Plebiscito y se acatase y llevase a la práctica el mandato plebiscitario ¿quién entonces la tendría? Es claro que el partido u organismo que propuso la fórmula triunfante tiene capacidad jurídica para recurrir a los tribunales en el sentido antes dicho. Esa es la manifiesta intención legislativa. En el Informe Conjunto de 17 de diciembre de 1966 de las Comisiones Especiales que se crearon para estudiar el proyecto de la Ley de Plebiscito, dice, en parte, lo siguiente:

"Las decisiones que se están tomando por esta Asamblea Legislativa exigen que haya garantías adecuadas para el acatamiento de la voluntad democrática que el pueblo exprese en el plebiscito."—*Diario de Sesiones,* Vol. 20, Sesión Extraordinaria de 1966, p. 503.

El Plebiscito no fue un mero ejercicio académico sino un paso práctico dado por el país en su angustiosa búsqueda de

sí mismo. Fue también un paso político y jurídico en el largo camino de su desarrollo constitucional. La Ley de Plebiscito, y en particular su Art. 45, invistió a los partidos políticos y organismos que concurrieron al mismo de capacidad para recurrir a los tribunales en defensa de los derechos que dicha ley les da y para solicitar y obtener que todos los funcionarios públicos concernidos cumplan con la ley. Véase Thio, *"Locus standi* in relation to Mandamus," *Public Law* (1966) págs. 133, 147.

Ya en *Asociación de Maestros* v. *Pérez, Gobernador,* 67 D.P.R. 848 (1947), sostuvimos que es una cuestión de interés público el que las leyes se pongan en vigor. Allí también se trataba de una petición de *mandamus* y se cuestionó la capacidad jurídica de la peticionaria, la Asociación de Maestros de Puerto Rico. A esos efectos dijimos en aquel caso, a la pág. 851:

"Se arguye por los demandados que la Asociación de Maestros no tiene interés especial en este asunto; que acaso podrían tenerlo los maestros que son los que han de enseñar en el idioma que se adopte, pero que la peticionaria es una persona jurídica distinta de los miembros que la componen y que por consiguiente no puede, ni siquiera asumir, la representación de los maestros en este asunto.

Convendríamos con los demandados si se tratase en el presente caso de una cuestión de interés privado. No cabe duda, sin embargo, que la selección del idioma que ha de servir de vehículo a la enseñanza pública de un país, es una cuestión de interés público. También lo es que las leyes se pongan en ejecución. Tratándose de cuestiones de interés público, sostiene la mayoría de las autoridades que interpretan preceptos similares al nuestro, que cuando la cuestión envuelta es de interés público y el *mandamus* tiene por objeto conseguir la ejecución de un deber público, el pueblo es considerado como la parte especialmente interesada y el demandante no necesita probar que tiene interés especial en el resultado del caso. Basta demostrar que

es un ciudadano y como tal está interesado en la ejecución y protección del derecho público." ([29-b])

## El Recurso no Es Prematuro y no Hay Incuria

Las defensas levantadas por el demandado de que el recurso es prematuro y de que el demandante incurrió en tardanza o incuria son contradictorias entre sí y no tienen mérito. No tiene utilidad alguna que elaboremos sobre ellas.

## Cosa Juzgada

Como otra defensa afirmativa levanta el demandado la de cosa juzgada. Alega que esta controversia ya fue juzgada y adjudicada en el Tribunal Superior de San Juan en el caso CS-69-243 titulado *Enrique Bird Piñero v. Luis A. Ferré y Partido Popular Democrático.* No estamos de acuerdo. Podríamos entrar en una discusión pormenorizada del citado caso de *Bird Piñero* y distinguirlo del presente, pero no es necesario hacerlo por lo que a continuación explicamos.

---

([29-b]) Esto, claro está, se refiere a situaciones excepcionales como la que se planteó en el caso de la Asociación de Maestros y se plantea en el caso de autos, pero la norma establecida por la Ley de *Mandamus* es al efecto de que sólo pueden invocar con éxito el auto las personas especialmente interesadas. 32 L.P.R.A. sec. 3423; *Prensa Insular v. Cordero,* 67 D.P.R. 89, 103 (1947). A los fines de este caso no es necesario considerar ni discutir quien es una persona especialmente interesada, si uno a quien el estatuto lo protege un derecho específico o uno que de hecho ha sido adversamente afectado. Esta compleja y técnica cuestión ha sido objeto de discusión por reconocidos tratadistas en el campo del derecho administrativo. 3 Davis, *Administrative Law Treatise,* cap. 22; Jaffe, *Standing to Secure Judicial Review: Public Actions,* 74 Harv. L. Rev. 1265 (1961); Jaffe, *Standing to Secure Judicial Review: Private Actions,* 75 Harv. L. Rev. 255 (1961).

La jurisprudencia federal no es uniforme sobre esta cuestión. Sin embargo, la tendencia moderna es la de abolir las complejidades técnicas de la doctrina de falta de capacidad jurídica y abrir las puertas de los tribunales a todos los que crean tener una reclamación válida. *Flast v. Cohen,* 392 U.S. 83 (1968); *Curran v. Clifford,* 37 U.S.L.W. 2390 (Dic. 1968, D.C. Cir.).

Como se sabe, la doctrina de cosa juzgada es de naturaleza técnica y tiene excepciones y limitaciones bien reconocidas. No hace mucho hemos discutido y examinado dicha doctrina de cosa juzgada en *Pérez* v. *Bauzá*, 83 D.P.R. 220 (1961) y en *Millán* v. *Caribe Motors*, 83 D.P.R. 494 (1961). En *Pérez* supra, a la pág. 225 dijimos:

"En términos generales, puede afirmarse que la regla de cosa juzgada está fundada en consideraciones de orden público y necesidad: por un lado, el interés del Estado en que se le ponga fin a los litigios, . . . y por otro lado, la deseabilidad de que no se someta en dos ocasiones a un ciudadano a las molestimas que supone litigar la misma causa."

Y a la pág. 226 del mismo caso:

"Sin embargo, los tribunales se han negado a aplicar en forma inflexible la defensa de cosa juzgada cuando hacerlo derrotaría los fines de la justicia, especialmente si hay envueltas consideraciones de orden público. . . . Según se ha expresado, la doctrina descansa en el principio básico de que debe propiciarse la terminación de litigios, pero si la aplicación rigurosa de la misma derrotaría en la práctica un derecho permeado en alguna forma del interés público, los tribunales se inclinan hacia la solución que garantice cumplida justicia en lugar de favorecer en forma rígida una ficción de ley que obedece fundamentalmente a un principio de conveniencia y orden procesal. . . . En otras palabras, la regla no es absoluta y debe siempre considerarse conjuntamente con el saludable principio de que debe dispensarse justicia en cada caso."

En *Millán* v. *Caribe Motors*, supra, nos negamos a aplicar la doctrina de cosa juzgada en una situación en que de hacerlo se hubiese producido una injusticia. Allí dijimos, en 83 D.P.R. 508:

"Es oportuno señalar que estamos conscientes de la utilidad y de la importancia de la regla de cosa juzgada y la doctrina de impedimento colateral por sentencia. Ciertamente hay un interés tanto individual como social en que los litigios tengan fin. Sin embargo, no podemos frustrar la justicia en nombre de reglas que se originaron con el propósito de facilitar su adminis-

tración. Las máximas generales hay que atemperarlas a los hechos del caso." ([30])

En el mismo sentido, véanse *Feliciano Ruiz* v. *Alfonso Develop. Corp.*, 96 D.P.R. 108, 114 (1968) y *Monagas* v. *Vidal*, 170 F.2d 99, 106.

Nuestra posición sobre la aplicación de la doctrina de cosa juzgada está acorde con las mejores corrientes de pensamiento sobre el particular. En *U.S.* v. *Silliman*, 167 F.2d 607, 614 (1948) se expresó:

"Dicha norma de política pública [la de cosa juzgada] debe aplicarse con buen juicio porque una aplicación ciega de la misma puede frustrar la norma superior de hacer justicia en cada caso."

En *Developments in the Law: Res Judicata*, 65 Harv. L. Rev. 818 (1952), luego de mencionarse las razones que justifican la doctrina y las que justifican sus excepciones, se dice: "Tanto la formulación judicial como el análisis de los estudiosos debe llevar a su justo nivel esas consideraciones contrapuestas." ([31])

Porque no creemos en aplicar las máximas y las doctrinas jurídicas "cuando hacerlo derrotaría los fines de la justicia, especialmente si hay envueltas consideraciones de orden público," *Pérez* v. *Bauzá*, supra; porque es innegable que este litigio envuelve consideraciones de orden público de la más alta jerarquía; porque este litigio participa de la naturaleza de un pleito de clase (425,000 electores votaron a favor del status de Estado Libre Asociado en el Plebiscito); y porque este Tribunal es el más adecuado para ventilar las importantes cuestiones aquí planteadas; somos de opinión que no es de aplicación aquí la doctrina de cosa juzgada.

---

([30]) Castán, *Teoría de la Aplicación e Investigación del Derecho*, 1947, págs. 253–258.

([31]) El citado trabajo aparece en *Selected Essays on Civil Procedure*, editado por la Harvard Law Review Association (1965).

De las defensas afirmativas que levanta el demandado hemos dejado tres para discutirlas conjuntamente debido a lo relacionadas que están unas con otras. Dichas defensas son: que no procede este recurso porque violaría la separación de poderes; que el asunto es uno político no susceptible de ser adjudicado judicialmente; y que el remedio que se solicita no procede porque va dirigido a una función discrecional del demandado. Ya al discutir estas defensas estamos entrando en los méritos de la controversia. Luego de discutidas llegaremos al meollo del litigio: si el demandado debe o no nombrar los grupos asesores a propuesta del demandante.

## La Separación de Poderes

El planteamiento de que se violaría el principio de la separación de poderes si este Tribunal ordenase al demandado dar cumplimiento a determinadas disposiciones de ley no es nuevo pero lo discutiremos porque llega al hueso del concepto del estado de derecho. Dicho concepto o principio de gobierno, conocido también como el imperio de la ley, y en la literatura jurídica anglosajona con el término más feliz de *"the rule of law,"* representa, desde luego, una condición básica e indispensable del sistema de gobierno democrático-constitucional. Utilizamos la palabra indispensable en su pleno sentido.

El tema es muy interesante y su literatura muy rica pero debido a limitaciones de espacio tenemos que resignarnos a no tratarlo con la extensión que se merece. Sin embargo, creemos que es conveniente entrar en algunas consideraciones.

Primero, reconozcamos que este principio de derecho constitucional—el de la separación de poderes—como tantos otros, representa la concretización jurídica de una teoría de gobierno. Esta teoría de los gobiernos "divididos" o "mixtos," como también se le conoce, es una valiosa defensa contra la tiranía y es mucho más antigua que la Constitución de los Estados Unidos y que los escritos de los teóricos políticos de

los siglos 17 y 18 que los autores de la Constitución americana conocían tan bien.

La Constitución de la Roma republicana ofrece un ejemplo notable de una cuidadosa separación de poderes. Discusiones del tema se encuentran en Aristóteles (*Política*), en Platón (*Las Leyes*) y en Polibio (*Historias*, Libro VI). El influjo del análisis de Polibio ha llegado hasta el pensamiento moderno.[32] En Inglaterra lo discute en 1583, ya con relación al derecho constitucional inglés, Sir Thomas Smith (*De Republica Anglorum*)[33] y el republicano Harrington en su *Oceana* (1656), libro dirigido a la atención de Cromwell, lo trata extensamente.

Las fuentes inmediatas que sobre esto inspiraron a los padres de la Constitución americana fueron Locke, *Second Treatise of Government* (1690) y especialmente Montesquieu, *El Espíritu de las Leyes*, Libro XI (1748), a quien Madison llamó "el oráculo que siempre se consulta sobre estos asuntos," *The Federalist* No. 47 (1788). En la formulación americana de la doctrina de separación de poderes también influyó Blackstone, *Commentaries on the Laws of England* (1765 y ediciones siguientes), debido a su gran influjo sobre la profesión legal americana durante el primer siglo de ésta. Pound, *The Formative Era of American Law* (1938). Para excelentes discusiones de la doctrina véase el capítulo *"The Separation of Powers: False and True"* en Finer, *The Theory and Practice of Modern Government*, edición revisada (1960), pág. 94; Friedrich, *Constitutional Government and Democracy*, ed. rev. (1950), pág. 173 y Sharp, *The Classical American Doctrine of the Separation of Powers*, 2 U. Chi. L. Rev. 385 (1935).

---

[32] Influyó en Cicerón y en pensadores de la Edad Media como Marsilio de Padue y Santo Tomás de Aquino; y en Locke y Montesquieu, entre los modernos.

[33] Allen, *A History of Political Thought in the Sixteenth Century* (1928) pág. 262.

Hoy día está reconocido universalmente por los tribunales y por los tratadistas que la separación de poderes no es completa ni absoluta. (³⁴) Puede decirse que nadie pretendió que lo fuese. La imposibilidad práctica de lo contrario fue reconocida por sus expositores principales y por los propios padres de la Constitución de los Estados Unidos. Madison, *The Federalist* No. 47.

En cuanto al derecho constitucional puertorriqueño, es cierto que nuestra Constitución organizó un gobierno en el cual los poderes Legislativo, Ejecutivo y Judicial están separados y son ejercidos por tres distintos departamentos o ramas del gobierno, pero esta separación, que es cierta en términos generales, tampoco es absoluta en nuestra Constitución. Por disposición constitucional y de ley hay funciones de gobierno que traspasan la línea divisoria y son ejercidas por una rama de naturaleza distinta a dichas funciones. Algunos ejemplos de estos son los siguientes:

El Gobernador, jefe de la rama ejecutiva, participa de la función legislativa (a) al someter anualmente a la Asamblea Legislativa el anteproyecto de presupuesto y un informe que, por mandato constitucional, "contendrá los datos necesarios para la formulación de un programa de legislación." Además, (b) puede convocar a la Asamblea Legislativa o al Senado a sesión extraordinaria cuando a su juicio los intereses públicos así lo requieran. Y (c) aprueba o desaprueba los proyectos de ley que la Asamblea Lsgislativa decreta. Participa en la función judicial al suspender la ejecución de sentencias en

---

(³⁴) *Banco Popular* v. *Corte*, 63 D.P.R. 66, 70 (1944) ; *Miffitt* v. *Statler Hilton, Inc.*, 248 A.2d 581, 583 (1968) ; *Hobson* v. *Hansen*, 265 F.Supp. 902, 915 (1967) ; *Hill* v. *Relyea*, 216 N.E.2d 795, 798 (1966) ; *David* v. *Vesta Co.*, 212 A.2d 345, 357 (1965) ; *United States* v. *Solomon*, 216 F.Supp. 835, 840 (1963) ; *Dickson* v. *Saiz*, 308 P.2d 205, 211 (1957) ; In re Opinion of the Justices, 64 A.2d 169, 172 (1949) ; *Parker* v. *Riley*, 113 P.2d 873, 877 (1941) ; Davis, 1 *Administrative Law Treatise*, sec. 1.09; Jaffe, *Judicial Control of Administrative Action* (1965) pág. 29; Sharp, artículo citado, 2 U. Chi. L.Rev. 385 (1935).

casos criminales, al conmutar penas, condonar multas y al conceder indultos.

El Senado, la cámara alta de la rama legislativa, participa de la función ejecutiva al confirmar o rechazar nombramientos hechos por el Gobernador. El Tribunal Supremo, el más alto cuerpo de la rama judicial, participa de la función legislativa al adoptar reglas de evidencia y códigos de procedimiento civil y criminal. El Juez Presidente, el más alto funcionario judicial, participa de la función ejecutiva al tener a su cargo una de las responsabilidades administrativas mayores del gobierno: ser responsable de la administración de los tribunales. Constitución, Art. IV, sec. 4; Art. V, sec. 7. Además, las Juntas y Comisiones autónomas creadas por ley ejercen funciones legislativas al promulgar reglas y reglamentos, judiciales al celebrar vistas, decidir casos e imponer sanciones, y ejecutivas al supervisar la administración de sus respectivas leyes.

El planteamiento de que la concesión del *mandamus* solicitado en este caso viola la separación de poderes ha sido resuelto adversamente para el demandado desde los comienzos de la jurisprudencia de los Estados Unidos y de la nuestra propia. En el célebre caso de *Marbury* v. *Madison*, 1 Cranch 137 (1803), un caso también de *mandamus*, luego de discutirse el asunto se expresó que "no es el cargo del funcionario público a quien va dirigido el recurso lo que determina si éste procede o no, sino que lo determinante es la naturaleza del deber que se interesa hacer cumplir." 2 L.Ed. 71.

En Puerto Rico, nuestra jurisprudencia constante ha sido en el sentido de sostener el estado de derecho mediante la supervisión judicial de los poderes del Gobernador y en específico hemos resuelto repetidas veces que los tribunales pueden compeler a los gobernadores a cumplir los deberes ministeriales que les imponen la Constitución y las leyes. En igual sentido se ha resuelto en California, Colorado, Kan-

sas, Kentuckey, Maryland, Montana, Nebraska, Nevada, North Carolina, Wyoming y Minnesota. ([35])

La primera vez que se planteó la cuestión de si los Tribunales de Puerto Rico tienen jurisdicción para expedir un auto de *mandamus* contra el Gobernador para obligarle a cumplir un deber ministerial fue en *Lutz* v. *Post*, 14 D.P.R. 860 (1908). Allí el Tribunal reconoció que la jurisprudencia demostraba dos tendencias: una, que resolvía el problema en la afirmativa y otra en la negativa, pero se decidió por la afirmativa por encontrar que esta posición está basada en razonamientos más sólidos que la contraria y además por tener la misma apoyo en decisiones del Tribunal Supremo de los Estados Unidos. Luego de señalar que "Nuestro gobierno es un gobierno de ley, y todos los funcionarios desde el más alto hasta el más inferior, están obligados a obedecer a la ley sin duda alguna" el Tribunal se expresó como sigue:

"Por consiguiente, estamos ampliamente justificados en declarar que en cuanto a deberes ministeriales o ejecutivos, el principio general de conceder un remedio mediante el auto de *mandamus* contra funcionarios ejecutivos debe ser sostenido y aplicado; y el mero hecho de que sea el Gobernador de Puerto Rico el funcionario contra quien se solicita el remedio por medio de este auto extraordinario no debe atemorizar los tribunales en el ejercicio de su jurisdicción, puesto que está bien establecido y no puede negarse el que la autoridad de los tribunales es suprema en la consideración y determinación de todas las cuestiones legales que sean judicialmente sometidas a las mismas, dentro de los límites legales de su jurisdicción; y nadie está exento del efecto de la ley; y el deber de cumplir fielmente las leyes incumbe al Gobernador en virtud de su juramento oficial; y en el caso de que el remedio solicitado fuera denegado podría suceder que los peticionarios no encontraran reparación alguna a los males o perjuicios que sufrieren."

([35]) *Lutz* v. *Post*, 14 D.P.R. 860, 864 (1908); Amadeo, "El Control Judicial de los Poderes del Gobernador de Puerto Rico," 12 Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de P.R. 193 (1949) y en 15 Rev. Jur. U.P.R. 1 (1945).

En cuanto a los méritos del caso, el Tribunal resolvió que lo que allí se solicitaba constituía un acto discrecional y no ministerial y que por lo tanto no procedía el *mandamus*. ([36])
También resolvió que el peticionario no tenía capacidad jurídica para promover el procedimiento porque no demostró que tenía un interés especial en el asunto. ([37])

En *Jiménez* v. *Reily*, 30 D.P.R. 626 (1922), se trataba del poder del Gobernador para destituir funcionarios públicos. Allí el Tribunal obligó al Gobernador, mediante un recurso de *mandamus*, a restituir en su cargo a un funcionario público nombrado por un término fijado en la ley y el cual había sido destituido por el Primer Ejecutivo sin previa formulación de cargos y sin darle oportunidad de defenderse.

Otro caso de *mandamus* es el de *Romero Moreno* v. *Gore, Gobernador*, 46 D.P.R. 408 (1934). Allí, igual que en *Jiménez* v. *Reily*, supra, el Tribunal encontró que el Gobernador había separado ilegalmente de su cargo al peticionario, Antonio Romero Moreno, y expidió un auto perentorio de *mandamus* ordenando la reposición en el mismo del peticionario. En forma idéntica resolvimos en *Abella* v. *Piñero, Gobernador*, 66 D.P.R. 690 (1946).

En una comunidad regida por leyes y no por hombres, en un estado de derecho, los casos citados anteriormente no se podían haber resuelto de otro modo. El auto de *mandamus* es uno de los recursos clásicos para garantizar y mantener el imperio de ley. Así se concebía ya desde tiempos de Sir Edward Coke. Jaffe, *Judicial Control of Administrative Action* (1965), págs. 179–180.

---

([36]) La cuestión envuelta era si el Gobernador tenía el deber ministerial de entregar al director de un periódico copia certificada de la contestación a unos cargos formulados contra un Juez de Distrito.

([37]) Esta opinión contiene el *dictum* de que en Puerto Rico, bajo la Carta Orgánica entonces vigente, no existía la separación de poderes. Por ser ésta una cuestión ya académica no es necesario discutirla, pero la validez de esa aseveración es muy cuestionable. *Springer* v. *Philippine Islands*, 277 U.S. 189 (1928); *Banco Popular* v. *Corte*, 63 D.P.R. 66 (1944).

Vistos los orígenes del principio de derecho constitucional de la separación de poderes y vistos los casos pertinentes, vayamos ya de una vez al corazón del problema que en esta etapa de la opinión nos ocupa. ¿Por qué no puede este Tribunal, sin dejar de cumplir su solemne y principal deber de velar por la supremacía de la ley, aceptar que basta que se invoque el principio de la separación de poderes para que nos declaremos sin jurisdicción? La respuesta es muy sencilla. Puede expresarse en unas pocas oraciones. Lo hacemos en el siguiente párrafo.

El nuestro es un gobierno de leyes y no de hombres. La ley es igual para todos. No hay persona, ni privada ni pública, no importa cuán elevada o común sea, que esté sobre la ley. En cuanto a controversias legales se refiere, este Tribunal es el árbitro supremo del país. Si un funcionario público pudiese utilizar el principio de la separación de poderes como valla para impedir el paso de nuestra jurisdicción en controversias legales, ese funcionario se colocaría fuera y por encima de la ley. Podría actuar caprichosamente, arbitrariamente. Los derechos y la propiedad de los ciudadanos que entrasen en contacto con ese funcionario quedarían sin protección, a merced de su capricho o deseo arbitrario. El estado de derecho quedaría hecho añicos. La supremacía de la ley desaparecería de nuestras vidas. Eso equivaldría a un retroceso de siglos. Desde luego eso no puede ser. Por si fuese necesario decirlo, se ha resuelto que ni la rama ejecutiva del Gobierno de los Estados Unidos,[38] ni el Congreso de ese país,[39] pueden actuar arbitrariamente o fuera de la ley.[40]

La teoría de que el Primer Ejecutivo está exento de la revisión judicial es contraria a toda la tradición del derecho

[38] *Youngstown Sheet and Tube Co.* v. *Sawyer,* (el "Steel-Seizure Case"), 343 U.S. 579 (1952); *Marbury* v. *Madison,* 1 Cranch 137 (1803).

[39] *Powell* v. *McCormack,* 395 U.S. 486 (1969).

[40] V. Schwartz, *A Commentary on the Constitution of the United States* (1963), Vol. II, págs. 79–85; del mismo autor, *American Constitutional Law* (1955), págs. 187–206.

constitucional que aplicamos y es inconsistente con el concepto de gobierno constitucional. Dicho concepto no reconoce funcionario alguno que sea *legibus solutus,* superior a la ley. No lo reconocía ni el constitucionalismo antiguo ni lo reconoce el constitucionalismo moderno. La idea medieval de que el gobernante está sujeto a la ley fue recogida y reivindicada por el derecho común. Como consecuencia de las crisis constitucionales de Inglaterra del siglo 17 dicha idea quedó definitivamente establecida. De ahí pasó a nuestras constituciones.([41])

Lo anterior no quiere decir, desde luego, que la rama judicial va a hacer todas las decisiones públicas finales. La rama judicial decide solamente casos y controversias. Fuera de eso, como se sabe, la rama judicial no tiene ingerencia. La política pública sobre los demás asuntos—que no sean casos y controversias—la hacen los dos departamentos políticos del gobierno—el Legislativo y el Ejecutivo. Esos dos departamentos gobiernan. Gobiernan porque son electos. La rama judicial no es un departamento político del gobierno. No es electa. No gobierna. Por eso puede ser, y constitucionalmente es, el árbitro tanto entre particulares, como entre particulares y el gobierno.

### La "Cuestion Política"

Esto nos trae a otra defensa que ha levantado el demandado: la de que la controversia ante nosotros es una de naturaleza política y no legal y que por eso no es susceptible de ser adjudicada por los tribunales. ¿Es eso cierto? ¿Se trata aquí de hacer política pública—quehacer de las ramas legislativa y ejecutiva—o se trata de decidir un caso, una controversia legal?

---

([41]) McIlwain, *Constitutionalism Ancient and Modern* (1940); Holdsworth, *A History of English Law* (ed. 1945 reimpreso 1966), Tomo V, pág. 423 y ss. y Tomo VI, págs. 3–122; Pound, *The Spirit of the Common Law* (1921), Cap. 3. Para una narración excepcional de la vida de Sir Edward Coke y los desarrollos constitucionales ingleses del siglo 17, véase Bowen, *The Lion and the Throne* (1956).

¿Vamos aquí a confeccionar un programa de gobierno, digamos, uno de fomento económico o de obras públicas, etc., o vamos a decidir qué es lo que dice el Art. 45 de la Ley de Plebiscito? ¿Vamos a ejercer *gubernaculum* o vamos a ejercer *jurisdictio*? Lo primero no es función nuestra; lo segundo es función solamente de la rama judicial.

La doctrina de la "cuestión política" es de origen jurisprudencial. En la jurisprudencia norteamericana fue enunciada por primera vez en *Foster* v. *Neilson*, 2 Pet. 252 (1829). Allí estaba envuelta la interpretación del Tratado de París de 1763 celebrado entre Gran Bretaña, Francia y España y se debía resolver si para el año 1804 ciertas tierras al este del Río Mississippi pertenecían a España o a Estados Unidos. El Tribunal entendió que se trataba de un asunto que pertenecía al ámbito de las relaciones exteriores del Gobierno de los Estados Unidos y que por ello debía ser resuelto por el Presidente o por el Congreso y no por el Tribunal. Como tantas otras doctrinas constitucionales (libertad de contratación, segregación racial, etc.) esta doctrina de la cuestión política ha evolucionado considerablemente.

Según se han ido expandiendo las fronteras de las libertades individuales y colectivas y la supremacía de la ley se ha hecho realidad en el terreno así ganado, se ha ido reduciendo el área de la tierra de nadie en donde no impera el derecho. Con motivo de ese desarrollo del derecho, la doctrina de la cuestión política ha sido considerablemente limitada. Los casos de *Baker* v. *Carr*, 369 U.S. 186 (1962) y *Powell* v. *McCormack*, 395 U.S. 486 (1969) son ingentes ejemplos de esa contracción judicial de dicha doctrina. Véanse además, *Williams* v. *Rhodes*, 393 U.S. 23 (1968); *Westberry* v. *Sanders*, 376 U.S. 1 (1964); Scharpe, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L.J. 517.

El caso de autos es un caso clásico de interpretación de estatutos. Por haber surgido una controversia entre el de-

mandante y el demandado sobre la interpretación del Art. 45 de la Ley de Plebiscito ha llegado hasta nosotros la misma y para resolverla debemos interpretar dicho artículo. Esa, la de interpretar la ley y aplicarla a los casos concretos, es una función eminentemente judicial. En eso consiste el *jurisdictio*: decir la ley. Los tribunales no pueden evadir su responsabilidad de interpretar la ley y de decidir los casos por el hecho de que se alegue que hacerlo violaría la separación de poderes o constituiría una indebida incursión judicial en asuntos políticos. *Powell* v. *McCormack*, supra, a las págs. 548–549.

### Deber Ministerial

Pasamos ahora a discutir la última de las defensas levantadas por el demandado y al hacerlo llegaremos al corazón de la controversia que este caso plantea. Esta defensa consiste en alegar que la función que se le pide al demandado que cumpla—nombrar los miembros de los grupos asesores— es una discrecional suya y no ministerial y que por ello no procede el *mandamus*.

La vieja dicotomía entre actos administrativos ministeriales y discrecionales ya no goza del vigor que antaño tenía. Tratadistas muy prestigiosos le han hecho fuertes ataques. Jaffe señala que los tribunales han padecido una "obsesión" con esa forma de caracterizar los actos administrativos; que la clasificación es ilusoria, errónea e impráctica; que meramente decide *a priori* el problema sin examinarlo y explicarlo. [42]

Davis expresa que dicha clasificación no se justifica; que si bien el recurso de *mandamus* históricamente tuvo la naturaleza de "extraordinario," lo fue y lo es cuando va dirigido a un tribunal porque el procedimiento ordinario en esos casos es la apelación, pero que como recurso para revisar

---

[42] *Judicial Control of Administrative Action* (1965), págs. 180–181.

actuaciones administrativas el *mandamus* es hoy día un recurso usual y ordinario.([43]) Algunos autores proponen que los tribunales abandonen la clasificación "ministerial-discrecional" de actuaciones administrativas como un paso hacia la elaboración de un derecho más racional sobre *mandamus*.([44]) Debido a la conclusión a que hemos llegado en cuanto a esta última defensa levantada por el demandado, no es necesario que resolvamos aquí el problema que los citados autores levantan.

Para no alargar innecesariamente esta opinión preferiríamos no hacerlo, pero en aras de la exactitud y de la objetividad vamos a transcribir *verbatim* el Art. 45 de la Ley de Plebiscito, Ley Núm. 1 de 23 de diciembre de 1966, 16 L.P.R.A. sec. 888. Creemos necesario hacerlo ya que, en esencia, el caso se contrae a interpretar judicialmente dicho Art. 45. El mismo lee como sigue:

"El Superintendente General de Elecciones certificará al Gobernador el resultado de la consulta plebiscitaria. El Gobernador, a su vez, certificará el resultado al Presidente y al Congreso de Estados Unidos, al Comisionado Residente y a la Asamblea Legislativa del Estado Libre Asociado de Puerto Rico.

De resultar triunfante una de las fórmulas según lo dispuesto en el Artículo 2 de esta ley, el Gobernador en su certificación al Presidente, solicitará la constitución conjunta de los grupos asesores recomendados en el informe de la Comisión de Status y descritos en la exposición de motivos de esta ley.

De acuerdo con ese informe, los grupos conjuntos asesores deberán considerar las medidas de transición necesarias hacia la estadidad o hacia la independencia en caso de que una de estas fórmulas resultara triunfante. En tal caso los miembros

---

([43]) 3 *Administrative Law Treatise* (1958), págs. 355–356.

([44]) Byse, Clark & Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and Nonstatutory Judicial Review of Federal Administrative Actions*, 81 Harv. L. Rev. 308, 334 (1967). Véase también Patterson, *Ministerial and Discretionary Official Acts*, 20 Mich. L. Rev. 848, 886 (1922).

del grupo asesor que deban ser nombrados por el Gobernador de Puerto Rico, serán designados a propuesta del partido, o del Comité Directivo que haya representado la fórmula triunfante en el proceso plebiscitario. Si la representación de la fórmula en el proceso plebiscitario hubiera sido dual, el partido y el Comité Directivo tendrán derecho a proponer un número igual de miembros.

En caso de que el Estado Libre Asociado fuera la fórmula triunfante, el Gobernador propondrá al Presidente la constitución conjunta de grupos asesores respecto a medidas de desarrollo del Estado Libre Asociado, según hayan de considerarse a base de la autorización otorgada por el pueblo en el plebiscito.

Un voto mayoritario a favor de cualquiera de las fórmulas de status constituirá un mandato del pueblo de Puerto Rico al Comisionado Residente, como su representante en la esfera federal, para actuar en el desempeño de sus funciones oficiales de acuerdo con la voluntad del pueblo expresada a virtud de dicho voto."

El artículo no es un modelo de redacción de estatutos y es precisamente por eso que se hace necesaria la interpretación judicial. El demandante sostiene que dicho artículo, interpretado en el contexto de toda la Ley de Plebiscito y de su historial legislativo y antecedentes históricos, establece su derecho al remedio solicitado porque le impone al demandado el deber ministerial de designar los miembros puertorriqueños de los grupos asesores a propuesta del Partido Popular Democrático, partido que defendió la fórmula triunfante en el plebiscito.

El demandado, por su parte, arguye que el Art. 45 le confiere facultad discrecional para designar dichas personas, sin intervenciones extrañas y que dicho artículo "ni siquiera le concede el derecho al Partido Popular Democrático de hacer propuesta alguna al Gobernador" pues entiende que el estatuto le confiere "máxima discreción."

Puede arguirse que el Art. 45 dispone que de haber resultado triunfante en el plebiscito la estadidad los miembros de los grupos asesores serían nombrados por el Gobernador a

propuesta del partido, o del comité directivo, que hubiese representado dicha fórmula en el plebiscito; y que de haber resultado triunfante la independencia el mecanismo de nombramiento hubiese sido igual que el antes descrito, pero que, de haber triunfado la fórmula del Estado Libre Asociado, entonces el Gobernador nombraría libremente dichos miembros de los grupos asesores, sin estar sujeto a designarlos a propuesta del partido que representó dicha fórmula en el plebiscito.

No podemos aceptar esa interpretación del Art. 45 porque, aparte de los razonamientos que más adelante expondremos, tal interpretación nos llevaría inevitablemente a determinar que dicho Art. 45 adolece de un serio vicio constitucional—el de negarle la igual protección de las leyes a la fórmula del Estado Libre Asociado—y nos veríamos obligados a declararlo nulo por inconstitucional. Ello es así porque esa interpretación a que hemos aludido resultaría en un tratamiento desigual para la fórmula de Estado Libre Asociado, tratamiento desigual que no tiene ninguna justificación racional y no es permisible.[45]

Pero, como se sabe, es norma sabia y antigua que los tribunales deben interpretar las leyes, siempre que sea razonablemente posible, en forma tal que se evite concluir que son inconstitucionales.[46] Igualmente, si un estatuto es susceptible de dos interpretaciones, una de las cuales lo haría inconstitucional y la otra no, es deber del Tribunal adoptar

---

[45] *McDonald* v. *Board of Election,* 394 U.S. 802, 809 (1968); *Moore* v. *Ogilvie,* 394 U.S. 814, 818–819 (1969); *Williams* v. *Rhodes,* 393 U.S. 23, 29–34 (1968); *Avery* v. *Midland County,* 390 U.S. 474, 479 (1968); *Harper* v. *Virginia Board of Elections,* 383 U.S. 663, 669–670 (1966); Tussman y Tenbroek, *The Equal Protection of the Laws,* 37 Calif. L. Rev. 341 (1949); *Developments in the Law—Equal Protection,* 82 Harv. L. Rev. 1065 (1969).

[46] *Panama Railroad Co.* v. *Johnson,* 264 U.S. 375, 390 y autoridades allí citadas; *Tesorero* v. *Tribunal,* 71 D.P.R. 298, 303 (1950).

aquella interpretación que, sin violentar la intención legislativa, lo haga constitucional. [47]

## La Intención Legislativa

Ante la necesidad ya antes explicada de interpretar el Art. 45 nos topamos con el problema real envuelto en este caso. Éste es: ¿cuál fue la *intención legislativa* al aprobar dicho artículo? Buscar y darle eficacia a la intención legislativa es la verdadera, permisible y sana interpretación judicial de las leyes. [48]

El argumento de que el Art. 45 le confiere al Gobernador "máxima discreción" en cuanto al nombramiento de los grupos asesores no resiste análisis. En primer lugar, dicho artículo no dice eso. En segundo lugar, sometámoslo a un análisis racional.

El demandado correctamente dice en su alegato de réplica que:

"No debe olvidarse que para la fecha de la aprobación de la Ley del Plebiscito la Legislatura de Puerto Rico estaba constituida en su inmensa mayoría por miembros del Partido Popular Democrático defensores de la fórmula de Estado Libre Asociado."

Es increíble que esa Legislatura, o cualquier otra, se propusiese conferir a una sola persona, a un futuro Gobernador, desconocido a la fecha de la aprobación de la Ley de Plebiscito, "máxima discreción," para encauzar el destino político del país. Tal abdicación de poder en favor de una persona desconocida a la fecha de la aprobación de la ley, aparte de sus probables vicios constitucionales, no se puede

[47] *Wong* v. *McGrath,* 339 U.S. 33, 50; *Rescue Army* v. *Municipal Court,* 331 U.S. 549, 569; *Pueblo* v. *Mantilla,* 71 D.P.R. 36, 45 (1950).

[48] "El medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas, es considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla."—Código Civil, Art. 19.

suponer. (⁴⁹) Y, si esa hubiese sido la intención de la Asamblea Legislativa ¿para qué había que celebrar un plebiscito entonces? pues el resultado de esa delegación unipersonal hubiese sido que, conferida esa máxima discreción, la dirección que ese gobernador futuro le hubiese dado al destino del país hubiese dependido de su personal ideología política.

Es inconcebible que la Asamblea Legislativa se propusiese que la Ley de Plebiscito de administrase en la forma que se administraría de prevalecer el criterio del aquí demandado. No podemos suponer que ningún legislador, no importa de qué partido fuese, se propusiese que de vencer en el plebiscito la fórmula política por él preferida, fuese ésta a ser encauzada y desarrollada por personas creyentes en otra fórmula distinta y adversaria a la suya.

No podemos suponer que la intención legislativa fue que de haber triunfado los estadistas o los independentistas en el plebiscito y de haber triunfado los populares en las elecciones de 1968, un gobernador popular hubiese tenido máxima discreción para encauzar el ideario político de sus adversarios. Tampoco podemos suponer que fue la intención legislativa que habiendo vencido en el plebiscito la fórmula del Estado Libre Asociado dicha fórmula fuese encauzada y desarrollada por sus adversarios políticos.

De un examen cuidadoso de la Ley de Plebiscito hemos llegado a la conclusión de que el propósito legislativo fue darle un trato igual a las tres fórmulas de status político. Repetidamente surge del texto de la ley este propósito. Además, así tenía que ser como cuestión de justicia y de sana política pública.

Así el Art. 4 confiere representación *igual* en la Junta Estatal de Elecciones a las tres fórmulas de status; el Art. 11

---

(⁴⁹) Desde luego, no estamos diciendo que el Sr. Luis A. Ferré fuese una persona desconocida en Puerto Rico en 23 diciembre 1966, fecha de la aprobación de la Ley de Plebiscito. Lo que estamos diciendo es que en esa fecha no era posible saber quién sería el Gobernador en 1969.

establece el derecho de cada fórmula de status de tener *igual* representación en cada Junta de Colegio; el Art. 92 dispone que se divida en partes *iguales* los fondos asignados para gastos generales de campaña y propaganda del plebiscito; también dispone tiempo y trato *igual* para cada una de las fórmulas de status en caso de que una emisora de radio o televisión del Estado Libre Asociado permitiese el uso de sus facilidades a alguna de ellas.

La correcta interpretación del Art. 45 debe ser no la que lo conduciría al defecto constitucional de la falta de igual protección de las leyes antes mencionado, ni la que lo conduciría a frustrar la clara intención legislativa, sino la que hace efectiva dicha intención. Esa intención, desde luego, es abundantemente clara en el sentido de que el legislador se propuso legislar para que se realizase la decisión plebiscitaria, no para que se le frustrase. Lo contrario sería suponer que la ley se propone lo absurdo y es también norma antigua y sabia de interpretación de estatutos que a la ley no se le pueden suponer propósitos absurdos. El juez debe innegable obediencia a la ley y frente a un texto que por no ser claro hay que interpretar, la mejor manera de servirla es la de realizar su idea animadora. ([50])

La Ley de Plebiscito, al organizar un mecanismo para que Puerto Rico pueda democrática y pacíficamente continuar su crecimiento constitucional, necesariamente tenía que disponer que unos partidos y que unos funcionarios llevasen a cabo determinadas labores. Por eso es que algunas de estas labores resultan ministeriales. No importa que se hayan colocado algunas aún en las manos del Primer Ejecutivo. La distinguida representación legal del demandado nos dice que la ley no puede tener el propósito de convertir al Gobernador en un autómata. Como explicamos a continuación tal enfoque no es correcto.

---

([50]) Véase Castán, *La Formulación Judicial del Derecho*, 2da. ed. (1954), pág. 115.

¿Representa para el Sr. Gobernador desdoro alguno cumplir deberes ministeriales? En forma alguna. Para ver esto con claridad hay que entender la naturaleza del gobierno que el Sr. Gobernador preside. En los gobiernos de tipo parlamentario, el Primer Ministro es el gobernante y el Rey, o en su defecto un Presidente, es la cabeza ceremonial del estado. El Rey o el Presidente ejecutan un sinnúmero de deberes ministeriales que no por serlo dejan de ser importantes en su simbolismo. En los gobiernos de tipo presidencial (como es el nuestro y es el de los Estados Unidos) el Primer Ejecutivo es a la vez el gobernante y el jefe ceremonial del estado. Por eso recaen sobre su persona los deberes de gobernante y también un sinnúmero de deberes ministeriales y ceremoniales. Cuando el Gobernador da instrucciones a su gabinete y cuando firma o veta una ley está ejerciendo deberes sustantivos de gobierno. En ellos tiene incuestionable discreción. Por otro lado, cuando el Gobernador corta la cinta al inaugurar una obra pública, recibe a la reina del carnaval u oprime el conmutador eléctrico que enciende la iluminación navideña en la mansión ejecutiva está ejerciendo actos ceremoniales. Los unos y los otros forman parte de sus muchos deberes y ninguno le desluce ni lo convierte en autómata. [51]

De ese modo la Ley de Plebiscito ha puesto en las elevadas manos del Primer Ejecutivo el nombramiento de los miembros puertorriqueños de los grupos asesores. Como un acto ceremonial. Es obvio que el legislador se propuso investir tal acto de un alto contenido simbólico. Pero la Ley de Plebiscito no pone en manos del Sr. Gobernador la facultad de determinar quiénes han de componer esos grupos

---

[51] Sobre lo anterior puede consultarse Jennings, *Cabinet Government*, 3ra. ed. (1961); Finer, *The Major Governments of Continental Europe* (1960); Shotwell, *Governments of Continental Europe*, ed. rev. (1952); Rossiter, *The American Presidency* (1956); Corwin, *The President*, 4ta. ed. rev. (1957).

asesores. Eso sería darle poderes sustantivos para intervenir, si lo quisiese, con la voluntad plebiscitaria. Esa, desde luego, no es la intención legislativa.

El plebiscito y la ley tienen el propósito de que se realice la voluntad del país manifestada en la votación plebiscitaria. No puede suponerse que el plebiscito se celebraba sin propósito alguno y para que un gobernador futuro hiciese las determinaciones sustantivas sobre el status político. La intención legislativa es en el sentido de que los integrantes de los grupos asesores sean personas creyentes en la fórmula que triunfase en el plebiscito. Por eso el Art. 45 dispone que se nombrarán a propuesta del partido o del Comité Directivo que haya representado la fórmula triunfante en el proceso plebiscitario. El acto formal y ceremonial del nombramiento la ley lo puso en las manos del Primer Ejecutivo como cuestión simbólica.

El legislador sabe que el Primer Ejecutivo es electo cada cuatro años y que la ideología política del incumbente puede variar a tenor con los vaivenes de la política partidista. Por eso no podía concederle la máxima discreción para componer esos grupos asesores pues podía darse el caso, como de hecho se dio, de que en determinado momento un Primer Ejecutivo podía ser de una ideología política distinta a la que el país endosó en el Plebiscito. De existir la discreción que el demandado reclama la voluntad de *una* persona—el Primer Ejecutivo de un momento dado—podría frustrar el mandato democrático plebiscitario. Naturalmente, tal cosa choca con las premisas más básicas de la filosofía democrática.

Precisamente se hizo una votación separada sobre el status político—el Plebiscito—para separarla de la votación ordinaria cuadrienal mediante la cual se elige el Gobierno. La Ley de Plebiscito instrumenta un proceso de desarrollo constitucional separado de los quehaceres regulares del gobierno que se elige cada cuatro años.

Ya en el año 1926, en *Pagán* v. *Towner*, 35 D.P.R. 1 (1926), este Tribunal se acercó bastante al punto que aquí decidimos. Allí la ley disponía que la Junta Insular de Elecciones se compondría de tres miembros, dos de los cuales deberían ser nombrados "por el Gobernador a propuesta de los organismos directivos centrales de los respectivos partidos políticos." Luego de decir que "si el Gobernador abusara de su facultad procedería el mandamus," el Tribunal expresó a la pág. 6:

"Por ejemplo, el Gobernador, según hemos dicho, no podría nombrar a persona alguna que no fuera propuesta por el partido y tendrá que escoger un nombre de entre los propuestos si no existen razones válidas para rechazarlos a todos."

Como señalamos antes, la Comisión del Status expresó en su Informe que "Sería muy útil para todos los interesados si ocurriese una *expresión de la voluntad* de los ciudadanos de Puerto Rico mediante una votación popular sobre la cuestión . . . [del status]." (Énfasis nuestro.)

El propio demandado, quien fue miembro distinguido de la Comisión del Status, nombrado por el Gobernador de Puerto Rico, por certificación del Partido Estadista Republicano, en su Explicación Suplementaria al Informe, se expresó como sigue:

"[N]osotros nos comprometemos a trabajar de buena fe, para alcanzar lo que la Comisión recomienda como 'expresión de la voluntad' por los ciudadanos de Puerto Rico."

El resumen que a comienzos de esta opinión hicimos del desarrollo constitucional de Puerto Rico demuestra, creemos, que este país, a diferencia de las trece colonias norteamericanas y de casi todos los demás países de este hemisferio, no ha escogido el camino de la violencia para crearse su propio status político. Tanto bajo España en 1896–1897 como contemporáneamente con los Estados Unidos, Puerto Rico ha escogido el camino de la negociación pacífica. A ningún ob-

servador de este largo desarrollo constitucional se le escapa
que el plebiscito fue un paso importante del mismo y que
el nombramiento y trabajos de los grupos asesores es una
continuación de dicho desarrollo. La interpretación que hemos
hecho del Art. 45 de la Ley de Plebiscito es la que creemos
correcta y la que es fiel a los hechos. Resolver de otra manera
vulneraría gravemente la integridad del proceso democrático
en Puerto Rico.

Creemos apropiado terminar esta opinión con las palabras
de un distinguido estudioso del Tribunal Supremo de los
Estados Unidos: ([52]) No disfrutamos de un exceso de insti-
tuciones dedicadas a la búsqueda racional de la verdad. . . .
Los estudiosos y los jueces están entrenados para abrocharse
sus abrigos y resistir las ventiscas de la propaganda, no
importa de qué dirección éstas soplen. . . . Cuando un juez
al resolver un caso expone los problemas con los cuales luchó
su conciencia, . . . trata de hacer una decisión justa y fiel
a los hechos, y hace una razonada exposición de su fallo,
está dando un ejemplo en la solución racional de los conflictos
humanos.

En ese espíritu hemos escrito todo lo que antecede.

Por las razones antes expuestas creemos que procede el
*mandamus* solicitado.

### *Addendum*

Presenté al Tribunal la opinión que antecede en 15 de
diciembre de 1969. Ahora, en 28 y 29 de enero de 1970 los
Señores Jueces Negrón Fernández y Santana han presentado
sus respectivas opiniones. Por no desear utilizar más tiempo
y espacio sobre este asunto con el fin de que el caso salga lo
antes posible, me limitaré a discutir brevemente tres puntos.

En cuanto a ciertas dudas que levanta el compañero Juez

---

([52]) Freund, *The Supreme Court of the United States* (1961), págs.
189–190.

Señor Santana en su opinión creo que lo mejor es recordar el propio lenguaje escrito por él en el año 1964 cuando escribió la opinión de este Tribunal en el caso de *R.C.A.* v. *Gobierno de la Capital*, 91 D.P.R. 416 (1964). Allí, luego de hacer una exposición sobre los acontecimientos y los documentos que formaron la base constitucional del Estado Libre Asociado, se expresó a la pág. 428 como sigue:

"De esos hechos evidentes de que fueron protagonistas el pueblo de los Estados Unidos por su Congreso y exponente máximo y la comunidad puertorriqueña directamente por sus habitantes capacitados, *y a virtud de las expresiones claras y sencillas* de esos pueblos contenidas en los varios documentos que perpetuaron los acontecimientos políticos que tuvieron lugar, *en derecho es claro* que, contrario a los regímenes territoriales de la Ley Foraker y de la Carta Orgánica de 1917 de autoridad y poderes meramente delegados por el Congreso . . . los poderes públicos y gubernamentales del Estado Libre Asociado de Puerto Rico . . . emanan de sí mismo y de su propia autoridad. . . ." (Énfasis nuestro.)

En cuanto a la opinión del señor Juez Presidente, estimo que no es correcto afirmar que convenir con el demandante equivale a creer que el Partido Popular quedó autorizado por el pueblo para llevar a cabo los "ulteriores trámites" sobre esta materia con exclusión de los demás. Los grupos asesores, conocidos como los Comités *Ad Hoc*, solamente pueden hacer recomendaciones. No pueden llevar a cabo trámite alguno. Todo cambio en nuestras relaciones políticas con los Estados Unidos tendría que ser aprobado por el pueblo puertorriqueño en las urnas. Excepto si se violenta la democracia, el Presidente y el Gobernador, o cualesquiera otras personas o partidos, sólo pueden ejecutar sobre esta materia los trámites que el pueblo ordene mediante el voto.

Teme el señor Juez Presidente que si el Tribunal decide este caso estaría trasladando el debate político al foro judicial. Angustiosa consideración le he dado yo en mi mente y en mi conciencia a este punto desde que este caso quedó

sometido a nosotros. Aunque reconozco que el planteamiento es serio no lo comparto. Reconozco que es sumamente desagradable para nosotros los Jueces resolver casos en que el Gobernador o los partidos políticos son partes. Pero entiendo que nuestro deber no se reduce a resolver solamente los casos agradables. También hemos asumido el deber de resolver los casos desagradables.

Lo que tenemos ante nosotros es un caso judicial: se trata de la interpretación del Art. 45 de la Ley del Plebiscito. Como he señalado antes, interpretar las leyes y decidir los casos es la función por excelencia de los tribunales. Pero si hubiese elementos o circunstancias que validaran en parte la indeseabilidad de entrar en la consideración de las cuestiones que este litigio plantea aún así, debido a los valores democráticos que envuelve, creo que se justifica entrar en esas cuestiones y resolver como propongo. No creo que en aras de la mencionada indeseabilidad se debe frustrar el principio democrático de que la voluntad mayoritaria debe determinar las decisiones políticas. No creo que podemos darle la espalda al caso en nombre de nuestra tranquilidad. La tranquilidad es deseable pero no se puede comprar a cualquier precio. Entiendo que se frustra la voluntad mayoritaria expresada en el plebiscito resolviendo como la mayoría ha resuelto. En mi conciencia y a la luz de los valores democráticos envueltos y del servicio que creo debemos hacerle a nuestro país, creo que aun a costa de sufrir una penosa intranquilidad el Tribunal debió encararse con el problema.

—O—

Voto separado del Juez Asociado Señor Ramírez Bages

San Juan, Puerto Rico, a 2 de febrero de 1970

1.—Concurro con el compañero Juez Señor Rigau,

    (a) que ninguna de las defensas aducidas por el demandado pueden sostenerse.

(b) que procede interpretar el Art. 45 de la Ley de Plebiscito al efecto de que la intención legislativa es en el sentido de que los integrantes de los grupos asesores sean personas creyentes en el status del Estado Libre Asociado, es decir, personas con "un público y reconocido historial de defensa" de dicha fórmula como indica el compañero Juez Señor Blanco Lugo en su opinión, y que los deberá designar el Gobernador a propuesta del Partido Popular Democrático que fue el partido que representó la fórmula del Estado Libre Asociado que resultó triunfante en el plebiscito y,

(c) en que procede el *mandamus* solicitado.

2.—Concurro con el compañero Juez Señor Blanco Lugo en que

(a) la instrumentación del resultado del Plebiscito de 1967 sobre el status político de Puerto Rico requiere un desarrollo pleno y completo, y no fraccional y a tientas de la fórmula triunfante y,

(b) la propia Ley de Plebiscito proporciona las guías necesarias para delimitar los confines generales de la gestión para el crecimiento del Estado Libre Asociado de conformidad con los lineamientos contenidos en la Resolución Núm. 1 de 3 de diciembre de 1962 y la Resolución Conjunta Núm. 2 de 19 de marzo de 1959, y así seleccionar las medidas de desarrollo del Estado Libre Asociado para la consideración de los grupos asesores.

3.—Concluyo que también debe interpretarse el Art. 45 de la Ley de Plebiscito al efecto de que el Gobernador debe seleccionar las referidas medidas a propuesta del Partido Popular Democrático.

4.—A mi juicio la Ley de Plebiscito no adolece del vicio constitucional de negar la igual protección de las leyes.

—O—

Voto separado del Juez Asociado, Señor Torres Rigual, en el cual concurre el Juez Asociado, Señor Rigau.

San Juan, Puerto Rico, a 2 de febrero de 1970

Comparto plenamente la opinión emitida por el compañero Juez Rigau y, por eso, me uno a su voto para que se expida el auto. Estoy firmemente convencido de que la controversia fundamental de este recurso se reduce propiamente a la interpretación de un estatuto, asunto que tradicionalmente y por disposición constitucional es de la incumbencia exclusiva de la Rama Judicial. *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803).

Estimo que es significativo que aunque no prevalece nuestra posición al efecto de que el Gobernador viene obligado a designar los miembros de los grupos asesores a propuesta del Partido Popular Democrático, sin embargo, seis de los ocho jueces que intervienen en este caso son del criterio de que los miembros de dichos grupos asesores a ser designados por el Gobernador deben ser personas "de la más reconocida habilidad y el más alto prestigio" y con "un público y reconocido historial de defensa" del Estado Libre Asociado como solución definitiva del status político de Puerto Rico.

